MICHAEL JAY GREEN        4451
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347

GLENN H. UESUGI        4865
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347

Attorneys for Plaintiffs
ANDREW GRANT, SANDRA DENISE KELLY
and ROBIN REISINGER

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2016 AUG -2  AM II: 09

H. MIYATA

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| ANDREW GRANT; SANDRA DENISE KELLY; and ROBIN REISINGER, | ) ) ) | CIVIL NO. 16-1-0060-01 VLC [Non-Motor Vehicle Tort] |
| Plaintiff, | ) ) | SECOND AMENDED COMPLAINT; DEMAND FOR JURY TRIAL; |
| vs. | ) ) | SUMMONS |
| MARRIOTT OWNERSHIP RESORTS, INC.; and DOE DEFENDANTS 1-100, | ) ) ) | |
| Defendants. | ) ) | |

## SECOND AMENDED COMPLAINT

COME NOW, Plaintiffs ANDREW GRANT (hereinafter "Plaintiff GRANT"),

SANDRA DENISE KELLY (hereinafter "Plaintiff KELLY") and ROBIN REISINGER

(hereinafter "Plaintiff REISINGER"), by and through their attorneys, Michael Jay Green and

Glenn H. Uesugi, and for Second Amended Complaint against Defendants MARRIOTT

OWNERSHIP RESORTS, INC. (hereinafter "Defendant MARRIOTT") and DOE

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

**EXHIBIT** D

DEFENDANTS 1-100, allege and aver as follows:

1.      Defendant MARRIOTT is and was at all times relevant herein a foreign profit corporation doing business in the County of Honolulu, State of Hawaii.

2.      The employees, agents, associates, and/or representatives of Defendant MARRIOTT and others who held themselves out as being employees, agents, associates, and/or representatives of Defendant MARRIOTT were acting within the scope of such relationship. Defendant MARRIOTT is therefore liable for all of the acts and/or omissions of its employees, agents and/or putative employees under the doctrine of respondeat superior, or are otherwise vicariously liable for their acts and omissions under principal/agent or master/servant principles.

3.      The employees, agents, associates, and/or representatives of Defendant MARRIOTT were acting under the actual and/or apparent authority and/or agency of Defendant MARRIOTT. Therefore, Defendant MARRIOTT is liable for all acts and/or omissions of the employees, agents, associates, and/or representatives of Defendant MARRIOTT under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency.

4.      Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOE DEFENDANTS 1-100 and therefore sue said Defendants by such fictitious names. Plaintiffs will amend their Complaint to allege their true names and thereon allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages, as herein alleged, were proximately caused by their conduct. Plaintiffs have made good faith and diligent efforts to identify said Defendants,

including interviewing individuals with knowledge of the claims herein.  Plaintiffs are informed

and believe and therefore allege that at all times herein mentioned, Defendants, and each of them,

were the agents, servants and employees of each of the other Defendants herein, and were acting

with the permission and consent and within the course and scope of said agency and

employment.

### PLAINTIFF ANDREW GRANT

5.      Plaintiff GRANT is a resident of the County of Honolulu, State of

Hawaii.

6.      Plaintiff GRANT is a caucasian male who was born outside of the State of

Hawaii.

7.      In 2003, Plaintiff GRANT began working as a timeshare salesperson for

Defendant MARRIOTT at their Ko Olina Beach Club location.

8.      Plaintiff GRANT experienced great success as a sales executive for Defendant

MARRIOTT.

9.      In 2006, Plaintiff GRANT was promoted to team leader (closer) by Defendant

MARRIOTT.

10.      In 2007, Plaintiff GRANT wrote $9.7 million in sales volume, which made him

one of the top producing executives in the entire company that year (worldwide).

11.      Plaintiff GRANT was well qualified as a timeshare sales person for Defendant

MARRIOTT.

12.      Also in the year 2006, a new director of sales for Defendant MARRIOTT was

hired, an asian man named Peter Park.

- 3 -

13.     During a closed door meeting in 2006, Mr. Park told Plaintiff GRANT that his ultimate goal was to give Marriott's Ko Olina Beach Club more of a 'local flavor' by hiring less caucasian people.

14.     Plaintiff GRANT asked Mr. Park, "Isn't this discrimination?"

15.     Mr. Park chuckled and exclaimed, "It's about time white people are discriminated against after hundreds of years!!"

16.     In September 2007, Plaintiff GRANT accepted a job offer in California.  .

17.     In March 2009, Plaintiff GRANT was rehired as a timeshare salesperson at Defendant MARRIOTT'S Ko Olina Beach Club property.

18.     Upon his return, Plaintiff GRANT immediately noticed a different feel at Defendant MARRIOTT's Ko Olina Beach Club sales center.

19.     Within a few weeks Plaintiff GRANT came to the harsh realization that being a caucasian salesperson at Ko Olina Beach Club was now a disadvantage.

20.     In March 2009, Plaintiff GRANT felt a weird tension he never experienced before at Defendant MARRIOTT's Ko Olina Beach Club sales center.

21.     During his first week back, Plaintiff GRANT wrote over $140,000.00 in business.

22.     After having such a good week, Plaintiff GRANT immediately noticed the weird tension Plaintiff GRANT felt at the office increased significantly to the point where certain non-caucasian sales executives and managers would not even make eye contact or talk to Plaintiff GRANT.

23.     Plaintiff GRANT's performance had seemed to make these non-caucasian sales

executives and managers angry.

24.     Plaintiff GRANT also noticed that 50% of all the sales he was writing the first couple of months were cancelling their sales contracts for no apparent reason.

25.     As the weeks passed, Plaintiff GRANT noticed a distinct shift in the type of customers he was receiving.

26.     By the end of the year, Plaintiff GRANT was receiving an inordinate amount of international customers (European, middle-Eastern, Canadian, etc), which are known to have one of the lowest conversion/closing ratios in the timeshare business.

27.     It is a statistical impossibility for Plaintiff GRANT to receive so many low conversion customers.

28.     At the same time, Plaintiff GRANT noticed that another timeshare salesperson, Mr. Be Vuong (asian male) received many high conversion customers, much more than normal.

29.     Since Plaintiff GRANT'S return to the Ko Olina Beach Club in March 2009, Be Vuong has not had one bad month (defined as less than $100,000 in sales volume) in the past 6 years.

30.     This includes months that Mr. Be Vuong goes on vacation for 2 weeks, which is statistically impossible.

31.     Plaintiff GRANT, like many other caucasian sales executives at Ko Olina Beach Club, brought these concerns to the attention of management.

32.     These complaints were quickly dismissed and swept under the rug:

33.     Defendant MARRIOTT'S Guaranteed Fair Treatment program was contacted by an associate at the end of December 2013 and informed about the blatant manipulation of

accounts and assignment of tours to certain non-caucasian sales associates.

34.     Once again, nothing was done.

35.     Several top salespeople (Forest Morgan, Shawn Berkeley, Bob Davis and others) have resigned due to the blatant unfairness and racism that happens on a daily basis at Defendant MARRIOTT'S Ko Olina Beach Club.

36.     In February 2010, Hitomi Yanai (non-caucasian front desk associate) handed Plaintiff GRANT his customer tour sheet while Xee Her (non-caucasian sales manager) stood behind her.

37.     As Plaintiff GRANT took the tour sheet out of her hand, she and Xee snickered and would not look Plaintiff GRANT in the eye.

38.     Plaintiff GRANT noticed it was another European tour, which has a very low conversion rate.

39.     Plaintiff GRANT had been getting an inordinate amount of these types of sales leads.

40.     It was obvious they were laughing because they had given Plaintiff GRANT such a bad tour.

41.     On many occasions Xee Her came up to Plaintiff GRANT after his tour and mentioned their profile, which he for some reason knew.

42.     For example, Xee Her would say "How did you do with those East Indians from Canada earlier today?" with a smirk on his face.

43.     It was odd that Xee Her knew the profile of many of Plaintiff GRANT'S tours.

44.     It was apparent that he knew that the tour rotation was being manipulated to

feed Plaintiff GRANT an unusual amount of low conversion tours.

45.    Mr. Her took great delight in rubbing this in Plaintiff GRANT'S face.

46.    Non-Caucasian sales executives are not subjected to these cruel practices.

47.    On January 1, 2012, at the 11:00 tour wave, Plaintiff GRANT caught Patty Burchett (front desk, non-caucasian female) trying to misdirect the tour Plaintiff GRANT was supposed to get to a non-caucasian sales executive named Sonny Labasan.

48.    On January 2, 2012, Plaintiff GRANT brought this incident to management's attention (Melinda Chasteen) and she said she sent an email explaining Plaintiff GRANT'S concerns to Gregg Grigaitis (project director), Rayn Chamizo (Patty's supervisor), and Andrew Olmstead (project director of marketing).

49.    When Plaintiff GRANT asked Ms. Chasteen to cc him on the email, she said she deleted it.

50.    When Plaintiff GRANT asked Ms. Chasteen to retrieve it from her deleted file, she said she deleted that too.

51.    Plaintiff GRANT sent an email to Gregg Grigaitis again voicing his concerns about the blatant manipulation occurring at the front desk.

52.    Ms. Chasteen told Plaintiff GRANT that Ms. Burchett would be disciplined and alluded that she would be written up.

53.    Plaintiff GRANT believed this to be true.

54.    Immediately after this incident, Ms. Burchett, as well as the other front desk staff seemed very nervous and on-guard around Plaintiff GRANT.

55.    Following this disciplinary action of a front desk person, Plaintiff GRANT had

the best month in sales (over \$345,000 in volume) in over 4 years.

56.    On January 11, 2012, Rayn Chamizo reprimanded Makoto Walker (new front desk staff) because she was seen talking to Plaintiff GRANT.

57.    On January 19, 2012, Kianna Carson (non-caucasian guest relations associate, a member of what is commonly called 'Rayn's Team') walks by the front desk and sees Plaintiff GRANT talking to Makoto Walker and yells to her: "Don't talk to him!"

58.    Mr. Xee Her (sales manager at the time) reprimands Makoto Walker when she first reports to work at 9:00 am by saying: "I hear you have been talking to Andrew Grant, don't get in trouble."

59.    Three weeks prior to this incident, Ms. Burchett advised Ms. Walker to not talk to Plaintiff GRANT.

60.    On January 20, 2012, Plaintiff GRANT went to Defendant MARRIOTT'S Human Resources department and had a conversation with the Human Resources manager, Ms. Patricia Abad regarding the fact that Ms. Walker was being harrassed by non-caucasaian managers for talking to Plaintiff GRANT.

61.    On January 21, 2012, Plaintiff GRANT walked out of the elevator, first thing in the morning, and passed the reception desk.

62.    Plaintiff GRANT said "Good Morning" to Junko Williams and Kalei Topinio and they did not speak or make eye contact.

63.    Plaintiff GRANT stopped and said again "Good Morning" and they hesitantly said it back.

64.    This is not unusual treatment for caucasian timeshare salespeople at Defendant

MARRIOTT'S Ko Olina Beach Club.

65.     On January 25, 2012, Plaintiff GRANT had a follow-up meeting with Ms. Abad (non-caucasian HR mgr) and she said, according to her investigation of the Makoto Walker incident: "No misconduct had occurred."

66.     On February 10, 2012, Plaintiff GRANT called in sick at 7:01 am on voice-mail (Ivox), which is standard protocol.

67.     The rule is, an employee must call before 7:30 am.

68.     Later, Plaintiff GRANT recieved a voice-mail from the broker (Mary Shumack) stating that the manager in charge (Xee Her) did not receive the message and that Plaintiff GRANT was considered an no-call/no-show.

69.     Plaintiff GRANT'S cell-phone log clearly showed that Plaintiff GRANT called at 7:01 am and the call lasted 17 seconds.

70.     Plaintiff GRANT later called Mr. Her and asked who checked the voice-mail.

71.     Mr. Her said he did and that he called later and the message somehow appeared.

72.     Non-caucasian employees are not treated in this manner.

73.     On March 17, 2012, during the first tour wave at 8:45 am, Denise Fournier (non-caucasian sales executive) is first to go out and Plaintiff GRANT is second.

74.     There are no customers sitting in the waiting area.

75.     One couple walks in first, then another couple in matching polo shirts and Rolex watches (what appears to be an ideal customer).

76.     The ideal customer should have gone to Plaintiff GRANT, but was issued to Ms. Fournier instead.

77.     On April 12, 2012, Plaintiff GRANT was informed by Mr. Grigaitis that Plaintiff GRANT'S encore customer (someone who had previously purchased an Encore package), Mr. James Young, did not wish to deal with Plaintiff GRANT. Plaintiff GRANT got along well with Mr. Young and Plaintiff GRANT did not understand why the tour was being reassigned.

78.     When Mr. Young came in, he was assigned to Mr. Kaleo Wong (non-caucasian sales person).

79.     This lost sale cost Plaintiff GRANT a $4000 bonus.

80.     On April 29, 2012, during the 8:45 am tour wave, Plaintiff GRANT witnessed Be Vuong literally leaning over the front desk right in front of the other front desk staff members sifting through the tour sheets, cherry-picking his customers.

81.     On May 30, 2012, Mr. Ofer Ahuvia (caucasian sales executive) had a customer that he previously toured come back to purchase.

82.     According to the front desk, the customers didn't want to deal with him, so they conveniently assigned it to Kaleo Wong (non-caucasian sales executive).

83.     Mr. Ahuvia stated that he got along just fine with the customers.

84.     On November 8, 2012, Plaintiff GRANT was informed by Mr. Keith Taira in the all non-caucasian accounting department that he would receive his $200 spiff credited on Plaintiff GRANT"S Sun Trust Bank spiff card on Friday, November 9, 2012.

85.     The spiff was never credited to Plaintiff GRANT'S bank account.

86.     Plaintiff GRANT later asked a non-caucasian sales executive when he received his spiff, and he casually said on Friday, November 9, 2012.

87.     On December 17, 2012, during the 11:30 am tour wave, Plaintiff GRANT was on point to go our first, meaning that the next customer to check in would be Plaintiff GRANT'S customer.

88.     Plaintiff GRANT observed a couple check in, so he went into his office to prepare for the tour.

89.     After approximately four minutes, Plaintiff GRANT was paged for his tour.

90.     When Plaintiff GRANT picked up his tour sheet, he noticed that he was given a single male in his twenties (a low conversion tour).

91.     Mr. Hong Vuong (non-caucasian male) was given the couple that should have gone to Plaintiff GRANT.

92.     Mr. Hong Vuong made the sale of over $30,000 in volume, while Plaintiff GRANT's customer did not purchase.

93.     Plaintiff GRANT reported this violation of the sales rotation to Mr. Grigaitis, but never heard anything else about it.

94.     On January 3, 2013, Plaintiff GRANT was approached by Gregg Grigaitis, who asked Plaintiff GRANT if he wanted to participate in a new CMD line that Mr. Grigaitis was putting together.

95.     The CMD customers would be comprised of mostly first time buyers (non-owners) who are staying at the resort on a deeply discounted package.

96.     The package prices typically run from $399 to $699 on average for 6 days/5 nights, and for this discount they were required to attend a 90 minute sales presentation.

97.     Plaintiff GRANT agreed to agreed to participate on this line, but was under the

impression that it would be a fair rotation.

98.     Plaintiff GRANT noticed upon receiving his first tours on this program was that most of his clients were very unhappy with the type of room they received, and claimed that Defendant MARRIOTT made misrepresentations at the time of booking.

99.     It turned out that Rayn Chamizo was pre-qualifying the tours before the presentation and assigning them to whoever she wanted and was assigning Plaintiff GRANT the bottom of the barrel customers.

100.    On March 16, 2013, Plaintiff GRANT gave a sales presentation to Mark and Kathy Alexander at 2:45 pm.

101.    Mr. and Mrs. Alexander told Plaintiff GRANT that they had been in contact with Rayn Chamizo weeks prior to attending the presentation and that they told her that based on their bad experience, they were not interested in buying anything.

102.    On March 17, 2013, Plaintiff GRANT walked past the reception area on his way to his office.

103.    Rayn Chamizo was standing behind the front desk, smirked at Plaintiff GRANT and said "I see that you toured the Alexander's" and chuckled.

104.    Rayn Chamizo was clearly enjoying the fact that she had assigned these extremely unhappy customers who did not purchase to Plaintiff GRANT.

105.    That afternoon, Plaintiff GRANT was notified by Rayn's Team that he was already assigned another CMD package by Rayn Chamizo.

106.    Plaintiff GRANT went to Rayn Chamizo and asked why he was assigned this particular tour when he just had a CMD tour the day before.

107.    The CMD tours should be distributed in a fair rotation for there were approximately 10 salespeople on the CMD line and 10 CMD tours had not come through the door in the last 24 hours.

108.    Rayn Chamizo said "Oops, I made a mistake," and reassigned the tour to another caucasian salesperson.

109.    When the tour arrived, they were a couple in their late 70's or early 80's (low conversion tour) on a $399 package.

110.    The couple did not purchase.

111.    Rayn Chamizo assigned the best tours to the non-caucasian salespeople and the worst tours to caucasian sales executives.

112.    Plaintiff GRANT immediately went to Gregg Grigaitis and asked that he remove him from the CMD line because it was not being run fairly.

113.    Gregg Grigaitis agreed and the CMD program was dissolved shortly thereafter.

114.    On March 31, 2013, Plaintiff GRANT off from work and later in the day, Patty Burchett (front desk person, part of Rayn's Team) called and asked if Plaintiff GRANT was coming in the next day.

115.    When Plaintiff GRANT confirmed that he was coming to work the next day, Ms. Burchett said said "Okay, because you have an assigned Encore tour at 2:00."

116.    On April 1, 2013, Plaintiff GRANT came in and found out that the Encore tour had been rebooked for Plaintiff GRANT'S day off (Friday) and reassigned to Tony Quach (non-caucasian sales executive).

117.    Plaintiff GRANT learned that the tour was a tri-fecta (3 couples instead of one)

and supposedly they said they could not tour any other day.

118.   Plaintiff GRANT was not asked if he wanted to come in on his day off.

119.   Plaintiff GRANT told them he would come in on his day off and the tour was reassigned back to Plaintiff GRANT.

120.   Two of the three couples purchased (John & Nalia Dehart and Cameron & Lindsey Foster) on April 6, 2013.

121.   When Plaintiff GRANT asked them why they booked this day as opposed to another day, and they told Plaintiff GRANT: "We were told this was the only day we could do the tour."

122.   On April 14, 2013, Plaintiff GRANT called off from work.

123.   Plaintiff GRANT had another assigned Encore tour (Mr and Mrs Erickson) and again it was assigned to Tony Quach, which resulted in a sale.

124.   Tony Quach and Be Voung always seem to be next in line for the premium orphan Encore tours.

125.   Whenever the caucasian sales associates are assigned an orphan Encore tour by Rayn's Team they have already been pre-qualified (by Rayn's Team) days or weeks in advance and are usually not desirable tours.

126.   On July 10, 2013, Julie Rohrer from accounting notified Plaintiff GRANT that he was charged for 2 tours on the 11:00 tour wave on July 9, 2013.

127.   The extra tour Plaintiff GRANT was charged for was Mr. and Mrs. Goei, which was not Plaintiff GRANT'S tour.

128.   Kamaile Motas (Rayn's Team) was the receptionist that charged Plaintiff

GRANT for the tour.

129.    When a sales executive is charged for extra tours it has an adverse

affect on his VPG (volume per guest), causing it to drop.

130.    If a sales executive's VPG gets too low, the sales executive will be written up.

131.    Plaintiff GRANT and other sales executives have witnessed Kamaile Motas

letting Tony Quach and Be Vuong go behind the front desk and sort through customer profile

sheets and literally pick out what tour they want.

132.    From November 28, 2013 through January 1, 2014 is called period 13, which is

the last period of the year.

133.    Plaintiff GRANT only needed just one small sale of $13,753 to hit his yearly

target of $1,800,000.

134.    This means a big bonus check and achieving the next level career advancement

called "Super Sapphire."

135.    This is also the only period of the entire year that is 5 weeks long instead of 4,

so Plaintiff GRANT had an extra week to hit his target.

136.    During period 13, most of the tours Plaintiff GRANT seemed to be getting were

existing owners who have toured 4-7 times since Defendant MARRIOTT rolled out the new

point system (June 20, 2010) and have not purchased, or owners who have just toured and

purchased within the past 1-12 months, giving them enough points to bump up their portfolio to

Premier Status (6500 points) or Premier Plus Status (13000 points).

137.    These are statistically the worst possible owner tours to convert into a sale.

138.    Out of the few decent tours Plaintiff GRANT did get he managed to make 3

- 15 -

sales, which all mysteriously canceled.

139.   Many of the caucasian sales executives at Ko Olina Beach Club have higher cancellation rates than non-caucasian sales executives.

140.   In contrast, Be Vuong and Tony Quach received a lot of coveted "Rental Rebate" tours, which statistically have a high conversion rate.

141.   By the end of the 5 week period, Plaintiff GRANT had net zero volume (which has NEVER happened to Plaintiff GRANT in 22 years) and Plaintiff GRANT missed hitting his target, costing him approximately $15,000.

142.   Plaintiff GRANT passed Rayn Chamizo in the hallway a few days later.

143.   Rayn Chamizo looked at Plaintiff GRANT with a smirk on her face and said "Too bad you missed hitting Super Sapphire."

144.   On December 28, 2013, Plaintiff GRANT was paged for a general information tour at approximately 1:45 pm.

145.   Plaintiff GRANT greeted Mr. and Mrs. Kimura and Yin Ting and asked how he can help them.

146.   After a brief discovery Plaintiff GRANT learned that they had just toured with Hilton Grand Vacations the day before and did not purchase.

147.   They said they were not interested in timeshare and that a Marriott marketing representative had sent them here to pick up their free resort passes.

148.   Plaintiff GRANT then went to reception and asked Chie Sabia (Rayn's Team) and asked for day passes for his customers.

149.   Ms. Sabia was talking to her best friend Kayo (non-caucasian sales associate),

who was leaned over the front desk with her cell phone.

150.    When Plaintiff GRANT politely asked for the day passes, Ms. Sabia said "I'm busy right now, YOU take care of your guests!"

151.    This was not protocol, as sales executives are not allowed behind the front desk for any reason.

152.    After this shocking and inappropriate response, Plaintiff GRANT said to Ms. Sabia: "You may do what you want, I am going to my office."

153.    Once the guests received their day passes and left, Plaintiff GRANT immediately went to Ms. Sabia (who was still talking to her friend Kayo) and asked her not to ever speak to him with that tone in front of customers.

154.    Plaintiff GRANT spoke firmly and absolutely did not raise his voice.

155.    Ms. Sabia defended her actions and said that Plaintiff GRANT should have gotten the day passes himself (again sales executives are not allowed behind the front desk).

156.    After going back and forth with Chie, with no resolution, Plaintiff GRANT escalated the situation to the only manager on duty, Mr. Xee Her (non-caucasian).

157.    Mr. Her came to Plaintiff GRANT'S office approximately 15 minutes later and said that he spoke to Ms. Sabia and Kayo.

158.    Mr. Her said that he recommended to Ms. Sabia that she apologize for the miscommunication and that Plaintiff GRANT in turn apologize.

159.    Plaintiff GRANT told Mr. Her that he would be happy to accommodate this request.

160.    On January 1, 2014, Plaintiff GRANT was written up for the front desk incident

with Ms. Sabia that occurred on December 28, 2013 for yelling at the front desk in front of the customers.

161.    Plaintiff GRANT did not yell at the front desk in front of customers on December 28, 2013.

162.    Plaintiff GRANT learned later that a new policy was implemented in 2014 that states: When an associate is issued 3 written warnings within a year, they will be terminated.

163.    On January 4, 2014, Plaintiff GRANT had a scheduled referral tour (Tom and Dawn Price) at 11:00 am.

164.    At 11:10 am, Plaintiff GRANT was paged by the front desk and assumed it was his customers.

165.    When Plaintiff GRANT got to reception, Michiko Abuel handed Plaintiff GRANT a tour sheet and said that he had a GI (general information tour).

166.    It was an international couple (very low-conversion tour) named Dhaval and Varsha Parikh.

167.    Plaintiff GRANT had a had a scheduled referral tour and his name was pulled out of rotation.

168.    To the best of Plaintiff GRANT'S knowledge, his scheduled customer was coming to purchase.

169.    If Plaintiff GRANT took the GI tour Ms. Abuel was trying to give him, he would be passed over when his customers came in and Plaintiff GRANT would lose the sale.

170.    When Plaintiff GRANT checked the line rotation, he was nowhere near the GI position even if his name had not been pulled out.

171.    Ms. Abuel had been working at the front desk for quite some time and knew Plaintiff GRANT was not supposed to get this tour.

172.    However, Ms. Abuel would not listen to Plaintiff GRANT and continued to insist that Plaintiff GRANT take this tour, almost as if she had been instructed to do so by management.

173.    The only manager on duty was Mr. Xee Her.

174.    Shawn Berkeley (caucasian sales associate) witnessed this and went to Mr. Her to correct the problem.

175.    Mr. Her came down from his office and told Ms. Abuel to give the tour to Mr. Berkeley.

176.    At approximately 4:00 pm, Mr. Her came to Plaintiff GRANT'S office and told him that he needed to give Plaintiff GRANT a verbal warning for his prior period's performance.

177.    Approximately 30 minutes later, Plaintiff GRANT went to Mr. Her's office.

178.    Mr. Her presented Plaintiff GRANT with a write-up and asked Plaintiff GRANT to sign it.

179.    Upon inspection, Plaintiff GRANT noticed the verbiage on the write-up stated 'Written' not 'Verbal.'

180.    Plaintiff GRANT brought this to Mr. Her's attention and he looked at it and said "Oops, I made a mistake."

181.    Mr. Her changed it to a verbal and Plaintiff GRANT asked him for a copy of the written Mr. Her tried to give him as well as the verbal.

182.    On January 7, 2014, Mr. Her made the comment "You can't teach an old dog

new tricks," referring to an older associate.

183.    On January 8, 2014, Mr. Brad DeLoach (caucasian sales executive) and Plaintiff GRANT overhear Mr. Her (non-caucasian senior sales manager) say "The reason Paul Callaham makes sales is that he 'dumbs' the customer into the deal," inferring that Paul is dumb.

184.    On January 8, 2014, Patrick Axtell (caucasian sales executive) says to Plaintiff GRANT: "Andrew, there is a target on your back because they know you know that they do crooked shit. There's a target on my back too, but not as big."

185.    On January 11, 2014, Mr. Her confessed to Plaintiff GRANT that when he worked as a contract supervisor at Newport Coast Marriott, he was reprimanded for making an demeaning remark to an overweight contract processor that said she needed to eat. He said "Yeah, you gotta eat!"

186.    On January 11, 2014, Plaintiff GRANT did a telephone transaction.

187.    With this type of transaction, the preliminary paperwork is done by fax, and then the additional documents are mailed to the customer to review, sign, and return.

188.    Shantel Matutino (non-caucasian contracts processor, good friends with Rayn Chamizo) was involved in this transaction.

189.    Plaintiff GRANT has done many of these types of transactions and it is routine that the documents and owner's kit get sent to the customer the next business day by Fed Express.

190.    Plaintiff GRANT confirmed with Ms. Matutino that it would be sent out the next business day, which was Monday Jan 13, 2014.

191.    On January 17, 2014, the customer called Plaintiff GRANT to complain that he had not received his paperwork or owner's kit yet.

192.    Plaintiff GRANT immediately called contracts and Ms. Matutino answered.

193.    Ms. Matutino informed Plaintiff GRANT that the documents had not been sent out yet because she was busy.

194.    The documents were eventually mailed to the customer.

195.    Other faxed deals that have occurred since Plaintiff GRANT'S that were procured by non-caucasian sales associates were processed and mailed to those customers promptly.

196.    This sale was particularly important to Plaintiff GRANT for two reasons.

197.    First, it was a large sale of $66,170 in volume which boosts Plaintiff GRANT'S VPG (volume per guest) and helps Plaintiff GRANT avoid a performance based write-up.

198.    Second, it was a self-generated sale.

199.    According to the Marriott standard operating procedures, any self generated sale of over $30,000 in volume would remove one previous performance based write-up.

200.    Based on the 3 strikes policy and the fact that Plaintiff GRANT recently received a write-up, this was critical.

201.    This example is one of many attempts of the contracts department trying to sabotage Plaintiff GRANT'S sales.

202.    In Jnaury 2014, Mr. Her told Plaintiff GRANT: "Andrew, I think you should really go to Arizona. The people there are educated, good-looking, and it'll have a 'different feeling.'"

203.    The message Mr. Her was trying to deliver is that there is no racial tension/discrimination in Arizona.

204. On April 1, 2014, at approximately 4:15 pm, Plaintiff GRANT asked Mary Shumack (broker in charge, keeps track of attendance) to verify that Plaintiff GRANT could call off on April 8, 2014.

205. Plaintiff GRANT believed that he had one more call off and he wanted to verify it so there was no misunderstanding.

206. As Ms. Shumack pulled up the information on the computer screen, she said "March 21 has dropped off."

207. Plaintiff GRANT asked "So it's okay if I call off?", to which Ms. Shumack responded: "Yeah."

208. On April 14, 2014, Mr. Her calls Plaintiff GRANT into his office and gives Plaintiff GRANT a written warning for calling off on April 8, 2014. I

209. Plaintiff GRANT explained that he verified it with Mary Shumack, the broker in charge, and she had said it was okay for him to call off on April 8, 2014.

210. Mr. Her said that Ms. Shumack would be disciplined for her action as well.

211. Plaintiff GRANT asked Mr. Her "Does this mean that Mary will be written up?" to which Mr. Her responded "It is my job to handle it," implying that she would be written up as well.

212. This would be Plaintiff GRANT'S second written warning.

213. On April 7, 2014, at approximately 10:35 am, Plaintiff GRANT had a heated word exchange with Phil Kozma (quality assurance representative), Plaintiff GRANT'S friend of over 10 years.

214. Plaintiff GRANT and Mr. Kozma have had many similar interactions over the

past decade and they always apologize to each other later, remain friends, and move on.

215.   Later that day, at approximately 4:10 pm, Plaintiff GRANT went to Mr. Kozma's office, poked my head in, smiled, and said "I'll say I'm sorry if you say you're sorry."

216.   Mr. Kozma smiled and said "I have already forgotten about it. I've learned a long time ago not to hold a grudge."

217.   Mr. Kozma then stated: "It's all Gregg Grigaitis's fault. Do you want to go to HR and get rid of him?"

218.   Plaintiff GRANT said "NO" and they chatted a bit more and before Plaintiff GRANT left Mr. Kozma's office.

219.   Plaintiff GRANT was a bit taken aback that Mr. Kozma suggested making a false statement about Mr. Grigaitis to get him in fired.

220.   On April 17, 2014, Plaintiff GRANT went into the office on his day off to pick up his paycheck.

221.   When Plaintiff GRANT was there he was informed by Xee Her that contracts was planning to default one of Plaintiff GRANT'S customer's contracts for not paying the remaining balance.

222.   This means that the sales volume would be reversed out of Plaintiff GRANT'S current numbers, adversely affecting his VPG.

223.   The customer's name was Robert Villwock.

224.   He purchased on January 7, 2014 and he gave Defendant MARRIOTT a 10% deposit and agreed to put the balance on his credit card over a 3 month period.

225.   After Defendant MARRIOTT charged the initial 10% deposit, Mr. Villwock

filled out and signed 3 separate credit card authorization forms, authorizing Defendant MARRIOTT to charge 1/3 of the balance due each month for three months until the balance was paid in full.

226.   Plaintiff GRANT immediately went to Xee Her's office and explained this to him.

227.   Mr. Her told Plaintiff GRANT that the Contracts Department said they had lost all three of the signed credit card authorizations and there was nothing anyone could do.

228.   Plaintiff GRANT later learned that Mr. Villwock sent a letter to Marriott Vacation Club's corporate office in Lakeland Florida on April 7, 2014.

229.   In this letter Mr. Villwock stated: "I am writing this letter to let you know that I am canceling my order to purchase. Too many disturbing incidents occurred along the way and I have lost confidence in Marriott's ability to deliver on promises and provide customer service. When I made my purchase, I chose to have the payment made in three installments through my credit card. I signed three separate release forms with both my credit card number and my signature. None of these were used and I don't know if they are lost somewhere in Marriott with my credit card number and signature on them or if they were ignored. After about two months had passed I received a letter telling me the entire balance was due. I called the phone contact on the letter and asked what had become of my three credit card releases for the total charges and the agent could not tell me. About two days later I received another letter with three forms in it to authorize more credit card payments. This is when I decided that Marriott's ability to deliver on promises might be seriously compromised."

230.   In the 22 plus years he has been in the timeshare business, Plaintiff GRANT

has never heard of a contracts department mysteriously losing not one, not two, but three credit card authorization forms.

231.    This one lost transaction cost Plaintiff GRANT approx $1000 dollars and negatively impacted his VPG.

232.    On April 9, 2014, after the first tour wave, Plaintiff GRANT was walking down the hall with Plaintiff Robin Reisinger (caucasian sales associate) on the 14th floor.

233.    Plaintiffs GRANT and REISINGER both overhear Xee Her in his office say "It's a matter of time before we get rid of all the caucasian people," and laugh.

234.    Soon after this comment was made by Mr. Xee Her, all three Plaintiffs were terminated by Defendant MARRIOTT.

235.    At 3:35 pm, Plaintiff GRANT got a page from the front desk to go see Mr. Xee Her.

236.    Plaintiff GRANT walked into Mr. Her's office and he is sitting with Don Ardissone (assistant sales manager).

237.    Mr. Her puts a write up in front of Plaintiff GRANT and said "Sign this written warning, this is for an incident with Phil Kozma on April 7. You threatened him."

238.    Plaintiff GRANT immediately responded, saying "I didn't threaten Phil."

239.    Mr. Her said "But we have witnesses."

240.    Plaintiff GRANT then said "I have the entire conversation with Phil recorded and I didn't threaten him. Whoever the witness is, is lying."

241.    Plaintiff GRANT then refused to sign the write-up.

242.    Protocol in a situation like this is for HR to do a thorough investigation asking

both parties their side of the story, and to ask if they have any witnesses.

243.    Plaintiff GRANT was never contacted by HR and asked for his side of the story.

244.    Mr. Her did not ask Plaintiff GRANT to write a statement until after the written warning was presented to Plaintiff GRANT.

245.    Plaintiff GRANT called Defendant MARRIOTT'S Guaranteed Fair Treatment and they did absolutely nothing to help Plaintiff GRANT.

246.    On April 21, 2014, Plaintiff GRANT was again notified by contracts that they were going to default and cancel another one of Plaintiff GRANT'S contracts.

247.    This customer was a single woman named Florence Randolph.

248.    On the day she purchased, September 29, 2013, she did not qualify to put down the minimum deposit of 15%, so Defendant MARRIOTT required a 35% deposit.

249.    Plaintiff GRANT got approval from Gregg Grigaitis (project director) to stretch the deposit out over a 6 month period by making a monthly payment of $742.50 from October 2013 to March 2014.

250.    Ms. Randolph did not make any payments until the sixth month when she sent in a check for the full amount owed.

251.    Contracts told Plaintiff GRANT that even though Ms. Randolph paid the full 35% deposit, she still owed approx $1000 in Encore funds.

252.    Plaintiff GRANT told Germinia (contracts dept, non-caucasian) that this was not part of the agreement and was not stated in the contract.

253.    Germinia said that it did not matter and a default was eminent.

254.    Plaintniff GRANT asked Germinia what manager signed off on the contract and

Germinia said "Gregg Grigaitis."

255.   Plaintiff GRANT then went to Mr. Grigaitis' office, and explained what the contracts department said to him.

256.   Plaintiff GRANT also reminded Mr. Grigaitis that he is the manager that signed off on the contracts and that nowhere did it state any Encore funds were due.

257.   Mr. Grigaitis then called the contracts department and advised them to close the file as is.

258.   On April 22, 2014, at approximately 8:10 pm, Plaintiff GRANT'S minor daughter had a seizure and was rushed to Kapiolani Medical Center in an ambulance.

259.   On April 23, 2014, Plaintiff GRANT reported to work at his regularly scheduled time.

260.   Plaintiff GRANT was afraid to call in sick for fear that Mr. Her would write him up again.

261.   At 9:05 am, Plaintiff GRANT approached Don Ardissone (assistant sales manager) and explained to him what happened to his daughter the night before.

262.   Plaintiff GRANT broke down in tears as he showed Mr. Ardissone a picture of his daughter in the hospital bed.

263.   Plaintiff GRANT told Mr. Ardissone that there was no way he could see any customers today.

264.   Mr. Ardisoone responded by telling Plaintiff GRANT that he could take the rest of the day off.

265.   At approximately 10:20 am Plaintiff GRANT went to Gregg Grigaitis's office.

266.    Plaintiff GRANT explained to Mr. Grigaitis a few days earlier about the incident with Phil Kozma, how there was no investigation and how Plaintiff GRANT had the whole thing recorded.

267.    Plaintiff GRANT emphatically told Mr. Grigaitis that he did not threaten Mr. Kozma.

268.    Mr. Grigaitis told Plaintiff GRANT that the write-up regarding Mr. Kozma would not be removed and that Plaintiff GRANT was welcome to call Fair Treatment and dispute it.

269.    Plaintiff GRANT then told Mr. Grigaitis that his minor daughter had a seizure the night before and that he did not know what was wrong with her.

270.    Plaintiff GRANT explained that many tests needed to be done on her and that he needed to go on a leave for a week or two to take care of his daughter.

271.    The Family and Medical Leave Act of 1993 (FMLA) requires that Defendant MARRIOTT provide up to 12 weeks of unpaid job protected leave.

272.    Despite this, Mr. Grigaitis told Plaintiff GRANT to call him tomorrow and he would let Plaintiff GRANT know regarding the FMLA leave.

273.    Plaintiff GRANT asked if Mr. Grigaitis could let him know sooner and Mr. Grigaitis stated to call him in an hour.

274.    Plaintiff GRANT called Mr. Grigaitis approximately 2 hours later (from the doctor's office).

275.    Mr. Grigaitis refused to give Plaintiff GRANT FMLA leave and stated that Plaintiff GRANT had two vacation days accrued and that is all that he would be allowed to take

276.    Plaintiff GRANT took his regularly scheduled days off (Thursday and Friday) plus Saturday and Sunday.

277.    On April 27, 2014 at 10:10 pm Plaintiff GRANT sent an email to HR manager Lesley Matsuwaki and cc'ed Gregg Grigaitis and Xee Her.

278.    The email explained that on April 22, 2014, Plaintiff GRANT'S seven year old daughter experienced seizure-like activity and was rushed to Kapiolani Medical Center in an ambulance.

279.    Due to the serious nature of his daughter's illness, Plaintiff GRANT requested, effectively immediately, his right to a family medical leave.

280.    Plaintiff GRANT also informed Ms. Matsuwaki that he would meet with her on April 28, 2014 to discuss the length of the leave, provide documentation, and fill out any necessary paperwork.

281.    On April 28, 2014, Plaintiff GRANT at 8:00 am reported to work.

282.    Plaintiff GRANT met Mr. Grigaitis as he was arriving to his office that morning.

283.    Plaintiff GRANT informed Mr. Grigaitis that "Effectively immediately, I am taking an FMLA to take care of my daughter."

284.    Mr. Grigaitis looked at Plaintiff GRANT and said "OK."

285.    Plaintiff GRANT left his office and as he walked down the hall to go to the elevator he passed Don Ardissone and told him the same thing.

286.    Mr. Ardissone said "OK" as well.

287.    Plaintiff GRANT then went down to HR and Ms. Matsuwaki was in her office

with the door closed and was on the phone.

288.    After a minute or two, she opened the door and Plaintiff GRANT asked her if she had received his email.

289.    Ms. Matsuwaki said "Yes, come in and have a seat. Gregg is on his way and has one more thing he has to do."

290.    Plaintiff GRANT asked: "What does Gregg have to do with this?"

291.    Ms. Matsuwaki then stated "He is going to write you up for performance."

292.    Plaintiff GRANT told Ms. Matsuwaki that he would complete the FMLA online and proceeded to leave her office.

293.    As Plaintiff GRANT was walking out the door, Mr. Grigaitis appeared with a piece of paper in his hand.

294.    Mr. Grigaitis blocked the door, violently grabbed Plaintiff GRANT'S arms and said "I have one more thing I have to do."

295.    Mr. Grigaits assaulted Plaintiff GRANT.

296.    Plaintiff GRANT asked Mr. Grigaitis: "What are you trying to do, tackle me?"

297.    Plaintiff GRANT then looked at Ms. Matsuwaki and asked her "Did you see that?"

298.    Ms. Matsuwaki smiled and gave no response.

299.    Plaintiff GRANT exited the office as quickly as possible and went home.

300.    Plaintiff GRANT then went on the Marriott website and initiated the FMLA.

301.    On May 2, 2014, even though there was no formal presentation of the write-up per standard protocol, Plaintiff GRANT was terminated from Marriott's  Ko Olina Beach Club

pursuant to the third written warning within a one year period.

302.   Prior to December 28, 2013, Plaintiff GRANT had only received three verbal warnings in more than 10 years.

303.   Suddenly, as soon as Defendant MARRIOTT implemented a 3 strikes rule (3 written warnings within a year constitutes termination), Plaintiff GRANT received 6 write-ups within 4 months (verbal, written, verbal, written, verbal, written) and was terminated.

304.   Plaintiff GRANT'S termination was for discriminatory reasons.

305.   The write ups that Plaintiff GRANT received was a pretext for discrimination.

306.   Defendant MARRIOTT did not have a legitimate valid basis for terminating Plaintiff GRANT'S employment.

## PLAINTIFF DENISE KELLY

307.   Plaintiff KELLY is a resident of the County of Honolulu, State of Hawaii.

308.   Plaintiff KELLY is a caucasian female who was born outside of the State of Hawaii.

309.   In June 2010, Plaintiff KELLY started working at Defendant MARRIOTT'S Vacation Club Ko'Olina as a timeshare salesperson.

310.   In September 2010, Plaintiff KELLY resigned her position with Defendant MARRIOTT due to having months without any sales and observing how the tours were assigned.

311.   Plaintiff KELLY observed that customers were not assigned to Sales Executives according to the policy.

312.   Rather, Plaintiff KELLY observed the front desk personnel including Patty

Burchette, Marchen (unknown last name), Kamaile Motas, and Bernie Camarillo along with their

Manager, Rayn Chamizo, manipulating who was assigned to each customer.

313.    These front desk personnel were giving the best tours to specific Sales

Executives.

314.    Plaintiff KELLY actually sat in the reception area a number of times and

watched who came in, the order they came in, where they sat and which Sales Executive they

were assigned to.

315.    Plaintiff KELLY saw that the first person checking in did NOT always go to the

first Sales Executive on the line rotation per policy and that each tour could be manipulated to go

to whomever the front desk personnel chose.

316.    Plaintiff KELLY brought this to the attention of the managers at the time, Xee

Her and Melinda Chasteen.

317.    Nothing was done.

318.    Plaintiff KELLY eventually resigned because it was very clear that the

management and staff ran the department committing fraudulent and discriminatory activities

every day.

319.    In addition to the fraud, there was a blatant amount of racism within the

department as well.

320.    Plaintiff KELLY has lived in many cities, but have never experienced such

racist behavior in a corporate environment of this size.

321.    Ms. Chamizo made it very clear that she did not like Plaintiff KELLY at all.

322.    Ms. Chamizo would ignore direct questions, would not look at Plaintiff

KELLY, always had an angry look on her face if she did have to answer Plaintiff KELLY and consistently created a very hostile and deeply uncomfortable environment.

323.    When Plaintiff KELLY was in the lunchroom at the same time with Ms. Chamizo and the other front desk staff, they would regularly make comments about "haoles" and would purposefully ignore and isolate Plaintiff from any conversation by speaking in a heavy pidgin accent.

324.    Plaintiff KELLY would always sit at the other end of the table and they would not even acknowledge Plaintiff KELLY's presence in the same room.

325.    This was much more pronounced when Ms. Chamizo was present because at times, when she was not in the lunchroom, a couple of the other staff would engage Plaintiff KELLY in conversation.

326.    Realizing that because Plaintiff KELLY was caucasian and not part of their non-caucasian clique, Plaintiff KELLY would not be getting fair treatment in how the tours were assigned or even enough good tours to make a decent living.

327.    When Plaintiff KELLY came to this realization, Plaintiff KELLY decided to resign.

328.    In March 2012, Plaintiff KELLY returned to her employment with Defendant MARRIOTT as a timeshare sales person at Ko Olina with the hopes that things had improved.

329.    Plaintiff KELLY felt that since Defendant MARRIOTT decided to rehire her, there had been some changes in the management and the managers knew of her concerns from before.

330.    The overall environment was not just unfriendly, but hostile.

331.   Almost daily, Defendant KELLY would hear racist and sexist jokes from everyone - other Sales Executives as well as Management.

332.   Within Plaintiff KELLY's own team, being a caucasian person, a haole, was clearly the worst disadvantage even though they made it look like a joke.

333.   It is well known that certain people are favored over others.

334.   The favored salespeople were part of what I called "the boys club" because it was non-caucasian men who were consistently in the top 1 and 2 positions with a few others, usually also non-caucasian, in the top 5.

335.   Everyone knows they get special treatment, fixed tours, and better concessions and discounts for their tours approved by the Project Director.

336.   The front desk would profile people checking in based on their race, jewelry, notes provided by Marketing, and notes in the computer on their past purchase history, etc.

337.   Plaintiff KELLY heard the front desk and managers as well as the favored salespersons who were non-caucasian speaking of guests and what they are wearing, comments about their jewelry, making statements about them being a good tour, or, the opposite when it was someone they profiled as a bad tour.

338.   This would include African Americans and Indians almost always and they made no effort to be secretive about their comments.

339.   The racist comments about these particular people would go so far as to make it from the front desk downstairs into the offices and manager's offices/TO office where everyone would joke and comment on so-and-so's tour... whoever the "unlucky" Sales Executive was who was assigned that tour.

340.    Ironically, Plaintiff KELLY never saw certain non-caucasian salespeople with those particular types of customers or prospects.

341.    There was an unprecedented level of conflict of interest unlike anything Plaintiff KELLY has ever witnessed in a professional environment.

342.    Be Vuong had been under multiple investigations over the years for buying gifts, lunch and dinner for management and front desk staff on a regular basis.

343.    Each time, Be Vuong would receive a warning and a directive to stop doing this because it was a conflict of interest.

344.    Be Vuong would stop for a while, but then totally disregarded the impropriety of his actions and eventually continued again.

345.    Be Vuong would make jokes about it in the lunchroom in front of everybody about how he had gotten warned and couldn't buy lunch anymore.

346.    Be Vuong would always make such comments in "mixed company" to try and gauge who might have filed the complaint against him by their reaction.

347.    Be Vuong would host dinner parties and invite Managers to his home that included thousands of dollars worth of aged steaks, lobster, and a feast of seafood.

348.    Be Vuong would then bring photos to work in to show off his "spread" and brag about how much the steaks cost.

349.    Other Sales Executives knew what was going on but the choice was to just try to stay on his good side or fear for your job if you started trouble.

350.    Everyone else is expendable.

351.    Anyone who raises questions or tries to elevate the issue, will eventually have to

leave or get terminated for not making their sales goals (performance out) which was easy for the management to make happen since they controlled the tours.

352.    One of the other things that was just blatant favoritism/advantage is that only certain people had access to computer programs that allowed the salesperson to see an owners purchase/tour history.

353.    Eventually, through multiple policy changes which could be manipulated through a host of sales criteria, only the top few Sales Executives had that advantage as well.

354.    Literally, policy was changed by the Project Director, Gregg Grigaitis, to give the advantage to Be Vuong, Tony Quach, Kaleo Wong (all non-caucasian males).

355.    It caused a great deal of problems for people who had access then were denied access.

356.    Plaintiff KELLY was one of those people.

357.    Mr. Grigaitis would literally change policy to suit the purpose of excluding everyone else from access based on these different criteria.

358.    So, if someone was not a "top" salesperson with specific sales criteria such as a high VPG (Volume Per Guest), specific cancellation percentage, a certain amount of time with the company, a certain level Sales Executive, and a myriad of other variables which were manipulated at will to exclude everyone, you didn't have access to this program that could HELP salespersons with their sales.

359.    It was grossly obvious and it was insulting that they continued to think that either the other causasian salespersons did not  know what was going on or that what we thought clearly didn't matter.

360.    Plaintiff KELLY managed to managed to make sales, but then experienced her second Summer (high season) in 2012 with no sales for over 2 months straight.

361.    It was clear that Ms. Chamizo and the front desk staff were feeding the best tours to the top few - Be Vuong, Tony Quach, Kaleo Wong.

362.    The summer was the time to really sell as much as possible to get as close as possible to true-up for end of year bonuses.

363.    Once September came, tours decrease, sales go down and only pick up slightly one more time around the holidays before the end of the year.

364.    Timeshare salespeople have to sell as much as possible during the summer months to ensure their year-end numbers and big bonuses.

365.    In October 2012, Plaintiff KELLY began to experience pain in her left lower back and swelling in her left knee.

366.    Plaintiff KELLY went to two orthopedic surgeons - one for the back, and one for the knee.

367.    The lower back was diagnosed as sciatica and the physician recommended Plaintiff KELLY report it to HR for a chair evaluation.

368.    Plaintiff KELLY did as her doctor advised in October 2012.

369.    The chair evaluation occurred in February 2013 by Defendant MARRIOTT.

370.    The knee injury was a torn meniscus with the possibility of impending surgery.

371.    On November 30, 2012, Plaintiff KELLY'S brother suffered a massive heart attack back on the East coast.

372.    Plaintiff KELLY flew to Philadelphia where her brother was the next day.

373.     Plaintiff KELLY'S brother was in the hospital for nearly 2 weeks before passing away.

374.     Plaintiff KELLY returned to work sometime around the 29th or 30th of December.

375.     In January, February and March of 2013, Plaintiff KELLY was in the top 5 and 10 which put her into additional bonus pools.

376.     There were 2 bonus pools - top 5 and top 10 with different bonuses depending on actual sales.

377.     Plaintiff KELLY was clearly able to sell timeshare units.

378.     Plaintiff KELLY was well qualified as a timeshare salesperson for Defendant MARRIOTT.

379.     Plaintiff KELLY had her first knee surgery on March 28, 2013 in Honolulu.

380.     Even though Plaintiff KELLY was supposed to be on crutches only a few days and back to work quickly.

381.     Plaintiff KELLY ended up on crutches for nearly 6 weeks but did return to work after only a few days.

382.     Being on crutches for 6 weeks was difficult to say the least, but Defendant MARRIOTT made it nearly impossible.

383.     During this time, Plaintiff KELLY moved offices about 5 or 6 times before she finally broke down in tears and said "What is wrong with these people?  Has management (which meant Xee Her) ever heard of reasonable accommodation?  Do they not understand they are required by law to assist me?"

384.   Don Ardissone, a T.O., told Xee Her what Plaintiff KELLY said.

385.   Xee Her from that point on, would not speak to Plaintiff KELLY and instead gave Plaintiff KELLY a hard time over everything.

386.   Mr. Her ended up putting Plaintiff KELLY in an office on the 14th floor, in a corner away from everyone else and which completely isolated Plaintiff KELLY.

387.   With everything that was going on, it was just another thing to deal with every day and it was overwhelming.

388.   The knee surgery was unsuccessful leaving Plaintiff KELLY with a swollen leg, a very bad limp, the inability to completely straighten or bend the knee.

389.   Plaintiff KELLY was on Ibuprofin daily to help with swelling and pain.

390.   Plaintiff KELLY also had to ice her knee throughout the day to keep the swelling at a reasonable level to walk.

391.   Plaintiff KELLY heard that Xee Her spoke negatively about her to other Sales Executives about the fact that he had to accommodate her during this time.

392.   In total, it was approximately 7 months between the first and second knee surgery.

393.   As a result, Plaintiff KELLY had another summer of little or no sales in 2013.

394.   Plaintiff KELLY still does not understand how that could happen when she was in the top 5 or 10 the first 3 months (which a slow period), but when it's the busiest and most critical to sell, Plaintiff KELLY got no sales at all.

395.   Plaintiff KELLY received a performance write up in August 2013 and then another one in September 2013.

396.    Plaintiff KELLY'S doctor put her on a medical leave of absence in mid-September 2013.

397.    Plaintiff KELLY ended up going to Philadelphia for the second knee surgery on October 30, 2013 and was walking within a couple days.

398.    Plaintiff KELLY returned to Hawaii in mid-November 2013 and was back at work by first week of December 2013.

399.    Plaintiff KELLY  spent a week or so getting back into practice with her presentation and was back on track for the holidays.

400.    In the first quarter of 2014, Plaintiff KELLY again made the top 10 for the quarter.

401.    There was an awards ceremony one morning for Marchen during our daily sales meeting.

402.    She won an award for outstanding service which was utterly unbelievable because she was a terrible person to deal with; similar to Rayn Chamizo in her level of hatred towards caucasian people.

403.    So, winning an award for team spirit and helping others was really quite a joke.

404.    One day in early April 2014, Marchen was working in the tour desk office and there were 3 people waiting for TO's including Plaintiff KELLY who was last in line.

405.    Hong Vuong was having a problem and he and another Sales Executive and Plaintiff KELLY were talking outside the tour desk window.

406.    Plaintiff KELLY was waiting for a long time and so Hong Vuong asked Marchen to take care of Plaintiff KELLY so she did not have to wait.

407.    Marchen came over, grabbed Plaintiff KELLY'S tour sheet without even looking at Plaintiff KELLY and then literally threw the tour sheet back at Plaintiff KELLY.

408.    Plaintiff KELLY said "Now that's an award winning attitude!" and regretted it immediately.

409.    As expected, after that, Plaintiff KELLY'S tours were terrible and sales went down.

410.    After being in the top 10 for the first quarter, Plaintiff KELLY had only one sale in April 2014.

411.    It was sometime shortly after this incident that Plaintiff KELLY commented to Xee Heragain about the line and how the tours are assigned.

412.    Mr. Her ignored it completely.

413.    Sometime around mid-April, Plaintiff KELLY'S husband mentioned having a week off for Spring break and suggested a short trip to Tokyo.

414.    Plaintiff KELLY filled out 2 PTO forms with different dates depending on what they got for flight itineraries.

415.    The PTO form Plaintiff KELLY submitted and was approved for was through April 29, 2014.

416.    About 12 hours after Plaintiff KELLY'S flight landed back in Honolulu on April 29, 2014, Plaintiff KELLY and her husband both became violently ill in the middle of the night with flu-like and food poisoning symptoms.

417.    Plaintiff KELLY and her husband spent the whole night and next day in the bathroom being sick.

418.   Plaintiff KELLY thought she had been approved for the PTO form through April 30, 2014 and so did not even think to call in to work.

419.   Plaintiff KELLY did go in on Thursday, May 1, 2014, thinking that was the correct return date even though she was still in the throes of Salmonella poisoning.

420.   Xee Her informed Plaintiff KELLY after the morning meeting that she was being written up for a no-call/no-show and would be suspended pending a review.

423.   Plaintiff KELLY was told to come back in on Wednesday, May 7, 2014 to plead her case.

424.   Plaintiff KELLY tried to talk with Mr. Grigaitis and explain what had happened with the two PTO slips and the illness but he said he couldn't help and that it was going to be reviewed.

425.   Plaintiff KELLY went to her office with Don Ardissone.

426.   Mr. Ardissone offered to help Plaintiff KELLY look for the other PTO slip to prove there was more than one.

427.   Plaintiff KELLY found it in her cabinet.

428.   Mr. Ardissone was present there when Plaintiff KELLY found the PTO slip with the date for May 30, 2014.

429.   Mr. Ardissone made a point of telling Plaintiff KELLY to talk with Mr. Grigaitis and let him know that he had witnessed Plaintiff KELLY finding that other PTO slip.

430.   Speaking to Mr. Grigaitis did not make a difference.

431.   Even Mary Shumack, the Broker, made a statement that it was ridiculous what they were doing to me and she did not believe what was happening to Plaintiff KELLY.

432.   Ms. Shumack stated that this had happened before with other people and they did not lose their job.

433.   Plaintiff KELLY went to the Doctor that afternoon and got a note which stated she was under her care from April 29 through May 5, 2014 and could not return to work.

434.   When Plaintiff KELLY went into the office on Saturday to give the note to Xee Her, he was angry that Plaintiff KELLY was there, asked her "What do you want?"

435.   Plaintiff KELLY attempted to give Mr. Her the doctor's note.

436.   Mr. Her refused to take a copy of it and told Plaintiff KELLY that she was not supposed to be in the building or at work.

437.   Mr. Her then escorted Plaintiff KELLY to the elevator.

438.   On May 7, 2014, Plaintiff KELLY went to the HR review meeting where Xee Her and Lesley Matsuwaki were in attendance.

439.   Mr. Her and Ms. Matsuwaki did not even let Plaintiff KELLY speak at the meeting.

440.   Instead, Mr. Her slid a paper in front of Plaintiff KELLY and said they investigated it and deemed it a no call/no show and the decision was to terminate Plaintiff KELLY.

441.   Prior to this incident, Plaintiff KELLY had never been written up or warned for being late.

442.   Plaintiff KELLY was late to work only once due to an accident delay and used a pass that employees given for such emergencies.

443.   Plaintiff KELLY was always early to work.

444.    Plaintiff KELLY later found out from Robin Reisinger that she ran into Kaleo Wong at Target in Kapolei and he told her Plaintiff KELLY had gotten fired too.

445.    This was the Monday, May 5, 2014, before Plaintiff KELLY went in for the HR review.

446.    Kaleo Wong knew Plaintiff KELLY would be fired before Plaintiff KELLY was told.

447.    Even though Sales Executives were not allowed behind the front desk, Plaintiff KELLY witnessed certain Sales Executives including Be Vuong and Tony Quach, behind the desk and actually looking through tour sheets.

448.    Plaintiff KELLY also has seen Be Vuong and Tony Quach talking (and even whispering when other Sales Executives were around) to Rayn Chamizo and Bernie who were usually the ones who controlled which tours went to each Sales Executive and then the front desk staff would administer the fraudulent order.

449.    Plaintiff KELLY knows that  if the front desk staff came across anything that was conflicting, they would either manipulate the tours themselves or bring it to either Rayn Chamizo or Bernie's attention.

450.    Front desk staff would regularly treat the rest of the Sales Executives differently by making the caucasian salespersons run around and get signatures and approvals on things that Be Vuong, Tony Quachand a few others did not have to do.

451.    Tony Quach and Be Vuong would then state "I never have to do that".

452.    Plaintiff KELLY asked a lot of questions to try to figure out all the ways that the system could be manipulated.

453.   Plaintiff KELLY wanted to know how tours were assigned, the different priority levels, who scheduled the tours from Encore Marketing Kiosks, and so on, but nobody would answer her questions about how things were done.

454.   One of Plaintiff KELLY'S more recent first hand experiences with the tour manipulation/racism came when she was leaving the morning meeting and going to her office.

455.   An international couple were checking in... the first to arrive.

456.   Plaintiff KELLY was 3rd on the line, so they should have gone to the first person on the line.

457.   As Plaintiff KELLY was walking by the front desk, another Sales Executive, Takio Mogi, was walking by too and started laughing when he saw the Indian couple.

458.   Mr. Mogi looked at Plaintiff KELLY and said very directly and without hesitation said, "that's going to be your tour".

459.   Plaintiff KELLY acknowledged that it was probably true and said that I was 3rd on the line and they could nott be her tour.

460.   Mr. Mogi just laughed again and said "that's your tour" and walked away.

461.   Plaintiff KELLY watched who else checked in, the order they checked in and then got beeped to pick them up.

462.   Tony Quach was first that day, but Plaintiff KELLY got the international couple.

463.   When Plaintiff KELLY pointed it out to the front desk, they said Tony Quach's tour was assigned.

464.   The front desk always had an answer when they got caught and again, it was easy because they had complete control over everything and they kept everyone else in the dark.

465.   Plaintiff KELLY also pointed it out to Xee Her and he said nothing at all.

466.   Plaintiff KELLY was again beginning to get very upset about what was going on and started to comment about it.

467.   According to Plaintiff KELLY, there are many instances of racism and/or discrimination on a daily basis.

468.   Most of the time, the comments would be made during the 8:30 morning meetings each day as well as in the TO office where the TO's, Sales Executives and Managers gathered.

469.   Specifically, Plaintiff KELLY remembers a morning when Xee Her was announcing sales from the previous day and the Sales Executive was telling the rest of the Sales Executives about the sale.

470.   Indians and African-Americans were the most targeted groups.

471.   Every conceivable name for an Indian was thrown out as if it was a competition.

472.   Some racist terms used to describe Indians were Dothead, towelhead, sand… (they stopped at the "n" word around Plaintiff KELLY), etc.

473.   Even though it was mostly Sales Executives who started it, Xee Her was present and also made laughing comments and contributed to the racist environment.

474.   Plainitff KELLY has two nieces who are bi-racial, mixed Caucasian/African-American.

475.   Even though Plaintiff KELLY had photos of them in her office for the longest time, it made no real difference except that they would occasionally stop at saying certain words when they realized Plaintiff KELLY was present.

476.    Be Vuong has a gun collection and whenever he would talk about his guns and why he has them (he's a "collector") and when he would use them, it was always some story about a black person intruding in his home or on his family.

477.    One of the most offensive things Xee Her would say (more than once and quite regularly) was quoting from the movie, "The Help".

478.    Mr. Her would quote the line "You is kind.  You is smart. You is important." Plaintiff KELLY found these comments to be extremely offensive.

479.    Knowing the tours were being manipulated so that the good tours went to the top two people and maybe a few other favored non-caucasians made the work environment extremely stressful.

480.    Every day, the caucasian salepeople are always aware that they are not part of the selected few and their income is literally controlled by the front desk.

481.    Defendant MARRIOTT's managers, Xee Her and Gregg Grigaitis, know what is going on but do nothing to prevent it, while contributing to the same.

482.    Plaintiff KELLY felt as if she was compromising her personal moral and ethical code every day that she could not say something about what was going on.

483.    The only way to describe what it felt like to work there every day is to say it was a hostile, untrusting, competitive, cut throat, back stabbing environment.

484.    Rayn Chamizo would give Plaintiff KELLY scowling looks, make Plaintiff KELLY wait while she took personal calls, ignored Plaintiff KELLY completely at times, and was rude in every way.

485.    Ms. Chamizo never genuinely smiled at Plaintiff KELLY because it is difficult

to smile at someone with her mouth and have such hatred on the rest of her face and eyes and not expect Plaintiff KELLY to see that she actually hates her.

486.   Ms. Chamizo is doing this to people who are at reading body language and facial expressions and identifying falseness and lying because timeshare salespeople must be good at identifying when they're being lied to.

487.   Plaintiff KELLY regularly had to hold herself back and put a false smile on her face when he would tell Plaintiff KELLY to "wear more dresses" and "dress more girlie".

488.   Every monthly review of Plaintiff KELLY's sales would include comments about how Plaintiff KELLY dressed and that she needed to be more feminine.

489.   Plaintiff KELLY often felt Mr. Her would hold it against Plaintiff KELLY as if she were purposely trying to challenge his authority because she tried to dress professionally.

490.   The comments Mr. Her made about Plaintiff KELLY in front of the entire team at the morning meetings were shocking to Plaintiff KELLY.

491.   Mr. Her would make a joke when Plaintiff KELLY made a sale, saying Plainitff KELLY must have worn a dress that day, insinuating that being more provocative improved her sales.

492.   Plaintiff KELLY found these comment to be deeply offensive.

493.   Eventually, Plaintiff KELLY began to wonder if he treated her with such disregard because it appeared to him as if she was being insubordinate for not taking his "advice".

494.   Plaintiff KELLY began to question whether she was supposed to wear more dresses to work.

495.    Wearing dresses was not a requirement in Defendant MARRIOTT'S dress code.

496.    However, but Mr. Her would tell Plaintiff KELLY and everyone else in an open sales meeting that the reason Plaintiff KELLY got a sale is because she wore a dress that day.

497.    Plaintiff KELLY began to wonder about the consequences of not wearing dresses to work.

## PLAINTIFF ROBIN REISINGER

498.    Plaintiff REISINGER is a resident of the County of Honolulu, State of Hawaii.

499.    Plaintiff REISINGER is a caucasian female who was born outside of the State of Hawaii.

500.    In October 2004, Plaintiff REISINGERI began working for Defendant MARRIOTT as a timeshare salesperson at the Kauai Beach Club.

501.    In November 2004, Plaintiff REISINGER was the first to graduate from her training class.

502.    In December 2004, Plaintiff REISINGER was the first to get a sale.

503.    After the 180 day probation period, Plaintiff REISINGER was also the only one still employed by Defendant MARRIOTT out of the original 8 who started.

504.    Plaintiff REISINGER won the Rookie of the Year in 2005, the second female ever on Team Kauai to win that award.

505.    Plaintiff REISINGER transferred to Waiohai Beach Club about a year later where she spent the next 5 years.

506.    Plaintiff REISINGER was promoted to the In House or Owner tour line after a

couple years, which was quite an accomplishment because one usually had to either be an owner or on the regular sales line for at least 5 years before one could request the switch.

507.    Plaintiff REISINGER'S managers encouraged her to make the move because in just 2 years at Waiohai, because she consistently had top sales volume, was exceptionally good at portfolio (off site) sales and was known for taking amazing care of her Owner's and Guest's needs.

508.    In January 2010, Team Kauai moved its sales operations up to the Kauai Lagoons where Plaintiff REISINGER succeeded in making the very first sale.

509.    In June 2010, Defendant MARRIOTT introduced the points program and began selling a new product.

510.    Once again, Plaintiff REISINGER got the first sale on the team.

511.    All of this showed Plaintiff REISINGER'S adaptability, consistency and passion for her work.

512.    Plaintiff REISINGER had a portfolio of hundreds of owners which she always took personal care of when they scheduled vacations.

513.    Plaintiff REISINGER provided truly exceptional service to Defendant MARRIOTT'S customers.

514.    On her own time, Plaintiff REISINGER also worked endlessly on designing new and innovative sales collateral which she always trained the entire team how to use in order to increase overall sales numbers for the site, even though all Sales Executives were in direct competition.

515.    Plaintiff REISINGER shared her collateral not only with Team Kauai, but also

with the Marriott Vacation Club headquarters.

516.   Defendant MARRIOTT incorporated some of Plaintiff REISINGER'S ideas in
its Sales Technology so all MVC Sales Executives would have access to it and be able to use it
in their presentations.

517.   Plaintiff REISINGER also hosted many trainings for existing Sales Executives
and new hires.

518.   Mentoring new Sales Associates and designing collateral become almost as
important to Plaintiff REISINGER as servicing her existing owner base; all of which were not
required of her.

519.   In the time Plaintiff REISINGER spent on Team Kauai, Plaintiff REISINGER
won multiple awards including "Highest Sales Volume" for not only different months but
sometimes even the quarter.

520.   Plaintiff REISINGER also received the most "Way To Go" awards on the team
(which are based on people writing letters to Marriott about their salesperson).

521.   Plaintiff REISINGER was even awarded the "O" for Owner Service, the "G" for
Guest Service and the "T" for Team Culture, all of which are voted on by other Sales Executives.

522.   Plaintiff REISINGER was highly qualified to work for Defendant MARRIOTT
as a timeshare salesperson.

523.   After 12 years on Kauai and 9 years with Marriott, Plaintiff REISINGER was
ready for both personal and professional growth.

524.   In June 2013, Plaintiff REISINGER moved to Oahu and transferred to the
Ko'Olina Beach Club.

525.    On her first day at Ko'Olina, Plaintiff REISINGER experienced a rude awakening.

526.    While waiting in the reception area for Xee Her, the Senior Sales Manager, Plaintiff REISINGER was approached by an asian male who appeared to be a Sales Executive.

527.    This asian sales executive came up to Plaintiff REISINGER and said "We're not hiring."

528.    Plaintiff REISINGER responded by stating "Good, I'm not interviewing. I already have the job."

529.    The asian sales executive replied, "Well Marketing meets downstairs.", to which Plaintiff REISINGER replied "I'm in Sales, not Marketing."

530.    The asian sales executive then asked, "Who are you here to meet with?"

531.    Plaintiff REISINGER said "Xee."

       The asian sales executive asked "Xee who?", to which Plaintiff responded "Xee Her."

532.    The asian sales executive asked Plaintiff REISINGER spell Mr. Her's name, which she did.

533.    The asian sales executive then told Plaintiff REISINGER there was no one there by that name.

534.    Plaintiff REISINGER responded "That's funny; this is where I interviewed with him."

535.    At this point, the asian sales executive raised his arms, looked around, snapped

his fingers and yelled "Someone please tell her who I am!" at which point he turned around and walked away.

536.    Shawn Marie told Plaintiff REISINGER "That's Be Voung. He's the #1 guy in the company."

537.    Plaintiff REISINGERI eventually met up with Mr. Her and in the hallway outside the lunchroom.

538.    When Plaintiff REISINGER mentioned to Mr. Her that she had already been "welcomed" by Be Vuong, Mr. Her responded, "Yeah, I heard about your introduction."

539.    Plaintiff REISINGER stated to Mr. Her "I really wouldn't call it an introduction".

540.    At this point, Mr. Vuong walked out of the lunchroom and into the hallway.

541.    Mr. Her and Mr. Vuong looked at each other and began to laugh.

542.    It was unfathomable to Plaintiff REISINGER, who had basically *been* the welcoming committee on Team Kauai, that this was her "unwelcome" reception at Ko'Olina.

543.    Plaintiff REISINGER was shocked that any manager would tolerate this level of disrespect of a new hire, let alone a Senior Sales Executive.

544.    Not only did Mr. Her condone it, he actually engaged in it.

545.    During her time at Ko'Olina, Plaintiff REISINGER was often on the receiving end of more of Mr. Be Vuong's bad behavior.

546.    Not only would he glare at Plaintiff REISINGER but he would walk right down the middle of a hallway or staircase, forcing Plaintiff REISINGER to hug against a wall or railing to avoid being steam rolled by him.

547.    Mr. Be Vuong was the most unprofessional Sales Executive Plaintiff
REISINGER ever worked with.

548.    One time on Plaintiff REISINGER'S day off, she received a phone call from
Gregg Grigatis, the Project Director, asking her to get in touch with some of her favorite owners
who had just toured with Be Vuong.

549.    Mr. Grigaitis instructed Plaintiff REISINGER to tell them a series of lies in
order to encourage them to purchase from Be Vuong.

550.    Mr. Grigaitis even tried to make Plaintiff REISINGER feel guilty when she said
could not do what he was  telling her to do.

551.    Plaintiff REISINGER never heard of a Sales Executive being ordered to lie to
Marriott Owners by anyone, let alone the Project Director, in order to procure a sale for another
sales executive.

552.    Plaitniff REISINGERI witnessed a number of incidents at Ko'Olina that were
not only against Defendant MARRIOTT'S Standard Operating Procedure but were not in
keeping with the Marriott culture that Plaintiff RESINGER was used to in Kauai.

553.    Mr. Xee Her would constantly make comments that were uncalled for and
unbecoming for a Senior Sales Manager.

554.    Mr. Her always remarked about Plaitiff KELLY and how she dressed and
specifically wanting to see her wear more feminine clothing.

555.    When guests would write comments about Plaintiff KELLY being friendly Mr.
Her would read them aloud in the morning meetings and act shocked.

556.    Whenever Plaintiff KELLY did dress more feminine, Mr. Her credited Plaintiff

REISINGER since Plaintiffs KELLY and REISINGER were sharing an office at that point.

557.   The month Plaintiff KELLY beat Plaintiff REISINGER in sales volume, Mr. Her stopped by their office on Plaintiff KELLY'S day off and said "You built her up so make sure that bitch knows that you can knock her back down".

558.   Plaintiff REISINGER never heard a manager speak like that to or about an sales executive.

559.   In the beginning, Plaintiff REISINGER made friends with a new hire named Ryan Grannis and began mentoring him.

560.   In Plaintiff REISINGER'S opinion, Mr. Grannis had more talent and drive than any new Associate she had ever come across and Plaintiff REISINGER was excited to be a part of his success in sales at Ko'Olina.

561.   Mr. Grannis was fired before his probation period ended for "attendance".

562.   A few months later, another young man named Ryan was hired.

563.   Mr. Xee Her asked Plaintiff REISINGER to mentor him.

564.   Always eager to help, Plaintiff REISINGER agreed.

565.   The new Ryan later told Plaintiff REISINGER that Mr. Her was surprised she was onboard since he believed Plaintiff REISINGER was still upset about the first Ryan's termination.

566.   The second Ryan then said he had asked Mr. Her why the first Ryan was fired so he himself could avoid the same pitfall.

567.   Mr. Her told the second Ryan not to worry, that the first Ryan had to be let go because he did not fit in with the Ko'Olina team, guests or culture.

568.   The second Ryan told Plaintiff REISINGER that when he pressed him for more information, Mr. Her fluttered his hands around with limp wrists and responded that Ryan Grannis was gay.

569.   Plaintiff REISINGER called Ryan Grannis on the mainland and repeated the second Ryan's story.

570.   Mr. Graninis was shocked and said "Really? Is that why Xee took me aside one day and asked me if I was gay?!? I told him I wasn't but he must not have believed me."

571.   But Be Vuong, on the other hand, could do no wrong in Mr. Her's eyes.

572.   Mr. Her made a PowerPoint presentation that he shared during the meeting one morning.

573.   Powerpoint presentation was about how all the sales executives should try to BE amazing and BE motivated and BE the best and basically BE more like Be.

574.   In all my years, Plaintiff REISINGER had never seen a Sales Executive "buy" control of everyone from managers to receptionists and tour desk staff.

575.   Be Vuong shows up early everyday and brings everyone coffee and treats.

576.   Mr. Vuong also buys lunch a few times a week and even takes their families out for expensive dinners.

577.   In exchange, Mr. Vuong has the "right" to go through the personal information of the day's incoming tours at which point he cherry picks which guests he wants to meet with.

578.   Then the best tours are assigned to Be Vuong by everyone like Rayn Chamizo and Bernie Camarillo (both managers) to the rest of the support staff.

579.   This is against Defendant MARRIOTT'S Standard Operating Procedures.

580.    Loretta, a Marketer, told Plaintiff REISINGER that she had to assign "gold ball buyers" to Be Vuong one day and called up to the tour desk and got Patty Burchett on the telephone.

581.    While they were going through the process of assigning the tour to Be Vuong, Loretta mentioned wishing she could just assign it to Plaintiff REISINGER instead.

582.    Patty Burchett told Loretta that it would not be "possible as long as Be's running the show"

583.    The receptionists even give Be Vuong the "good" tours as they walk through the door even if they aren't pre-assigned to him.

584.    One day Plaintiff REISINGER checked the rotor to see if she was going to get another tour.

585.    There were were 6 tours scheduled to come in and Plaintiff REISINGER was sixth down on the wheel.

586.    Be Vuong was ahead of Plaintiff REISINGER in the fifth spot, meaning Plaintiff REISINGER would only get a tour if all six showed up and Be Vuong would only get one if 5 of the 6 showed.

587.    Plainitff REISINGER asked tour reception if any of the tours were pre-assigned to any of the sales executives and they said none of them were.

588.    Only three of the scheduled tours came to their appointments.

589.    In spite of this, Be Vuong was given a tour, even though he was not supposed to receive one according to the rotor.

590.    Until Plaintiff REISINGER went to work at Ko'Olina, she had never been the

victim of racism.

591.    During one of the morning sales meetings, Be Vuong was in the middle of telling the team about how he bought a new golf cart and had it customized to look like the General Lee from Dukes of Hazzard.

592.    One of the new trainees was an African American man who happened to have a long name that was hard to say so he just goes by KK.

593.    When the African American new hire was being introduced, Be Vuong said "Oh yeah, well I go by KKK" and did a Hitler salute.

594.    Plaintiff REISINGER was eventually wrongfully terminated by Defendant MARRIOTT on April 30, 2014..

## ADDITIONAL INCIDENTS AND EVIDENCE OF DISCRIMINATION

595.    The examples given above were experienced by caucasian time share sales executives who were employed at Defendant MARRIOTT'S Ko'Olina Beach Club.

596.    There are many other caucasian sales associates that also experienced this treatment at Ko Olina Beach Club day in and day out, but are afraid to rock the boat for fear of retaliation.

597.    This discrimination has included, but is not limited to misdirection/manipulation of customer accounts to the advantage of non-caucasian sales executives, racially demeaning comments and unfair treatment from management, discrimination in dealing with the contracts and accounting departments, and ultimately the loss of employment.

598.    Bob Davis (sales associate) and Plaintiff GRANT overheard senior sales manager Xee Her in the lunchroom bragging to other non-caucasian sales executives: "It's

another day of Asian Domination at Ko Olina Beach Club!"

599.    Bob Davis commented: "I was one of the top sales executives of the year at Ko Olina Beach Club a few years ago with a low cancellation rate, just like I was one of the top sales executives of the year with a low cancellation at the Westin in Maui last year. Now I come back to Ko Olina Beach Club and all of a sudden I seem to have mysteriously contracted 'selling amnesia' and can hardly sell anything, and when I do half of the sales I make mysteriously cancel!!"

600.    Mr. Davis resigned within 4 months of returning to Ko Olina Beach Club and went back to the Westin timeshare resort in Maui.

601.    During his first full month back at the Westin, Mr. Davis sold over $400,000 in sales volume.

602.    After returning to the Westin, Mr. Davis sent a text message to Plaintiff GRANT, stating: "My hat is off to you for enduring it for so long. I honestly don't know how you stay sane. It was beginning to affect the way I would treat my family when I came home from that place and they are the most important people in the world to me. I can't believe I lasted 4 months."

603.    Mr. Davis is a timeshare industry veteran of over 14 years, and has always a been a top producer at every company he has ever sold for.

604.    Patrick Axtell (sales associate) overheard front desk manager Rayn Chamizo say on the phone: "Yeah, I've had to deal with a lot of dumb caucasian people today too."

605.    Rayn Chamizo and her Team (all non-caucasian) are responsible for assigning Encore tours to sales executives.

606.   Encore tours have a significantly higher conversion rate (selling rate)  than other tours.

607.   Manager Rayn Chamizo is also responsible for hiring the front desk staff that distributes the customers to sales executives each and every day.

608.   Since October 2003 until Plaintiffs' termination from their employment with Defendant MARRIOTT, Ms. Chamizo has never hired a caucasian employee to distribute tours to sales executives.

609.   Ms. Chamizo's (all non-caucasian) team in a back room assigning cherry-picked Encore customers to select non-caucasian sales executives.

610.   The non-caucasian front desk staff (who are supervised by Ms. Chamizo) also manipulated the tour distribution to the advantage of non-caucasian associates.

611.   Some of these non-caucasian salespeople are literally seen behind the reception desk (where salespeople are not allowed) sorting through customer profile sheets and picking out the customer they want to tour.

612.   Makoto Walker (former front desk receptionist) said: "Andrew, Patty Burchett (the non-caucasian receptionist doing the training for new hires) told me before I ever met you, not to be nice to you."

613.   Ms. Walker also stated: "Xee Her tells me, 'I hear you have been talking to Andrew Grant. Don't get in trouble!!'"

614.   Ms. Walker also stated: "I noticed non-caucasian salespeople allowed behind the front desk to sort through tour sheets (customer profiles)."

615.   Ms. Walker specifically named named Be Vuong, Tony Quach, and Kaleo

Wong (all non-caucasian sales associates) doing this and mentioned never seeing one caucasian person exhibiting this behavior.

616.    Ms Walker also stated: "Managers Rayn Chamizo and Xee Her (both non-caucasian) reprimanded me because I was seen talking to you in the lunchroom. I don't understand why, we were even sitting at separate tables."

617.    Non-caucasian sales executives are seen routinely having lunch and sitting at the same table with the front desk staff and the front desk manager.

618.    However, when a caucasian sales executive is seen having friendly conversation with an Asian front desk person, the asian front desk person gets in trouble.

619.    The only  managers that reprimanded Ms. Walker for talking to caucasian sales executives were non-caucasian.

620.    Plaintiff GRANT brought this to the attention of human resources and had advanced dialogue with Patricia Abad (HR manager, non-caucasian) about the fact that Ms. Walker is getting harassed by Asian managers for talking to to him.

621.    Plaintiff GRANT asked why it was okay for non-caucasian associates to openly buy the front desk staff gifts and have lunch with them and he could not even speak to one in the lunchroom.

622.    Ms. Abad just smiled and stared at Plaintiff GRANT like she hated him, while remaining silent.

623.    Andrea Dunn (former sales executive) stated to Plaintiff GRANT: "I felt the racial tension at Ko Olina Beach Club right from the start. I remember, just like you, getting single man after single man and European tour after European tour thinking, this cannot be

possible!!"

624.    Ms. Dunn also stated: "I confronted Be Vuong about calling me a haole and told

him I was going to go to HR. Be Voung then said to me: 'Even if you went to HR and

complained about discrimination, you wouldn't be the first caucasian person whose complaint

was never documented.'"

625.    Ms. Dunn went to HR, literally in tears, and reported the incident.

626.    As as Be Vuong said, nothing happened.

627.    Ms. Dunn resigned within a week of that incident.

628.    Ofer Ahuvia (former sales executive) and Plaintiff GRANT were speaking to

Xee Her (sales manager).

629.    Plaintiff GRANT asked Xee Her: "If you hate caucasian people so much, why

did you marry a caucasian girl?"

630.    Xee Her responded by stating: "So I can dominate her too!!"

631.    Mr. Her did not deny that he hates caucasian people.

632.    Ofer Ahuvia and Plaintiff GRANT were in the lunchroom when Plaintiff

GRANT asked Mr. Her how he could get more of the good Encore tours.

633.    Mr. Her smirked and told Plaintiff GRANT:  "Your skin is the wrong color."

634.    Sebastian Brevart (former sales executive) said: "I knew within a relatively short

amount of time I didn't have a chance in hell succeeding at Ko Olina Beach Club as a caucasian

person. Day after day I kept getting the worst tours you could imagine: Indians, Europeans,

Australians, and single men. It was absolutely ridiculous!! Meanwhile, certain Asians

consistently got the more qualified tours. It didn't take a rocket scientist to figure out what was

going on!!"

635.    Mr. Brevart also stated: "No matter how hard I tried to fit in, I constantly felt like an outsider."

636.    Mr. Brevart also stated: "I approached Rayn Chamizo (front desk manager) one day as she was coming out of the bathroom. I asked her how I could keep getting so many bad tours. As always, she glared at me like she despised me and said under her breath 'Sucks to be Haole.' I quit a few days later."

637.    Another former caucasian timeshare sales executive shared a story about being at one of Be's parties.

638.    While sitting on his couch with two other Caucasian guests (one was an employee, the other his wife), the former timeshare sales executive witnessed Be Vuong telling his daughter to "tell them what happens if they cut your hair", whereupon the daughter, who was afraid to say anything, hesitated, looking at her father fearfully.

639.    When he said "it's ok, you can talk to them, they're nice haoles", she told the 3 guests "if you cut my hair, my daddy will kill you".

640.    The time share salesperson expressed her shock and horror that Be Vuong's family even appeared to live in fear of him and that he's teaching his children to be racist.

641.    Mark Churchey stated: "Be scares me.  He was very open about the fact that he didn't like black people AT ALL.  Everybody knows Be hates black people.  Why would he take the admin staff out to really nice dinners?  Be was seen behind the desk going through the tour sheets.  Nobody wins every single month.  He would take 2 weeks vacation and still come in first.  Gregg gave all kinds of favors to Be and Tony all the time in concessions and discounts.

Gregg never did anything; that's why he hid in his office all the time; it was plausible deniability.

Rayn is local; if it was up to her there wouldn't be any caucasian people in Hawaii."

642.    In committing the above acts and omissions, Defendants acted wantonly and/or

oppressively and/or with such malice as implies a spirit of mischief or criminal indifference to

civil obligations and/or there has been some wilful misconduct that demonstrates that entire want

of care which would raise the presumption of a conscious indifference to consequences,

justifying an award of punitive damages in an amount to be proven at trial.

643.    Plaintiffs were given Notice of Right to Sue letters from the US Equal

Employment Opportunity Commission (hereinafter "EEOC").

644.    This lawsuit was timely filed within the time frame outlined in the Notice of

Right to Sue letters from the EEOC.

## COUNT I: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

645.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 644 as if

said paragraphs were fully set forth herein.

646.    The above acts by Defendants with respect to Plaintiffs constituted a violation

of Title VII of the Civil Rights Act of 1964.

647.    As a result of the aforementioned wrongful, unlawful, and illegal acts and/or

omissions of Defendants as alleged herein, Plaintiffs suffered special and general damages in an

amount to be proven at trial.

## COUNT II: VIOLATION OF HAWAII REVISED STATUTES SECTION 378-2

648.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 647 as if

said paragraphs were fully set forth herein.

649.    The above acts by Defendants with respect to Plaintiffs constituted a violation of Hawaii Revised Statutes Section 378-2.

650.    As a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendants as alleged herein, Plaintiffs suffered special and general damages in an amount to be proven at trial.

## COUNT III: VIOLATION OF HAWAII REVISED STATUTES SECTION 378-62

651.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 650 as if said paragraphs were fully set forth herein.

652.    The above acts by Defendants with respect to Plaintiffs constituted a violation of Hawaii Revised Statutes Section 378-62.

653.    As a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendants as alleged herein, Plaintiffs suffered special and general damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor and against Defendants jointly and severally, as follows:

A.      For general damages in amount to be shown at trial;

B.      For special damages in an amount to be shown at trial;

C.      For punitive and/or exemplary damages in an amount to be shown at trial; and

D.      For attorneys' fees, costs, prejudgment and post-judgment interest and such other and further relief both legal and equitable as the Court deems just and necessary under the

\*

\*

circumstances.

DATED: Honolulu, Hawaii, _____ AUG 0 2 2016 _____

_____
MICHAEL JAY GREEN
GLENN H. UESUGI
Attorneys for Plaintiffs
ANDREW GRANT, SANDRA DENISE
KELLY and ROBIN REISINGER

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| ANDREW GRANT; SANDRA DENISE KELLY; and ROBIN REISINGER, | ) ) ) | CIVIL NO. 16-1-0060-01 VLC [Non-Motor Vehicle Tort] |
| Plaintiffs, | ) ) | DEMAND FOR JURY TRIAL |
| vs. | ) ) ) | |
| MARRIOTT OWNERSHIP RESORTS, INC.; and DOE DEFENDANTS 1-100, | ) ) ) | |
| Defendants. | ) ) | |

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable.

DATED: Honolulu, Hawaii, _AUG 0 2 2016_ _____

_____
MICHAEL JAY GREEN
GLENN H. UESUGI
Attorneys for Plaintiffs
ANDREW GRANT, SANDRA DENISE
KELLY and ROBIN REISINGER

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| ANDREW GRANT; SANDRA DENISE KELLY; and ROBIN REISINGER,<br><br>            Plaintiffs,<br><br>    vs.<br><br>MARRIOTT OWNERSHIP RESORTS, INC.; and DOE DEFENDANTS 1-100,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO. 16-1-0060-01 VLC<br>[Non-Motor Vehicle Tort]<br><br>SUMMONS |

**SUMMONS**

STATE OF HAWAII

TO:    THE DEFENDANTS

        YOU ARE HEREBY SUMMONED and required to file with the court and serve upon Plaintiffs' attorneys, whose address is stated above, an answer to the Second Amended Complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service.

        If you fail to make your answer within the twenty day time limit, judgment by default will be taken against you for the relief demanded in the Second Amended Complaint.

        This Summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled Court permits, in writing on this Summons, personal delivery during those hours.

        A failure to obey this Summons may result in an entry of default and default judgment

against the disobeying person or party.

      DATED: Honolulu, Hawaii, _____ AUG 0 2 2016 _____

                                                      N. MIYA

                    _____

                    CLERK OF THE ABOVE-ENTITLED COURT

- 2 -