IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

ANDREW GRANT; SANDRA DENISE      )      CIVIL 16-00451 LEK-RLP
KELLY; and ROBIN REISINGER,      )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
MARRIOTT OWNERSHIP RESORTS,       )
INC.; and DOE DEFENDANTS 1-       )
100,                             )
                                 )
          Defendants.            )
_____ )

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

          Before the Court are Defendant Marriott Ownership

Resorts, Inc.'s ("MORI"): Motion for Summary Judgment as to All

of Plaintiff Sandra Denise Kelly's Claims ("Kelly Motion"), filed

on April 20, 2018; and MORI's Motion for Summary Judgment as to

All of Plaintiff Robin Reisinger's Claims ("Reisinger Motion"),

also filed on April 20, 2018.  [Dkt. nos. 77, 79.]  On June 25,

2018, Plaintiff Sandra Denise Kelly ("Kelly") and Plaintiff

Robin Reisinger ("Reisinger") each filed her respective

memorandum in opposition ("Kelly Opposition" and "Reisinger

Opposition").  [Dkt. nos. 96, 98.]  MORI filed its replies to the

Kelly Opposition and Reisinger Opposition ("Kelly Reply" and

"Reisinger Reply") on July 2, 2018.  [Dkt. nos. 100, 101.]  On

July 11, 2018, MORI filed letters stating it intended to rely on

additional authorities at the hearing.  [Dkt. nos. 102, 103.]

The Kelly Motion and the Reisinger Motion came on for hearing on July 16, 2018, and this Court granted Reisinger and MORI leave to file supplemental memoranda.  [Minutes, filed 7/16/18 (dkt. no. 104).]  Reisinger filed her supplemental memorandum on July 20, 2018, and MORI filed its response on July 24, 2018.  [Dkt. nos. 105, 106.]  This Court issued its ruling on the Kelly Motion and the Reisinger Motion on August 16, 2018 ("8/16/18 EO Ruling").  [Dkt. no. 109.]

Also before the Court is MORI's Motion for Summary Judgment as to All of Plaintiff Andrew Grant's Claims ("Grant Motion"), filed on May 11, 2018.  [Dkt. no. 82.]  Plaintiff Andrew Grant ("Grant") filed his memorandum in opposition on August 31, 2018 ("Grant Opposition"), and MORI filed its reply ("Grant Reply") on September 10, 2018.  [Dkt. nos. 111, 113.]  The Grant Motion came on for hearing on September 24, 2018, and this Court issued its ruling on the Grant Motion on October 2, 2018 ("10/2/18 EO Ruling").  [Dkt. no. 116.]

A further ruling on the Kelly Motion, the Reisinger Motion, and the Grant Motion (collectively "Motions") was issued on October 22, 2018 ("10/22/18 EO Ruling").  [Dkt. no. 116.]  The instant order supersedes the 8/16/18 EO Ruling, 10/2/18 EO Ruling, and 10/22/18 EO Ruling.  MORI's Motions are hereby granted in part and denied in part for the reasons set forth below.

2

On January 12, 2016, Grant, Kelly, and Reisinger ("Plaintiffs") initiated this action in state court against Marriott Vacations Worldwide Corporation ("MVWC").[1] [Notice of Removal, filed 8/11/16 (dkt. no. 1), Decl. of Sarah O. Wang ("Wang Removal Decl."), Exh. A (Complaint).[2]] On June 26, 2016, Plaintiffs filed their First Amended Complaint against MVWC. [Wang Removal Decl., Exh. B.] The state court approved Plaintiffs and MVWC's stipulation to allow the filing of a second amended complaint and, on August 2, 2016, Plaintiffs filed their Second Amended Complaint against MORI. [Id., Exhs. C, D.] MORI accepted service of the Second Amended Complaint on August 3, 2016. [Id., Exh. E (acknowledgment of service).]

The Second Amended Complaint alleges the following claims: violation of Title VII of the Civil Rights Act of 1964 ("Title VII" and "Count I"); [Second Amended Complaint at ¶¶ 645-47;] violation of Haw. Rev. Stat. § 378-2 ("Count II"); [id. at ¶¶ 648-50;] and violation of the Hawai`i Whistleblower Protection Act ("HWPA"), Haw. Rev. Stat. § 378-62 ("Count III"), [id. at ¶¶ 651-50]. Plaintiffs pray for general, special, and

---

[1] At the time they filed the Complaint, Plaintiffs were all represented by the same counsel. Plaintiffs now have separate counsel.

[2] MORI removed the case based on federal question jurisdiction, with supplemental jurisdiction over the state law claims. [Notice of Removal at ¶ 9.]

punitive/exemplary damages; attorneys' fees and costs;
pre-judgment and post-judgment interest; and any other
appropriate relief. [Id. at pg. 65.]

Plaintiffs all worked for MORI as timeshare sales
executives at its Ko`Olina location. [Id. at ¶¶ 7, 309, 500,
524; Answer to Second Amended Complaint, filed 11/11/16 (dkt.
no. 16), at ¶¶ 1, 49, 72, 75 (admitting employment allegations).
Plaintiffs allege:

1)  Kelly was: terminated based on her gender and race
    (Caucasian); subjected to a sexually and racially hostile
    work environment; and terminated because of her alleged
    whistle-blowing activities;

2)  Reisinger was: terminated based on her race (Caucasian);
    subjected to a racially hostile work environment; and
    terminated because of her alleged whistle-blowing
    activities; and

3)  Grant was: terminated based on his race (Caucasian) and in
    retaliation for engaging in a protected activity; subjected
    to a racially hostile work environment; and terminated
    because of his alleged whistle-blowing activities.

Plaintiffs' claims in this case are based upon their
allegation that certain sales executives were treated more
favorably than Plaintiffs were. The "favored" sales executives –
in particular, Be Vuong – were allowed to review lists of
potential tours,[3] which allowed them to "cherry-pick" the tours
that were believed to be easier sales. [MORI's Concise Statement

---

[3] Sales executives took guests on tours of the property "to
try to sell them timeshares." [Kelly CSOF, Decl. of Sandra
Denise Kelly ("Kelly Decl.") at ¶ 5.]

4

of Facts in Supp. of Kelly Motion ("MORI's Kelly CSOF"), filed 4/20/18 (dkt. no. 78), at ¶¶ 1-2; Kelly's Concise Statement of Facts ("Kelly CSOF"), filed 6/25/18 (dkt. no. 97), at ¶¶ 1-2 (stating MORI's ¶¶ 1-2 are undisputed).] In addition, the favored sales executives were provided more information about the potential customers participating in the tours. [MORI's Kelly CSOF at ¶ 1; Kelly CSOF at ¶ 1.] Plaintiffs allege the "[f]ront desk employees who assigned tours . . . 'messed with' sales executives they were angry at or who made snide remarks to them, including non-Caucasians." [MORI's Kelly CSOF at ¶ 4; Kelly CSOF at ¶ 4.] MORI seeks summary judgment as to all of Plaintiffs' claims.

## I.  **Kelly Motion**

Kelly is a Caucasian female who was not born in Hawai`i. She started working for MORI in June 2010 as a timeshare sales executive at the Marriott Vacation Club Ko`Olina Beach Club ("MVC-KOBC"). [Kelly Decl. at ¶¶ 3-4.[4]] She resigned

---

[4] MORI has argued this Court should disregard improper evidence, including Plaintiffs' declarations, which MORI argues are self-serving and often conflict with their deposition testimony. See, e.g., Kelly Reply at 1. MORI's argument is rejected, and this Court will consider both Plaintiffs' declarations and their deposition testimony in ruling on MORI's Motions. To the extent there are any inconsistencies, those are relevant to Plaintiffs' credibility, which this Court cannot weigh in considering MORI's Motions. See Blankenhorn v. City of Orange, 485 F.3d 463, 470 (9th Cir. 2007) (stating that "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury
(continued...)

in September 2010 "due to having months without any sales and observing how the tours . . . were assigned." [Id. at ¶ 5.] There was supposed to be a rotation line of sales executives who were assigned to tours as guests came in. The first guest was supposed to get the first sales executive in the line. The sales executives who had made sales the day before were moved to the front of the line. [MORI's Kelly CSOF, Decl. of Richard M. Rand ("Rand Kelly Decl."), Exh. A (excerpts of trans. of Kelly's 3/1/18 depo. ("Kelly Depo.")) at 18.] After the sales executives who made sales the day before, the order of the line was determined based on the sales in that period. [Id. at 176.] However, if a guest requested a specific sales executive, his tour was assigned to that executive, regardless of the executive's place in the line. [Id. at 178.] According to Kelly, the line process was not always followed, and the tour assignments were manipulated throughout the day. Kelly testified that tours where the marketing executive knew the guest intended to buy a timeshare were assigned to the top sales executives – Be Vuong, Tony Quach, and Kaleo Wong. In addition, Be Vuong and Mr. Quach would look through the tour sheets for the day. [Id. at 18-20.] According to Kelly, Be Vuong is Vietnamese, [Kelly

---

    [4] (...continued)
functions, not those of a judge'" (alteration in Blankenhorn) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1986))).

Depo. at 159,] and Mr. Quach and Mr. Wong are Asian, [id. at 135], but she does not identify what specific ethnicity they are.

In March 2012, Kelly received assurances that things had changed, and she returned to employment at MVC-KOBC. [Kelly Decl. at ¶¶ 28-29.] When Kelly returned to work with MORI, the same management personnel were still there, as were the sales executives who Kelly believed had received favorable treatment during her previous employment. [Kelly Depo. at 17, 25, 43.]

Kelly states that, when she returned to work in 2012, "the overall environment toward [her] by the employees at the front desk was not just unfriendly, but hostile." [Kelly Decl. at ¶ 31.] According to Kelly, there were never any Caucasians who assigned tours at the front desk, and the front desk manager – Rayn Chamizo, who is not Caucasian – made it clear that she disliked Kelly. [Id. at ¶¶ 10-11, 20.] Ms. Chamizo would ignore direct questions from Kelly; would not look at Kelly; had an angry look on her face when she had to answer Kelly's questions; scowled at Kelly; made Kelly wait while she made personal calls; was always rude to Kelly; and never smiled at Kelly in a genuine way. [Id. at ¶¶ 21, 202-04.] When Kelly was in the lunchroom with Ms. Chamizo and other front desk employees, they would: make comments about haoles;[5] speak in heavy pidgin English accents,

---

[5] "'Haole' is a Hawaiian word for a white person or 'Caucasian.'" State v. Walsh, 125 Hawai`i 271, 275, 260 P.3d
(continued...)

which Kelly asserts was to "purposefully ignore and isolate [her] from any conversation"; share food with other non-Caucasians without offering Kelly any; and would not acknowledge Kelly's presence in the room. [Id. at ¶¶ 22-23.] However, when Ms. Chamizo was not present, "a couple of the other non-Caucasian staff" would talk to Kelly. [Id. at ¶ 24.]

Kelly testified that the front desk employees primarily gave favorable treatment to Be Vuong and Mr. Quach, and occasionally to Mr. Wong. [Kelly Depo. at 202.] Be Vuong's brother, Hong Vuong, also received special treatment from the front desk employees and the team leaders because of his brother. [Id. at 131.] The non-Caucasian front desk employees also made the Caucasian sales executives obtain signatures and approvals that Be Vuong, Mr. Quach, "and a few others" did not have to obtain. [Kelly Decl. at ¶ 162.] In addition, Be Vuong was able to get concessions from Gregory Grigaitis[6] that would help Be Vuong close sales. Kelly would rarely get similar concessions and, when she did, she had to go through her team leader first. [Kelly Depo. at 74-75.]

---

[5] (...continued)
350, 354 (2011) (citing Mary K. Pukui & Samuel H. Elbert, Hawaiian Dictionary 58 (rev. ed. 1986)).

[6] Gregory Grigaitis is the MVC-KOBC Project Director for Sales and Marketing. Kelly's immediate supervisor, Xee Her, reported directly to Mr. Grigaitis. [MORI's Kelly CSOF, Decl. of Gregory Grigaitis ("Grigaitis Kelly Decl.") at ¶¶ 1-2.]

Kelly asserts the tours were manipulated so that

Be Vuong, Mr. Quach, and Mr. Wong – all of whom are non-Caucasian

– were given when she calls "the 'good tours.'" [Kelly Decl. at

¶ 32.] According to Kelly,

> it is widely believed by the sales executives,
> sales managers and the front desk employees
> assigning the tours that customers likely to buy
> have the following characteristics: people that
> are wearing expensive jewelry (rings and watches),
> dressed in nice/expensive clothes and shoes, those
> who scheduled through marketing kiosks where the
> customer would provide information that would
> allow the sale executives insight as to their
> intent in buying which would be documented on
> "tour sheets" at the front desk and the race of
> the person: Caucasian-Americans, Chinese, Filipino
> and Japanese people were considered "good tours"
> that would likely buy. Conversely, the tours that
> were considered "bad tours" by sales executives,
> sales managers and the front desk employees
> assigning the tours at Ko`Olina were: Indian
> people, African-American people and people dressed
> in cheap clothing and shoes.

[Id. at ¶ 26.] Kelly asserts these are "proven indications as to

whether the touring customers will be a good chance of making a

sell [sic]" and, based on her experience and statements from

other sales executives, "the likelihood of making sales to

Indians and African-Americans was much less likely than selling

to Caucasian-Americans, Chinese, Filipino and Japanese people."

[Id.] Kelly states the non-Caucasian front desk employees would

profile guests who checked in for tours based on these

characteristics and give the best tours to Be Vuong, Mr. Quach,

Mr. Wong, and other non-Caucasian sales executives. Kelly also

heard front desk employees, managers (including Mr. Her), and the favored sales executives talking about guests, the aforementioned characteristics, and whether the certain guests would be good tours or bad tours. [<u>Id.</u> at ¶¶ 44-45.] Kelly never saw Be Vuong, Mr. Quach, or Mr. Wong have a bad tour, nor did she hear of them having bad tours. However, the three would talk about or laugh at other sales executives who had bad tours. [<u>Id.</u> at ¶ 49.]

Plaintiffs concede the alleged favorable treatment was detrimental to both male and female sales executives and to both Caucasian and non-Caucasian sales executives, but Plaintiffs emphasize that all the executives who received favorable treatment were non-Caucasians, and the detrimental effects were predominantly felt by Caucasians. [MORI's Kelly CSOF at ¶ 3; Kelly CSOF at ¶ 3 (partially disputing MORI's ¶ 3, subject to the aforementioned clarification).] Plaintiffs are not alleging tours were completely withheld from the disfavored sales executives, and they acknowledge that the factors sales executives use to predict whether a tour was good or bad do not always hold true. Ultimately, the sales executive has to make the sale. [MORI's Kelly CSOF at ¶¶ 1, 5; Kelly CSOF at ¶¶ 1, 5.]

According to Kelly, within six months after returning to work at MVC-KOBC, she spoke to her supervisors, Xee Her and

Melinda Chasteen,[7] about her concerns regarding Be Vuong's conduct. Kelly's concerns included: Be Vuong being assigned tours outside of the ordinary line rotation; his disrespect for management; his buying lunch for front desk employees, which Kelly alleged was part of the reason he received special treatment;[8] and his having computer access to obtain additional information about touring guests.[9] [MORI's Kelly CSOF at ¶ 7;

---

[7] According to Grant, Melinda Chasteen was "the senior sales manager." [MORI's Concise Statement of Facts in Supp. of Motion for Summary Judgment as to All of Pltf. Andrew Grant's Claims ("MORI's Grant CSOF"), filed 5/11/18 (dkt. no. 83), Decl. of Richard M. Rand ("Rand Grant Decl."), Exh. A (excerpts of trans. of Grant's 3/20/18 depo., vol. I and 4/10/18 depo., vol. II (collectively "Grant Depo.")) at 318.] According to MORI's personnel records, Ms. Chasteen "self-identified her race as 'White.'" [MORI's Grant CSOF, Decl. of Lesley Ann Matsuwaki ("Matsuwaki Grant Decl.") at ¶ 11.] Ms. Chasteen began a leave of absence on February 23, 2013, but never returned to work. [Id.] The parties' filings in this case have used both the spelling "Chasteen" and the spelling "Chastain." It is not clear which one is correct.

[8] Kelly states that, based on what another MORI employee told her, Be Vuong was investigated multiple times over the years for buying lunches and gifts for management and the front desk staff, and for inviting them to expensive dinners at his home. [Kelly Decl. at ¶¶ 50, 56-57.] Be Vuong was given directives to stop doing this because it was a conflict of interest, but he "laughed it off" and, after stopping for a while, would resume the practice. [Id. at ¶¶ 51, 53.]

[9] On one occasion, Kelly saw Be Vuong and Mr. Quach looking through the front desk's tour sheets, which would allow them to determine which tour guests were likely to buy timeshares, based on the aforementioned characteristics. Kelly asserts this violated MORI's tour assignment policy. [Kelly Decl. at ¶ 33.] Kelly states sales executives were not allowed behind the font desk. [Id. at ¶ 159.]

(continued...)

11

Kelly CSOF at ¶ 7.]  Kelly never went to Mr. Her to complain about something Be Vuong had done directly to her.  [Kelly Depo. at 41.]  Further, the only time Kelly may have attempted to use MORI's "guarantee of fair treatment" ("GFT") process was when she attempted to obtain a copy of the corporate attendance policy after her termination.[10]  [MORI's Kelly CSOF at ¶ 9; Kelly CSOF at ¶ 9.]  Kelly's position is that she believed: she could not complain about Be Vuong because he was protected by Mr. Her; and complaints about Be Vuong could cost a sales executive her job. The management could force a sales executive's termination for not meeting the required sales levels by manipulating the tours that the complaining executive received so that the executive was less likely to sell timeshares.  [Kelly Decl. at ¶¶ 58-59.] Kelly emphasizes Mr. Her and Mr. Grigaitis knew about the racially discriminatory tour manipulation, but they did nothing to prevent it, and in fact contributed to it.  [Id. at ¶ 199.]

---

[9] (...continued)
Similarly, at one point, only certain sales executives – including Be Vuong, Mr. Quach, and Mr. Wong – had access to computer programs that showed timeshare owners' purchase and tour histories.  For a short period, all sales executives had access to the programs, but Be Vuong complained that only a few should have access.  The other sales executives' access was later removed.  According to Kelly, Mr. Grigaitis changed the policy to give Be Vuong, Mr. Quach, and Mr. Wong an advantage.  [Id. at ¶¶ 60-61.]  The denial of access caused Kelly and others "a great deal of sales problems."  [Id. at ¶ 62.]

[10] Employees can call a GFT hotline to raise concerns, and they can "appeal local decisions to a higher, regional or corporate level."  [MORI's Kelly CSOF at ¶ 9; Kelly CSOF at ¶ 9.]

Kelly found the tour manipulations to be "extremely stressful" because a Caucasian sales person's income was "literally controlled by the front desk." [Id. at ¶¶ 197-98.]

Kelly describes an example of the tour manipulation, although she did not specify the date of the incident. A couple from India was the first to arrive for a tour, and they should have been assigned to the first sales executive on the line. Another sales executive – Takio Mogi, who is Japanese – laughed and said that the couple was going to be Kelly's tour. Kelly thought he was right because of the favoritism in tour assignments, but she told him that she was third on the line and should not be assigned the couple's tour. Mr. Mogi laughed and repeated that it was going to be her tour. [Id. at ¶¶ 167-72.] Mr. Quach was first on the line that day, but the Indian couple's tour was assigned to Kelly. Kelly notified the front desk about the apparent discrepancy, but they responded that Mr. Quach's tour was assigned. [Id. at ¶¶ 174-75.] According to Kelly, assigned tours was "a common excuse" for tour manipulation, but she could not verify whether a purported assignment was accurate or not because the front desk "had complete control over everything." [Id. at ¶¶ 176, 178.] Kelly notified Mr. Her about this incident, but he did nothing. [Id. at ¶ 179.]

Plaintiffs also submit other testimony, which they argue shows the tour manipulation was racially motivated. Grant

13

states that, on one occasion (he does not specify the date), he asked Mr. Her how he "could get more of the good Encore tours,"[11] and "Mr. Her smirked and told [him]: 'Your skin is the wrong color.'" [Kelly CSOF, Decl. of Andrew Grant ("Grant Kelly Decl.") at ¶¶ 344-45.[12]] Plaintiffs present a declaration of a Caucasian male, also a previous MVC-KOBC timeshare sales executive, who asked Ms. Chamizo "how [he] could keep getting so many bad tours." [Kelly CSOF, Decl. of Sebastian Brevart ("Brevart Decl.") at ¶ 6.] Mr. Brevart states, "[a]s always, she glared at [him] like she despised [him] and said under her breath 'Sucks to be Haole.'" [Id. at ¶ 7.] Mr. Brevart resigned a few days after this incident. [Id. at ¶ 8.]

---

[11] It is not clear what an "Encore tour" is, but he states "Encore tours have a significantly higher conversion rate (selling rate) than other tours." [Grant Kelly Decl. at ¶ 318.] Kelly refers to "tours from Encore Marketing Kiosks," [Kelly Decl. at ¶ 165,] so an Encore tour is presumably a tour for guest who the marketing kiosk had recruited and gathered additional information about. The additional information could potentially help the sales executive sell the guest a timeshare. See Kelly Decl. at ¶ 26.

[12] Ofer Ahuvia was also present when Mr. Her made the statement about Grant's skin. [Grant Kelly Decl. at ¶ 344.] Mr. Ahuvia is a Caucasian male who previously worked as a MVC-KOBC timeshare sales executive. [Kelly CSOF, Decl. of Ofer Ahuvia ("Ahuvia Decl.") at ¶¶ 3-4.] Mr. Ahuvia's declaration also describes the incident. [Id. at ¶¶ 10-11.]

## A.   **Termination**

### 1.   **General Policies**

The 2014 version of the MVC-KOBC Westbound Eagle Flight Plan ("Flight Plan") was the Local Standard Operating Procedures Manual for line sales associates at the time of Kelly's termination.  [Kelly Depo., Exh. 16 (2014 Flight Plan).]  Kelly admits receiving the 2014 Flight Plan.  The 2014 Flight Plan provides for the following discipline sequence: documented verbal warning; written warnings; and immediate suspension pending separation if three written warnings are received in a twelve-month period.  A sales associate could receive a warning for unsatisfactory sales performance or for behavior issues, including attendance matters like a "no call/no show."[13]  [MORI's Kelly CSOF at ¶ 10; Kelly CSOF at ¶ 10 (stating MORI's ¶ 10 is undisputed, except that Kelly asserts the deactivation policy superseded the discipline policy in the 2014 Flight Plan); 2014 Flight Plan at 3 of 26.]  The 2014 Flight Plan states the discipline policy would be modified if an employee was "beginning an approved LOA [(leave of absence)] or extending a current LOA."

---

[13] A "no call/no show" includes: arriving late for a scheduled shift by one hour or more, without prior notification; and failing to notify a manager or supervisor of an unexpected absence at least two hours before a scheduled shift.  [Kelly Depo., Exh. 20 (MVC-KOBC Attendance and Tardiness policy, updated 1/31/13) at D 000099.]  Kelly admitted that she saw the policy while she was working with MORI.  [Kelly Depo. at 105.]

[2014 Flight Plan at 3 of 26.]  The 2014 Flight Plan's discipline

policy contains the following section, titled "Eagle Passes":

> If an SE [(Sales Executive)] generates $30,000 in
> direct business in a period or $80,000 over the
> course of three consecutive periods the oldest
> PERFORMANCE warning will be deemed inactive and
> any additional performance warnings will be backed
> up to the previous sequence step.
>
> If an SE achieves Sapphire status in 2014 all
> previous PERFORMANCE warnings will be deemed
> inactive.

[Id. at 5 of 26 (emphases in original).]  According to Kelly,

sapphire status was the highest sales level.  Kelly believed

Be Vuong was at the sapphire level.[14]  [Kelly Depo. at 213.]

Kelly acknowledges neither of the Eagle Pass exceptions applied

to her.  [MORI's Kelly CSOF at ¶ 10; Kelly CSOF at ¶ 10; Kelly

Depo. at 213.]

    At her deposition, Kelly testified that, if a sales

associate had a written warning for low VPG,[15] the warning would

"fall off" or "go away" if the associate had no further warnings

for low VPG in the next three months ("Deactivation Policy").

---

[14] According to Grant, the super sapphire status is the
highest level.  [Grant Depo. at 146.]

[15] Sales performance is measured by the associate's "volume
per guest" ("VPG"), *i.e.* the number of sales divided by the
number of tours during a four-week period.  [Grigaitis Kelly
Decl. at ¶ 4.]  "Discipline could be avoided by meeting the
requisite percentage of the team's VPG for either the current
period or one of two specified 'rolling' periods, or by meeting a
minimum 'safety net' figure."  [MORI's Kelly CSOF at ¶ 19; Kelly
CSOF at ¶ 19.]

[Kelly Depo. at 102.]   According to Kelly, the Deactivation
Policy was in effect in 2014, but it was developed outside of the
2014 Flight Plan.   Someone may or may not have "sign[ed] off on a
sheet" about it.   [Id. at 103.]   Kelly admits she did not invoke
the Deactivation Policy either when she was terminated, when she
appealed her termination, or when she filed a charge with the
United States Equal Employment Opportunity Commission ("EEOC").
She also admits MORI, Grant, and Reisinger deny the existence of
the Deactivation Policy that she describes.   [MORI's Kelly CSOF
at ¶ 11; Kelly CSOF at ¶ 11 (only disputing MORI's ¶ 11 to the
extent it states Kelly has no evidence the Deactivation Policy
existed).]

Regarding the 2014 Flight Plan and its discipline
policy, Kelly asserts "[t]hese policies changed all the time."
[Kelly Decl. at ¶¶ 148-49.]   According to Kelly, Mr. Her told her
that Mr. Grigaitis created the Deactivation Policy.   [Id. at
¶ 150.]

### 2.   **Events Leading to Kelly's Termination**

In January, February, and March 2013, Kelly was in the
top five and ten for sales, which she argues proves she "was
clearly able to sell timeshare units."   [Id. at ¶¶ 79, 81.]
However, Kelly had knee surgery on March 28, 2013 in Honolulu.
The surgery was unsuccessful, forcing her to use crutches for six
weeks and have another surgery approximately seven months after

17

the first surgery.  [Id. at ¶¶ 83, 85, 92, 96.]  Kelly states the situation with her knee and the tour manipulation were the reasons why she had little or no sales in the summer of 2013, resulting in her write ups in August and September for low VPG.  [Id. at ¶¶ 97, 100-01.]  Kelly's second knee surgery was on October 30, 2013 in Philadelphia, but she was back at work by the first week of December.  Kelly made the top ten in sales for the first quarter of 2014.  [Id. at ¶¶ 103-05.]  However, after an April 2014 incident in which Kelly made a comment to front desk employee "Marchen"[16] that apparently angered Marchen, Kelly received worse tours than she had in the first quarter.  [Id. at ¶¶ 109-14.]  According to Kelly, her "sales went down due to the front desk, including Marchen's manipulation of the tours to [her] disadvantage," and Kelly only made one sale in April 2014.  [Id. at ¶¶ 114-15.]  "[S]ometime shortly after" the incident with Marchen, Kelly complained to Mr. Her about the manipulation of tours, but he ignored her complaint.  [Id. at ¶¶ 116-17.]

In December 2012, Kelly received a documented verbal warning for failing to meet the required VPG.  In August 2013, Kelly received a written warning for failing to meet the required VPG.  Kelly did not appeal the written warning.  [MORI's Kelly CSOF at ¶¶ 20-22; Kelly CSOF at ¶¶ 20-22; Kelly Depo., Exh. 6

---

[16] Kelly does not know Marchen's last name, but Kelly states Marchen is not Caucasian.  [Kelly Decl. at ¶ 10.]

18

(Disciplinary Action Form, dated 12/3/12, for verbal warning),
Exh. 11 (Disciplinary Action Form, dated 8/13/13, for written
warning).]  In September 2013, Kelly received a second written
warning for failing to meet the required VPG.  Kelly was aware
that she faced suspension and termination if she received a third
written warning, and she acknowledges that the option of an
appeal was specifically reviewed with her.  However, Kelly did
not appeal the second written warning.  [MORI's Kelly CSOF at
¶ 23; Kelly CSOF at ¶ 23; Kelly Depo., Exh. 12 (Disciplinary
Action Form, dated 9/5/13, for written warning).]

After the second written warning, Kelly's VPG, at a
minimum, met the "safety net" level, excluding periods when her
VPG was not calculated because she was on leave.  [MORI's Kelly
CSOF at ¶ 24; Kelly CSOF at ¶ 24.]  Kelly had approved time off
from April 23 to 29, 2014.  On April 30, 2014, Kelly did not
return to work.  She did not call MVC-KOBC to say that she would
be absent, because she believed she had turned in another leave
request form which included leave on April 30.[17]  However,
Kelly's belief was mistaken, and her absence was deemed a no

_____

[17] Kelly became ill when she and her husband returned on
April 29, 2014 from a trip to Japan.  [Kelly Decl. at ¶ 121.]
She returned to work on May 1, 2014, even though she had
salmonella poisoning.  [Id. at ¶ 124.]  Prior to the trip, she
apparently completed a leave request form that included April 30,
2014, but she left it on her desk and never turned it in.  Thus,
it was not approved.  [Kelly Depo. at 92.]  Only Kelly's leave
requests for April 23 to 25, 2014 and April 27 to 29, 2014 were
approved.  [Kelly Depo., Exh. 13.]

call/no show, resulting in Kelly's third written warning. When Kelly returned to work on May 1, 2014, she was issued a suspension pending termination notice, pursuant to the MVC-KOBC Attendance and Tardiness policy. [MORI's Kelly CSOF at ¶¶ 25-26; Kelly CSOF at ¶¶ 25-26;[18] Kelly Depo., Exh. 14 (Disciplinary Action Form, dated 5/1/14).] Kelly admits she is not aware of any specific sales executive who was not "written up" for a no call/no show, but she has heard there was someone who was not written up. [MORI's Kelly CSOF at ¶ 29; Kelly CSOF at ¶ 29.]

Kelly tried to explain to Mr. Grigaitis about her illness and the other leave slip which included April 30, but he said the matter had to be reviewed. Kelly and Don Ardissone[19] went to Kelly's office, and he was present when she found the leave slip that included April 30. He advised her to speak with Mr. Grigaitis again and tell him that they found the slip. Kelly did so, but it did not make a difference. [Id. at ¶¶ 127-33.] According to Kelly, Mary Shumack, a broker and part of the MVC-KOBC management, said what was being done to Kelly was ridiculous and "this had happened before with other people and

---

[18] Kelly only disputes MORI's ¶ 26 in order to assert her position that the Deactivation Policy superseded the Attendance and Tardiness policy. [Kelly CSOF at ¶ 26.]

[19] Don Ardissone is a MVC-KOBC team leader. [Kelly Decl. at ¶ 87.]

they did not get suspended for the no call/no show." [Id. at ¶¶ 134-35.]

Kelly obtained a note from her doctor stating she could not work from April 29 to May 5, 2014. Kelly attempted to give the note to Mr. Her, but he would not accept it. [Id. at ¶¶ 136-39.] Kelly went to a May 7, 2014 human resources ("HR") review meeting with Mr. Her and Lesley Matsuwaki,[20] but they did not let Kelly speak, and they merely informed Kelly the incident was deemed a no call/no show, and the decision had been made to terminate her. [Id. at ¶¶ 141-43.] Kelly emphasizes that, prior to this incident, she had never received a warning or a write up for being late. She states she was only late for work once, and she had a pass because it was due to an accident. [Id. at ¶¶ 144-45.]

On May 7, 2014, Kelly was informed that she would be terminated. Kelly does not recall being told that the reason for her termination was her three written warnings in a twelve-month period, but she understood that was the official reason for her termination. [MORI's Kelly CSOF at ¶ 27; Kelly CSOF at ¶ 27; Kelly Depo., Exh. 15 (Disciplinary Action Form, dated 5/7/14).] Kelly asserts that, under the Deactivation Policy, her August

_____

[20] Lesley Ann Matsuwaki is MORI's Regional Work Environment Manager, Resort Operations – Hawaii. From November 2012 to March 2015, she was the MVC-KOBC HR Manager. [MORI Kelly CSOF, Decl. of Lesley Ann Matsuwaki ("Matsuwaki Kelly Decl.") at ¶ 1.]

2013 and September 2013 written warnings for low VPG should have
been deactivated because of her subsequent three months of
satisfactory sales.  Without either, or both, of those written
warnings, the no call/no show for April 30, 2014 would not have
resulted in her termination under the 2014 Flight Plan's
discipline policy.  [Kelly Decl. at ¶¶ 150-53.]

MORI has presented evidence that Mr. Grigaitis makes
all of the termination decisions, with input from HR, for the
MVC-KOBC sales executives.  [Grigaitis Kelly Decl. at ¶ 11.]
After Kelly received her suspension pending termination,
Mr. Grigaitis: reviewed her situation; consulted with Jennifer
O'Connor, the "Work Environment Manager for Sales and Marketing,
West/Hawaii"; and made the decision to terminate Kelly.  [Id.]

In addition to Kelly, Grant and two non-Caucasian sales
executives – one male and one female – were terminated during
2014 for having three written warnings in a twelve-month period.
[MORI's Kelly CSOF at ¶ 6; Kelly CSOF at ¶ 6 (disputing MORI's
¶ 6 only to the extent Plaintiffs allege the reason for Grant's
termination was pretextual).]  Kelly acknowledged "[m]any people"
were terminated because their VPG was consistently low.  [Kelly
Depo. at 56.]  However, Kelly states the sales executives' sales
numbers were posted near the break room, and there were many
periods during Hong Vuong's time at MVC-KOBC when he did not have
satisfactory sales.  However, he was not written up when he

should have been, and he would laugh and state he was not worried about being written up. [Kelly Decl. at ¶ 154.]

Plaintiffs also argue they have presented other evidence that Kelly's termination was racially motivated. Reisinger and Grant both provide testimony that Mr. Her stated, less than a month before Ms. Kelly was terminated, "[i]t's a matter of time before we get rid of all the haole people." Kelly CSOF, Decl. of Robin Reisinger ("Reisinger Kelly Decl.") at ¶ 108; see also Grant Kelly Decl. at ¶¶ 232-34. Grant also states that, in a 2006 meeting with the new sales director, Peter Park, who Grant describes as Asian, Mr. Park "told [Grant] that his ultimate goal was to give Marriott's Ko Olina Beach Club more of a 'local flavor' by hiring less Caucasian people." [Grant Kelly Decl. at ¶¶ 9-10.] Grant asked Mr. Park if that was discrimination, and Mr. Park responded: "'It's about time white people are discriminated against after hundreds of years!'" [Id. at ¶¶ 11-12.]

B. **Conduct in the Workplace**

According to Kelly, during her monthly reviews of her performance, Mr. Her would comment about how she dressed, and he would tell her to smile more, be more "girlie," and be more friendly. [MORI's Kelly CSOF at ¶ 13; Kelly CSOF at ¶ 13.] When Kelly would make a sale, Mr. Her would state that she must have worn a dress or that she must have smiled and been nice. Other

23

sales executives would make jokes about Mr. Her's comments to Kelly. The sales executives would state Kelly should dress more provocatively. Someone, although Kelly does not recall who, made a comment about Kelly being flat-chested. [MORI's Kelly CSOF at ¶¶ 13-14; Kelly CSOF at ¶¶ 13-14.]

Further, in groups of sales executives and team leaders, sexual jokes were told, but Kelly does not recall any specific ones. [MORI's Kelly CSOF at ¶ 15; Kelly CSOF at ¶ 15.] Sales executives and team leaders would also tell jokes and make fun of different ethnicities, including their own. For example, they would state that African-Americans and Indians were unlikely to buy timeshares, and they would refer to an Indian guest as "dot head." Although at her deposition Kelly did not recall ever hearing anyone use the word "nigger," she now recalls that someone did so. [MORI's Kelly CSOF at ¶ 17; Kelly CSOF at ¶ 17 (disputing only that she never heard anyone use the word).] The sales executives also made jokes about how: haoles were rude, loud, and did not understand local culture; and Asians were bad drivers. [Kelly Depo. at 152, 159.] Kelly alleges Mr. Her made racial comments, including using the word haole when talking about a guest, but Mr. Her never called Kelly a haole to her face. He would also quote the movie "The Help" when trying to encourage associates to make sales, saying: "You is kind. You is

smart.  You is important."  [MORI's Kelly CSOF at ¶ 16; Kelly
CSOF at ¶ 16.]

   Kelly states she heard racist and sexist jokes from
sales executives and management, including Mr. Her, almost daily.
Mr. Her and Be Vuong would mock people of Indian ancestry by
copying their accent, and Be Vuong would make comments about
African Americans raping women.  [Kelly Decl. at ¶¶ 34-36.]
However, Kelly asserts that, on her sales team, "being a
Caucasian person, a haole, was clearly the worst disadvantage."
[Id. at ¶ 37.]  According to Kelly, MVC-KOBC employees, including
Mr. Her and Ms. Chamizo, used the term haole in a negative manner
on a daily basis.  The non-Caucasian sales executives and the
front desk employees would state that haoles were not "'one of
us'" or would otherwise use the term to exclude Caucasians.  [Id.
at ¶ 38.]  According to Kelly, a white person would be called
haole when she did something stupid.  [Id. at ¶ 39.]

   According to Kelly, most of the racist comments were
made during the 8:30 a.m. meetings and in the team leaders'
office, and the comments were most often about African-Americans
and Indians.  [Id. at ¶¶ 183, 185.]  Kelly recalls one morning
meeting (she does not specify the date) when "every conceivable
name for an Indian was thrown out by many sales executives as if
it was a competition," including "Dothead, towelhead, sandnigger,
etc."  [Id. at ¶¶ 184, 186-87.]  It was primarily the sales

executives who participated in this, but Mr. Her "was present and also made comments and laughed, contributing and condoning this racist environment."  [Id. at ¶ 188.]

Also at the morning meetings and with Mr. Her present, the sales executives made discriminatory statements about African-Americans, including using the word "nigger."  Kelly informed them she had nieces who were half African-American, and she had photos of her nieces in her office.  Occasionally, the sales executives would stop using certain words when Kelly was present.  [Id. at ¶¶ 190-92.]  Kelly also states Mr. Her quoted "The Help" "more than once and quite regularly."  [Id. at ¶¶ 194-95.]

Kelly found all of these racial comments "extremely offensive."  [Id. at ¶ 196.]  As further evidence of the racial harassment at MVC-KOBC, Plaintiffs present other testimony about racially discriminatory statements:

- Mr. Her bragged in the lunchroom to other non-Caucasian sales executives: "It's another day of Asian Domination at Ko Olina Beach Club!"  [Grant Kelly Decl. at ¶ 310.]

- In another incident, Grant asked Mr. Her why he married a Caucasian woman if he hated Caucasians so much.  Mr. did not deny that he hated Caucasians, and he responded, "'[s]o I can dominate her too!'"  [Id. at ¶¶ 340-43; Ahuvia Decl. at ¶¶ 6-9.]

- Grant states: "On January 8, 2014, Mr. Brad DeLoach (Caucasian sales executive) and I overhear Mr. Her (non-Caucasian senior sales manager) say 'The reason Paul Callaham (Caucasian) makes sales is that he dumbs the customer into the deal,' inferring that Paul is dumb."

[Grant Kelly Decl. at ¶ 183 (some internal quotation marks omitted).]

- Grant states: "In January 2014, Mr. Her told [him]: 'Andrew, I think you should really go to Arizona. The people there are educated, good-looking, and it'll have a different feeling." [Id. at ¶ 202.] According to Grant, Mr. Her was inferring "there is no racial tension/discrimination in Arizona against Caucasians." [Id. at ¶ 203.]

- Kelly also states that, when Be Vuong talked about his gun collection, "why he has them and when he would use them, it was always some story about a black person intruding in his home or on his family." [Kelly Decl. at ¶ 193.]

However, MORI states, and Kelly does not dispute that:

The only alleged race-based comments and conduct directed toward [Kelly] by sales executives, [team leaders] and some front desk employees consisted of being called haole; feeling excluded in the break room when the front desk employees would not talk to her, would tell "haole jokes" and would speak "deep pidgin"; and a front desk employee not making eye contact with her.

[MORI's Kelly CSOF at ¶ 18; Kelly CSOF at ¶ 18.] Kelly does not allege either Ms. Chasteen or Mr. Grigaitis ever made offensive comments to her, whether based on either race or sex/gender. [Kelly Depo. at 138, 149-50.] Kelly admits she received MORI's policy regarding harassment, and she knew she could report concerns either to the on-site HR representative or on the toll-free hotline. However, she does not recall reporting any of the comments she found offensive. [MORI's Kelly CSOF at ¶ 8; Kelly CSOF at ¶ 8.]

## C.  **The Kelly Charge**

Kelly submitted a Charge of Discrimination, dated November 20, 2014, against Marriott Vacation Club International to the EEOC ("Kelly Charge").  It alleged discrimination based on race and sex, in violation of Title VII.  It did not allege violations of Haw. Rev. Stat. § 378-2, nor did it allege retaliation.  Further, it did not refer to the HWPA.  [Kelly Depo., Exh. 29 (Kelly Charge).]  The EEOC dismissed the Kelly Charge because it was unable to conclude there was a violation of the applicable statutes.  [Id., Exh. 30 (Dismissal and Notice of Rights, dated 10/19/15).]

## II.  **Reisinger Motion**

In addition to the evidence relevant to the Kelly Motion, the parties have presented the following evidence regarding Reisinger's claims.

Reisinger is a Caucasian female who was not born in Hawai`i.  She started working for MORI in October 2004 as a timeshare sales executive at Kauai Beach Club.  [Reisinger's Concise Statement of Facts ("Reisinger CSOF"), filed 6/25/18 (dkt. no. 99), Decl. of Robin Reisinger ("Reisinger Decl.") at ¶¶ 3-4.]  She later transferred to the Waiohai Beach Club, where she worked for five years.  [Id. at ¶ 9.]  In January 2010, the sales team moved to the Kauai Lagoons.  [Id. at ¶ 12.]

Plaintiffs assert Reisinger was a successful sales executive before she transferred to MVC-KOBC. At the Kauai Beach Club, Reisinger graduated first from her training class in November 2004, made the first sale in the training class in December 2004, and was the only one of the training class to complete the 180-day probationary period. She also won the Rookie of the Year award at the in 2005. [Id. at ¶¶ 5-8.] At the Waiohai Beach Club, she was promoted to the In House/Owner tour line after a couple of years, even though sales executives usually were only promoted to that line if the executive was an owner or had been on the regular sales line for at least five years. [Id. at ¶ 10.] At the Kauai Lagoons, after MORI started selling a new product in June 2010, Reisinger was the first to make a sale of the new product. [Id. at ¶¶ 13-14.]

In addition to making sales, Reisinger: took care of hundreds of timeshare owners when they scheduled vacations; designed new sales collateral and sales technology that she would share with the Kauai team and the MVC headquarters; hosted sales executive training sessions; and was a mentor to new sales executives. [Id. at ¶¶ 16, 18-22.] She also received various awards while she was on Kauai. [Id. at ¶¶ 23-25.] Reisinger asserts all of this showed she "was highly qualified to work for MORI as a timeshare sales [executive]." [Id. at ¶ 26.]

The parties agree that, during Reisinger's employment with MORI on Kauai: she was disciplined on numerous occasions, primarily for attendance and performance; she did not appeal any of those disciplinary actions; and "[i]n late 2011, her discipline brought her to the brink of termination." [MORI's Reisinger CSOF at ¶ 1; Reisinger CSOF at pg. 2 (stating Reisinger has no objection to MORI's ¶ 1); MORI's Reisinger CSOF, Decl. of Richard M. Rand ("Rand Reisinger Decl."), Exh. A (excerpts of trans. of Reisinger's 3/8/18 depo. ("Reisinger Depo."), Exhs. 2-10 (documentation of Reisinger's verbal and written warnings from 3/3/06 to 12/12/12).] Reisinger knew she could appeal each of those disciplinary actions, but she did not do so because she believed they were fair. [Reisinger Depo. at 43-45, 51-52, 56, 61, 66, 68-69.]

In June 2013, Reisinger moved to Oahu and transferred to MVC-KOBC. [Reisinger Decl. at ¶ 28.] Mr. Her was Reisinger's immediate supervisor. [MORI's Concise Statement of Facts in Supp. of Reisinger Motion ("MORI's Reisinger CSOF"), filed 4/20/18 (dkt. no. 80), Decl. of Gregory Grigaitis ("Grigaitis Reisinger Decl.") at ¶ 2.] Reisinger was terminated on April 30, 2014. [MORI's Reisinger CSOF at ¶ 14; Reisinger CSOF at pg. 2.]

Like Kelly's claims, Reisinger's claims are also based, in part, on the favoritism shown to Be Vuong, which Reisinger asserts "'trickle[d] down'" to sales executives who were his

friends.  [MORI's Reisinger CSOF at ¶ 6; Reisinger CSOF at pg. 2.]  Be Vuong's friends were various races, but none were Caucasian.  However, Reisinger acknowledges there were Caucasian sales executives who did well at MVC-KOBC.  Reisinger believed: anyone on Be Vuong's bad side would not do well; and she was on his bad side because she once refused to help him make a sale to guests who had previously made a purchase from her.  [MORI's Reisinger CSOF at ¶ 7; Reisinger CSOF at pg. 2.]

A.   **Conduct in the Workplace**

Reisinger alleges the following comments and conduct, which she asserts were race-based, occurred during her employment:

> (a) Mr. Her made comments such as, "Finally, I knew I hired you for a reason," or "I haven't been happy that we hired you, but now you're finally doing something"; (b) Mr. Her made a comment to an unknown person, in an unknown context, "It's only a matter of time until we get rid of all these haoles"; (c) on one occasion, front desk manager . . . Rayn [Chamizo] made Plaintiff Reisinger wait while Rayn finished a personal phone call and got off the phone by saying, "This haole is waiting in the hallway"; (d) when Plaintiff was trying to use the printer, a receptionist said, "You people aren't allowed to touch this," and did not explain what she meant by "you people"; and (e) on one occasion, when Plaintiff was trying to figure out how long it would take to print a contract, a contract manager screamed at Plaintiff to go back to her desk.

[MORI's Reisinger CSOF at ¶ 8; Reisinger CSOF at pg. 2.]

According to Reisinger, she reported race discrimination to HR.

[MORI's Reisinger CSOF at ¶ 20; Reisinger CSOF at pg. 2.]

31

In addition, Reisinger states she "witnessed a number of incidents at Ko`Olina that were not only against MORI's Standard Operating Procedure but were not in keeping with the MORI culture that [she] was used to in Kauai." [Reisinger Decl. at ¶ 61.] Reisinger describes similar conduct involving Be Vuong and others that Kelly described. Reisinger states she reported the discriminatory tour manipulation to HR a couple months before her termination. [Id. at ¶¶ 56, 100.] Reisinger also told Ms. Matsuwaki she was being picked on because of her race. [Id. at ¶ 117.] Ms. Matsuwaki told Reisinger that the tour manipulation was impossible because it would be illegal, and MORI does not do illegal things. [Id. at ¶ 101.] Reisinger states that, throughout her employment at MORI, she made numerous complaints about Be Vuong's preferential treatment. She also reported to Mr. Grigaitis that Be Vuong was acting like a bully. [Id. at ¶ 116.]

Reisinger describes an incident in which Mr. Grigaitis asked her to contact some of her owners who had just done a tour with Be Vuong and to lie to them so that they would buy from Be Vuong. [Id. at ¶¶ 57-59.] Reisinger states she and Grant overheard Mr. Her make the "matter of time" statement on April 9, 2014. She asserts all Plaintiffs were terminated soon after this statement. [Id. at ¶¶ 107-09.]

**B.** **Termination**

At the time of her transfer to MVC-KOBC, Reisinger received the Associate Handbook ("Handbook") and a version of the Flight Plan. Both included a progressive discipline policy that provided for termination after a third written warning. [MORI's Reisinger CSOF at ¶ 2; Reisinger CSOF at pg. 2.] According to Reisinger, until January 2014, MORI's policy only required termination if there were three written warnings for the same infraction. In January 2014, the policy was changed so that termination would result from any three infractions, and Reisinger believed this was to target her for termination. However, she admits the policy change affected other sales executives, not only her or other Caucasian sales executives. [MORI's Reisinger CSOF at ¶ 3; Reisinger CSOF at pg. 2.] Reisinger also admits that "warnings for low VPG 'happen[ed] pretty often' to many sales executives." [MORI's Reisinger CSOF at ¶ 4; Reisinger CSOF at pg. 2.] The parties agree that having three call-offs[21] on non-consecutive days is considered excessive and would result in a verbal or written warning for attendance problems, depending on the employee's status in the discipline system. [MORI's Reisinger CSOF at ¶ 5; Reisinger CSOF at pg. 2.]

---

[21] A call-off is, for example, when a sales associate works for an hour or less and then leaves work prior to the close of her shift due to illness. [Reisinger Depo., Exh. 13 (MVC-KOBC Attendance and Tardiness policy) at D 000100.]

On August 7, 2013, Reisinger received a verbal warning for three non-consecutive call-offs. She did not contest the warning. [MORI's Reisinger CSOF at ¶ 9; Reisinger CSOF at pg. 2; Reisinger Depo., Exh. 22 (Disciplinary Action Form, dated 8/7/13).] The parties agree that, on December 16, 2013, Reisinger received a Disciplinary Action Form for having another three non-consecutive call-offs. [MORI's Reisinger CSOF at ¶ 10; Reisinger CSOF at pg. 3 (disputing other portions of MORI's ¶ 10).] The typewritten Disciplinary Action Form states the incident date was December 10, 2013, and the discipline type is "Verbal Warning," but the version MORI submitted in support of the Reisinger Motion has an initialed, handwritten note that appears to say "written." [Reisinger Depo., Exh. 25 at D 000185.] Reisinger contests the handwritten modification of the form. She states the copy she received does not have any handwritten notation that it was changed from a verbal warning to a written warning. [Reisinger Decl. at ¶ 111, Exh. 1.] It was not until her deposition in this case that she saw the version of the December 10, 2013 form with the handwritten change. According the Reisinger, the handwriting is Mr. Her's. [Reisinger Decl. at ¶ 112.]

On April 4, 2014, Reisinger was issued a verbal warning for low VPG, which she did not dispute. [MORI's Reisinger CSOF at ¶ 11; Reisinger CSOF at pg. 2; Reisinger Depo., Exh. 26

(Disciplinary Action Form, dated 4/4/14, for incident date 3/26/14).]

On April 12, 2014, Reisinger signed a Disciplinary Action Form for a written warning for three non-consecutive call-offs. The form stated it was a her second written warning. [MORI's Reisinger CSOF at ¶ 12; Reisinger CSOF at pg. 2; Reisinger Depo., Exh. 27 (Disciplinary Action Form, dated 4/12/14).] When Reisinger saw the April 12, 2014 written warning, which said the December 10 warning was a written warning, she thought it was a mistake. [Reisinger Decl. at ¶ 112.] Reisinger argues the April 12, 2014 written warning is unjustified because she had a valid reason for missing work on March 18, 2014. On March 17, 2014, after notifying the supervisor on duty, Reisinger left early to obtain medical treatment. On March 19, 2014, she returned to work and submitted a doctor's note stating she was excused from work on March 18. Reisinger gave the original note to Mr. Her. He stated he would give a copy back to her but he never did. [Id. at ¶¶ 113-14, Exh. 2 (medical bills for the 3/17/14 office visit).]

On April 25, 2014, Reisinger received a written warning for low VPG. Because this was considered her third written warning in a twelve-month period, it constituted a suspension pending termination. Reisinger does not dispute that her VPG was below the minimum level at that time. She was told there would

be an investigation, but she does not know what was actually investigated. [MORI's Reisinger CSOF at ¶ 13; Reisinger CSOF at pg. 2; Reisinger Depo., Exh. 28 (Disciplinary Action Form, dated 4/25/14).] At an April 30, 2014 follow-up meeting, Mr. Her and Ms. Matsuwaki informed Reisinger she was being terminated. [MORI's Reisinger CSOF at ¶ 14; Reisinger CSOF at pg. 2.]

After Reisinger received her suspension pending termination, Mr. Grigaitis: reviewed the situation; consulted with Ms. O'Connor; and made the decision to terminate Reisinger. [Grigaitis Reisinger Decl. at ¶ 7.] MORI emphasizes other sales executives besides Plaintiffs were terminated for having three written warnings, and these include non-Caucasians. [MORI's Reisinger CSOF at ¶ 16 (some citations omitted) (citing MORI's Reisinger CSOF, Decl. of Lesley Ann Matsuwaki ("Matsuwaki Reisinger Decl.") at ¶ 5; Grigaitis Reisinger Decl. at ¶ 3).] However, Reisinger argues she should not have gotten "strikes" for poor sales because her poor sales were due to the discriminatory tour manipulation that disadvantaged Caucasians. [Reisinger Decl. at ¶ 110.]

The parties agree Reisinger did not try to use the GFT process until her termination. [MORI's Reisinger CSOF at ¶ 17; Reisinger CSOF at pg. 2.] Reisinger believes Hong Vuong was not terminated for poor performance, but she does not have personal

knowledge of any discipline he received.  [MORI's Reisinger CSOF
at ¶ 19; Reisinger CSOF at pg. 2.]

### C. __The Reisinger Charge__

Reisinger filed a Charge of Discrimination with the
EEOC, which was received on March 23, 2015 ("Reisinger Charge").
The Reisinger Charge only alleges race discrimination.
[Reisinger Depo., Exh. 34.]  The EEOC dismissed the Reisinger
Charge because it was unable to conclude there was a violation of
the applicable statutes.  [Id., Exh. 35 (Dismissal and Notice of
Rights, dated 12/15/15).]

In response to the Reisinger Motion, Reisinger agreed
to withdraw her hostile work environment claim, but she opposes
the motion as to all of her other claims.  [Reisinger Opp. at 3.]

## III. __Grant Motion__

In addition to the evidence relevant to the other
motions, the parties have presented the following evidence
regarding Grant's claims.

Grant is a Caucasian male who was not born in Hawai`i.
He worked as a sales executive at MVC-KOBC from October 2003
until September 2007, when he was recruited to work at the Westin
in California.  [Grant Depo. at 34-36.]  In 2008, Grant returned

to work for MORI in Palm Springs, California as a team leader.[22]
[Id. at 50-51, 53.]  In March 2009, Grant transferred back to
MVC-KOBC as a sales executive, and his supervisors were
Mr. Grigaitis, Ms. Chasteen, and Mr. Her.  [Id. at 53-54.]  Grant
worked with the westbound sales team, which primarily works with
guests who traveled west to get to Hawai`i.  In contrast,
customers from Japan were considered eastbound.  Grant never
worked with the eastbound sales team.  [Id. at 63-64.]  Grant was
ultimately terminated on May 2, 2014 for having three written
warnings within a one-year period.  [Grant Kelly Decl. at ¶ 301.]

Like Kelly's and Reisinger's claims, Grant's claims are
based on the alleged favoritism shown to certain non-Caucasian
sales executives.  [MORI's Grant CSOF at ¶ 1; Grant's Concise
Statement of Facts ("Grant CSOF"), filed 8/31/18 (dkt. no. 112),
at pg. 1 (stating Grant has "no objection to" MORI's ¶ 1).]
However, Grant acknowledges that the disfavored sales executives
were of various races and skin colors.  [MORI's Grant CSOF at
¶ 2, Grant CSOF at pg. 1.]  Grant also admitted: the front desk
employees who treated certain sales executives more favorably
"could pick one person they really wanted to bury more than say
another Caucasian"; [Grant Depo. at 61-62;] guests did not always
hold true to their perceived stereotype of being more or less

_____

[22] A team leader, referred to as a "TO," would usually come
in at the end of the sales process to close the sale.  [Grant
Depo. at 51, 53.]

likely to buy timeshares; [MORI's Grant CSOF at ¶ 3; Grant CSOF at pg. 1;] and he often had strong sales, as did "other Caucasian/lighter-skinned sales executives," [MORI's Grant CSOF at ¶ 3; Grant CSOF at pg. 1].

A. **Changes in MORI's Employment Policies**

Upon returning to MORI in 2009, Grant signed an acknowledgment stating that he received the Handbook, although, at his deposition, he did not recall actually receiving the Handbook. However, he was aware that he could obtain the Handbook from HR, and he requested and received a Handbook from HR in 2014. [Grant Depo. at 39-41.] Both the Handbook in effect in 2009 and the Handbook in effect in 2014 contained the progressive discipline policy described *supra*. [Matsuwaki Grant Decl. at ¶ 3.]

Grant believed that, prior to January 2014, a MORI employee would only be terminated if he or she received three written warnings for the "same offense." [MORI's Grant CSOF at ¶ 8; Grant CSOF at pg. 1.] Grant believed this policy changed in January 2014, such that three written warnings for "any offense" would result in termination. [MORI Grant CSOF at ¶ 8 (emphasis omitted); Grant CSOF at pg. 1.] Grant believed this policy change was intended to target him, but he acknowledged that it applied to all sales executives regardless of their race/color, and the change resulted in the termination of other sales

executives.  [MORI's Grant CSOF at ¶ 8, Grant CSOF at pg. 1.]  In 2014, two sales executives who self-identified as "Asian" and "two or more races," but not "White," were terminated for having three written warnings within a twelve-month period.  [MORI's Grant CSOF at ¶ 9, Grant CSOF at pg. 1.]

Like Kelly and Reisinger, Grant received the 2014 Flight Plan, which contained various policies pertaining to the sales processes.  [Grant Depo. at 128, 131.]  Grant acknowledges that sales performance can fluctuate, and most sales executives will have a bad month periodically.  He also acknowledges that other sales executives have been terminated because of their poor sales.  [MORI's Grant CSOF at ¶ 10; Grant CSOF at pg. 1.]

Grant admits that he probably saw the MORI Attendance and Tardiness policy, also described *supra*.  [Grant Depo. at 126-27.]  Grant was aware of MORI's GFT process and utilized it in 2012 to report an alleged assault by another sales executive (Brian Denigris), and again in April 2014 after his notice of suspension pending investigation for termination.  [Grant Depo. at 81-83.]  Both MORI's 2009 Handbook and its 2014 Handbook had a "Policy Prohibiting Harassment and Unprofessional Conduct," which allowed an employee to raise concerns with management or HR. [Matsuwaki Grant Decl. at ¶ 4.]  Grant sought assistance from HR related to Mr. Denigris in 2012, but otherwise did not follow the

policy's process for reporting incidents of alleged harassment. [MORI's Grant CSOF at ¶ 25; Grant CSOF at pg. 1.]

### B. __Conduct in the Workplace__

Grant claims to have witnessed several racially motivated comments while employed with MORI, including: Mr. Her's "a matter of time" statement; [Grant Kelly Decl. at ¶¶ 232-34;] his "Asian Domination" statement;[23] [id. at ¶ 310;] his statement that he married a "white girl" so that he could "dominate her too"; [id. at ¶¶ 340-43;] his statement that Grant did not receive good tours because Grant's skin was the wrong color; [id. at ¶¶ 344-45;] and his advice that Grant should go to Arizona; [id. at ¶¶ 202-03]. Grant also recalls Be Vuong saying: "What's up, haole?" to Grant when Be Vuong entered the lunchroom. [MORI's Grant CSOF at ¶ 26(f); Grant CSOF at pg. 1.] Grant did not report the above comments to management or HR. [MORI's Grant CSOF at ¶ 25; Grant CSOF at pg. 1.]

Grant made complaints to HR twice in 2012. The first incident involved Mr. Denigris's alleged assault and belligerent behavior,[24] and his second complaint was that an Asian front desk

---

[23] Grant admits this statement was made "in the context of the eastbound sales time (*i.e.*, tours from Japan) out-selling the westbound team." [MORI's Grant CSOF at ¶ 26(b); Grant CSOF at pg. 1.]

[24] According to Grant's deposition testimony, Grant and Mr. Denigris made competing complaints about one another related to verbal bickering which resulted in "coaching and counseling"
(continued...)

employee had been reprimanded for being nice to him.[25]  [MORI's
Grant CSOF at ¶ 21; Grant CSOF at pg. 1.]  Grant asserts that,
between 2009 and 2014, "he raised concerns about improper tour
assignments," and some of these concerns "were addressed and
corrected," while others were not.  [MORI's Grant CSOF at ¶ 23;
Grant CSOF at pg. 1.]  In 2009, Grant reported to Mr. Grigaitis
that he was being assigned "an inordinate amount of Russian
tours" because the front desk was "messing around with [his]
tours."  [Grant Depo. at 55-56.]  Mr. Grigaitis's response was:
"Oh, you think there's a conspiracy?"  [Grant Depo. at 56-58.]

     In January 2012, Grant testified he reported to
Mr. Grigaitis that a front desk employee had given Grant's tour
to an Asian sales executive, who Grant referred to as "Sonny."
Ms. Chasteen later told Grant the front desk employee had been
disciplined, which made Grant feel like "whatever happened made a
difference there for a little while."  [Grant Depo. at 318-19.]

------

     [24] (...continued)
and a prohibition on further interaction between them.  [Grant
Depo. at 86-87, 113, 116-17, 118, 122-23, Exh. 7 (Disciplinary
Action Form, dated 8/8/12), Exh. 12 (Interoffice Memorandum,
dated 12/9/12, from Mr. Grigaitis to Grant regarding "ACTION PLAN
for Andrew Grant and Brian Denigris" (emphasis in original)).]

     [25] Grant testified that Makoto Walker was a Japanese woman,
married to a Caucasian, who worked as a receptionist.  She told
Grant she was reprimanded by two people for being nice to Grant.
[Grant Depo. at 91.]  Ms. Walker had smiled at Grant and said
"good morning" when he got out of the elevator, and she was
"being nice" to him while sitting close to him (although at a
different table) in the lunch room.  [Id. at 91-92.]

In December 2012, Grant reported to Mr. Grigaitis that a tour with a married couple, which should have gone to Grant, was given to Hong Vuong while Grant received a tour for a single male in his twenties.  Grant does not believe Mr. Grigaitis did anything in response to this.  [Id. at 327-28.]  At an unspecified time, Grant complained to Ms. Chasteen that a tour that should have been assigned to him was instead assigned to Mr. Quach.[26]  [Id. at 321.]  Ms. Chasteen told Grant: "I'll see what I can do," but, shortly after that, Grant overheard her talking to Mr. Quach and telling him "Oh, Tony, I took care of it.  You get to keep the tour.  I take care of my boys."  [Id. at 322.]

According to Grant, in 2013 or 2014 he reported to Mr. Grigaitis that Be Vuong and Mr. Quach were not disclosing when they completed their first tour, and they were doing other things.  When a good tour came in, the front desk employees would call them, and they would be assigned the tour out of the rotational tour sequence.  [Grant Depo. at 70-73, 291-93.]  Grant admitted that Mr. Grigaitis immediately addressed the situation and prevented the improper assignment; however, when this type of improper assignment happened again, Grant did not report it to Mr. Grigaitis.  [Grant Depo. at 71, 73, 292-93.]  In January

---

[26] The incident must have occurred prior to February 25, 2013, which was when Ms. Chasteen left MVC-KOBC.  See Matsuwaki Grant Decl. at ¶ 11.

2014, Grant reported another improper tour assignment to Mr. Her, which Mr. Her corrected. [Grant Depo. at 336-38.]

Apart from reporting improperly assigned tours, Grant also raised other concerns about his employment to Mr. Grigaitis. In 2011, Grant reported that he did not receive an incentive payment on time whereas an Asian sales executive did. [MORI's Grant CSOF at ¶ 24(a); Grant CSOF at pg. 1.] In 2013 or 2014, Grant reported receiving "'looks' . . . from certain associates" and that Mr. Her "'would give [him] stink eye.'" [MORI's Grant CSOF at ¶ 24(b) (some alterations in original); Grant CSOF at pg. 1.] Grant testified that, in 2013 or 2014, he rang the bell at the contracts department window and Mr. Her, upon discovering Grant was at the door, told him to "[g]o away," and then "he and the other Asian associates laughed at" Grant. [Grant Depo. at 290.] Grant states Mr. Grigaitis, "on more than one occasion," set the threshold level to become a TO at an amount barely over the VPG numbers Grant had posted at the time. [Id. at 296.] Grant raised this to Mr. Grigaitis, but Grant does not recall when he did so or what Mr. Grigaitis's response was. [Id. at 297.] On April 21, 2014, Grant reported to Mr. Grigaitis that the contracts office prevented one of Grant's sales from going through. Mr. Grigaitis promptly fixed the situation, and Grant received his credit for the sale. [MORI's Grant CSOF at ¶ 24(e); Grant CSOF at pg. 1.]

C. **Termination**

Grant received two verbal warnings in 2010 – one for failing to meet the required VPG, and one for attendance issues, *i.e.*, having three non-consecutive call-offs within a sixty-day period. [MORI's Grant CSOF at ¶ 12; Grant CSOF at pg. 1.] In 2012, Grant received "coaching and counseling" related to the incident with Mr. Denigris. [MORI's Grant CSOF at ¶ 12; Grant CSOF at pg. 1.] On December 14, 2013, Grant received a second verbal warning for his attendance. On January 1, 2014, Grant was issued a verbal warning for unprofessional conduct, and, on February 1, 2014, Grant was issued another verbal warning for low VPG. [MORI's Grant CSOF at ¶ 12; Grant CSOF at pg. 1.] On April 14, 2014, Mr. Her issued Grant his first written warning for attendance, despite the fact that Grant told him one of the call-offs was authorized by Ms. Shumack.[27] [Grant Depo. at 186-90.] Mr. Her allegedly told Grant that Ms. Shumack would be disciplined. [Id. at 264.] Grant has known Ms. Shumack since 2003 and thought she was his friend. [Id. at 223.]

On April 19, 2014, Grant received his second written warning, which was issued on the ground that Grant threatened Phil Kozma, a quality assurance representative, during an

---

[27] According to Ms. Shumack, Grant asked her how much "PTO" he had, although he does not recall using that "verbiage," and she told him he could take the time off. See Grant Depo. at 263-64 (Grant's testimony about an email from Mr. Shumack).

incident on April 7, 2014 ("Kozma Incident"). [Grant Depo. at 345, Exh. 23 (Disciplinary Action Form, dated 4/19/14).] Grant appealed the written warning to Mr. Grigaitis. [MORI's Grant CSOF, Decl. of Gregory Grigaitis ("Grigaitis Grant Decl.") at ¶ 10.]

Grant admits there was a "heated exchange between" him and Mr. Kozma. [Grant Depo. at 286.] However, he denies that there was a threat. See, e.g., id. at 179. Grant later talked about the incident with Mr. Kozma. Mr. Kozma said he did not hold a grudge, and it was "all Gregg Grigaitis's fault." [Id. at 345-46.] Grant thinks Mr. Kozma meant that Mr. Grigaitis made the situation worse than it actually was. [Id. at 346.] Paul Callaham, another MVC-KOBC sales executive, told Mr. Her he witnessed Grant say to Mr. Kozma: "Let's go. Let's take this outside." [Id., Exh. 33 (4/14/14 email from Mr. Callaham to Mr. Her).] Grant contends Mr. Callaham - who is Caucasian - lied about Grant making that statement. [Grant Depo. at 246-48.] At his deposition, Mr. Callaham testified that Mr. Her asked him to write an email about what he heard. [Grant CSOF, Decl. of Charles H. Brower, Exh. 8 (trans. of Paul Callaham's 8/16/18 depo.) at 14-15.] Grant testified that he had a recording of the Kozma Incident but, upon the advice of counsel, refused to play it for Mr. Grigaitis. [Grant Depo. at 246; Grigaitis Grant Decl. at ¶ 10.] Based on Grant's refusal to play the recording and, in

light of Mr. Callaham's statement, Mr. Grigaitis upheld the written warning issued to Grant. [Grigaitis Grant Decl. at ¶ 10.]

In April 2014, Grant received a written warning for having sub-standard VPG. This was his third written warning within twelve months. [Grant Depo., Exh. 25 (Disciplinary Action Form, dated 4/28/14).] On April 28, 2014, Ms. Matsuwaki emailed and mailed Grant his notice of suspension pending termination. [Matsuwaki Grant Decl. at ¶ 7; Grant Depo., Exh. 29 (email, dated 4/30/14, from Ms. Matsuwaki to Grant, forwarding the email dated 4/28/14, with attachments).] Ms. Matsuwaki also informed Grant that he could utilize the GFT process, and that a follow up meeting with HR was scheduled for May 2, 2014 at 12:00 p.m. [Matsuwaki Grant Decl. at ¶ 7.]

As previously noted, Grant utilized the GFT process after he received the notice of suspension pending termination. Following his call to the GFT hotline, Ms. O'Connor investigated the matter. [MORI's Grant CSOF, Decl. of Jennifer O'Connor ("O'Connor Grant Decl.") at ¶ 3.] In the course of the investigation, Ms. O'Connor spoke with Mr. Grigaitis on April 24, 2014, and she spoke to Grant several times. [Id. at ¶¶ 2-3.] On May 2, 2014, she informed Grant that she "could not substantiate his complaints about his written warnings, so they would be upheld." [Id. at ¶ 4.] Ms. O'Connor also reminded Grant about

the follow up meeting, which was scheduled for later that day.
[Id.]

With input from Ms. O'Connor and based on his independent review, Mr. Grigaitis decided to terminate Grant. [Grigaitis Grant Decl. at ¶ 13.] Grant argues that Ms. O'Connor's participation in his termination was a part of the conspiracy to terminate him. [Grant CSOF at ¶ 19.] Grant did not attend the May 2, 2014 follow up meeting; therefore Ms. Matsuwaki mailed a termination letter to Grant that day. [Matsuwaki Grant Decl. at ¶ 8.] Grant admits that it is not uncommon for sales executives to be disciplined or terminated because of poor sales. [MORI's Grant CSOF at ¶ 17; Grant CSOF at pg. 1.] Grant is also unaware of anyone who received three written warnings and was not terminated. [MORI's Grant CSOF at ¶ 20; Grant CSOF at pg. 1.]

D. **The Grant Charge**

Grant filed a Charge of Discrimination with the EEOC, which was received on June 17, 2014 ("Grant Charge"). The Grant Charge alleges race/color discrimination and retaliation. [Grant Depo., Exh. 40.] The EEOC dismissed the Grant Charge because it was unable to conclude there was a violation of the applicable statutes. [Id., Exh. 41 (Dismissal and Notice of Rights, dated 10/15/15).]

# DISCUSSION

## I.   **Withdrawn Claim**

In light of Reisinger's withdrawal of her hostile work environment claim, [Reisinger Opp. at 3,] Reisinger's claim in Count I alleging that she was subjected to a racially hostile work environment, in violation of Title VII, is dismissed.  See Fed. R. Civ. P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper.").  In light of the dismissal of Reisinger's hostile work environment claim, the Reisinger Motion is DENIED AS MOOT as to that claim. Kelly's and Grant's Title VII hostile work environment claims are not affected by the dismissal of Reisinger's claim.

## II.  **Exhaustion of Administrative Remedies**

MORI does not contest the fact that all Plaintiffs fulfilled the Title VII exhaustion of administrative remedies requirement by filing their respective charges with the EEOC. Cf. Scott v. Gino Morena Enters., LLC, 888 F.3d 1101, 1106 (9th Cir. 2018) (stating that, under Title VII, "a claimant must exhaust administrative remedies by filing a charge with the EEOC or an equivalent state agency . . . and receiving a right-to-sue letter" (citing 42 U.S.C. § 2000e-5(e)(1); Jasch v. Potter, 302 F.3d 1092, 1094 (9th Cir. 2002))).  MORI seeks summary judgment as to all of Kelly's and Reisinger's Haw. Rev. Stat. § 378-2

claims (Count II) on the ground that Kelly and Reisinger each
failed to exhaust her administrative remedies as to those claims.
MORI does not contest that Grant exhausted his administrative
remedies as to his § 378-2 claims.  MORI also raises exhaustion
argument regarding Count III, but those will be addressed *infra*
during the discussion of Plaintiffs' HWPA claims because it is
not clear that there is an exhaustion requirement for HWPA claims
in the first instance.

It is well settled that "Hawaii law . . . requires a
plaintiff to exhaust her administrative remedies before bringing
a claim for discrimination pursuant to" § 378-2.  See, e.g.,
Decampo v. OS Rest. Servs., LLC, Civ. No. 14-00092 ACK-BMK, 2014
WL 1691628, at *6 (D. Hawai`i Apr. 29, 2014) (citing Haw. Rev.
Stat. §§ 378-4, 368-11; You v. Longs Drugs Stores California,
LLC, 937 F. Supp. 2d 1237, 1248 (D. Haw. 2013)).  Kelly and
Reisinger have not identified any factual or legal reason why
this Court should reject MORI's position that their claims in
Count II are not exhausted.  This Court therefore finds there are
no genuine issues of material fact and concludes MORI is entitled
to judgment as a matter of law as to Kelly's and Reisinger's
claims in Count II.  See Fed. R. Civ. P. 56(a) ("The court shall
grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law.").

The Kelly Motion is granted as to all of Kelly's claims
in Count II, and the Reisinger Motion is granted as to all of
Reisinger's claims in Count II.

## III. **Title VII Claims**

### A. **Whether Kelly's Race-Based Claims and Her Gender-Based Claims Are Inseparable**

As a threshold matter, this Court must address Kelly's
argument that her race discrimination claims and her sex
discrimination claims must be considered together because of
"their inherently inseparable nature." [Kelly Opp. at 10 (citing
Lam v. University of Hawaii, 40 F.3d 1551 (9th Cir. 1994)).] In
Lam, the Ninth Circuit stated:

> [W]here two bases for discrimination exist, they
> cannot be neatly reduced to distinct components.
> See Jefferies [v. Harris Cty. Cmty. Action Ass'n],
> 615 F.2d [1025,] 1032-34 [(5th Cir. 1980)]; Graham
> v. Bendix Corp., 585 F. Supp. 1036, 1047 (N.D.
> Ind. 1984); Chambers v. Omaha Girls Club, 629 F.
> Supp. 925, 946 n.34 (D. Neb. 1986), aff'd, 834
> F.2d 697 (8th Cir. 1987). Rather than aiding the
> decisional process, the attempt to bisect a
> person's identity at the intersection of race and
> gender often distorts or ignores the particular
> nature of their experiences. Cf. Moore v. Hughes
> Helicopters, Inc., 708 F.2d 475, 480 (9th Cir.
> 1983) (black female not necessarily representative
> of interests of black males and white females).
> Like other subclasses under Title VII, Asian women
> are subject to a set of stereotypes and
> assumptions shared neither by Asian men nor by
> white women. In consequence, they may be targeted
> for discrimination "even in the absence of
> discrimination against [Asian] men or white
> women." Jefferies, 615 F.2d at 1032 (discussing
> black women); Hicks v. Gates Rubber Co., 833 F.2d
> 1406, 1416 (10th Cir. 1987) (same). Accordingly,
> we agree with the Jefferies court that, when a

> plaintiff is claiming race and sex bias, it is
> necessary to determine whether the employer
> discriminates on the basis of that combination of
> factors, not just whether it discriminates against
> people of the same race or of the same sex. Cf.
> Connecticut v. Teal, 457 U.S. 440, 455, 102 S. Ct.
> 2525, 2535, 73 L. Ed. 2d 130 (1982) ("Title VII
> does not permit the victim of a facially
> discriminatory policy to be told that he has not
> been wronged because other persons of his or her
> race or sex were hired.").

40 F.3d at 1562 (some alterations in Lam) (footnotes omitted).

The evidence before this Court is that the allegedly
discriminatory treatment and harassment Kelly experienced was
either distinctly race-based or distinctly sex-based. See, e.g.,
Kelly Decl. at ¶ 44 (stating that "[t]he non-Caucasian front desk
employees[] would profile people checking in for tours . . . and
give the best tours to Be Vuong, Tony Quach and Kaleo Wong and
other non-Caucasians"); Grant Kelly Decl. at ¶ 233 (Mr. Her
stated, "'It's a matter of time before we get rid of all the
white people.'"); MORI's Kelly CSOF at ¶ 13 (noting Kelly has
testified that, during her monthly reviews of her performance,
Mr. Her would comment about how she dressed and would tell her to
smile more, be more "'girlie,'" and be more friendly).  Further,
Reisinger, who is also a Caucasian female, is only alleging race-
based discrimination; and Grant, a Caucasian male, is alleging he
was discriminated against based on his race.  All of Plaintiffs'
race-based discrimination claims are based on the same set of
facts (albeit with some additional incidents relevant to each

Plaintiff individually) – the preferential treatment of specific Asian, male, sales executives; the disadvantaged position of the Caucasian sales executives; and the generally hostile work environment for the Caucasian sales executives. Kelly has not identified any evidence she, as a Caucasian female, was "subject to a set of stereo types and assumptions shared neither by" Caucasian men or non-Caucasian women. Kelly's argument that her Title VII race-based claims are inseparable from her sex-based claims is therefore rejected.

**B.** **General Standards**

Title VII prohibits employers from, *inter alia*, "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish disparate treatment in violation of . . . Title VII through direct evidence or, alternatively, through the familiar McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973),] burden shifting framework." Li v. City & Cty. of Honolulu, CIVIL 14-00573 LEK-RLP, 2017 WL 3015827, at *5 (D. Hawai`i July 14, 2017) (citing Surrell v. California Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2008) (discussing standard with respect to, *inter alia*, Title VII claims)).

When a plaintiff does not rely on the
McDonnell Douglas framework to oppose a summary
judgment motion, but seeks to establish her case
through the submission of actual evidence, "very
little such evidence is necessary to raise a
genuine issue of material fact regarding an
employer's motive[.]"  Lowe [v. City of Monrovia],
775 F.2d [998,] 1009 [(9th Cir. 1985), *amended by*
784 F.2d 1407 (9th Cir. 1986)]. . . .

For an employee to meet this burden, the
Ninth Circuit has "repeatedly held that a single
discriminatory comment by a plaintiff's supervisor
or decisionmaker is sufficient to preclude summary
judgment for the employer."  Dominguez-Curry v.
Nev. Transp. Dep't, 424 F.3d 1027, 1039 (9th Cir.
2005). . . .

Id. at *7.  This Court concludes the McDonnell Douglas analysis

is the appropriate standard in this case because the evidence

before this Court includes actions and statements by persons

besides Plaintiffs' supervisor and the decisionmaker.

The Ninth Circuit has stated:

Under th[e McDonnell Douglas] analysis, plaintiffs
must first establish a prima facie case of
employment discrimination.  Noyes v. Kelly Servs.,
488 F.3d 1163, 1168 (9th Cir. 2007).  If
plaintiffs establish a prima facie case, "[t]he
burden of production, but not persuasion, then
shifts to the employer to articulate some
legitimate, nondiscriminatory reason for the
challenged action."  Chuang v. Univ. of Cal.
Davis, Bd. of Trs., 225 F.3d 1115, 1123–24 (9th
Cir. 2000).  If defendant meets this burden,
plaintiffs must then raise a triable issue of
material fact as to whether the defendant's
proffered reasons for their terminations are mere
pretext for unlawful discrimination.  Noyes, 488
F.3d at 1168; see also Coleman v. Quaker Oats Co.,
232 F.3d 1271, 1282 (9th Cir. 2000) (plaintiffs
must "introduce evidence sufficient to raise a
genuine issue of material fact" as to pretext).

54

To establish a prima facie case, plaintiffs "must offer evidence that 'give[s] rise to an inference of unlawful discrimination.'" Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998) (alteration in original), citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Plaintiffs may establish a prima facie case based on circumstantial evidence by showing: (1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that "similarly situated individuals outside [their] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004); see also Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155-56 (9th Cir. 2010) (some alterations in Hawn) (citation omitted). However, the Title VII plaintiff's burden in response to a motion for summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." Rashdan v. Geissberger, 764 F.3d 1179, 1183 (9th Cir. 2014). This Court has stated:

A plaintiff must demonstrate that his or her situation is similar in all material respects to that of employees who received more favorable treatment. See Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006). However, "a plaintiff is not obligated to show disparate treatment of an **identically** situated employee." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) (cited approvingly in Selig). Instead, "individuals are similarly situated when they have similar jobs and display similar conduct." Hawn v. Exec. Jet Mgmt. Inc., 615 F.3d 1151, 1160 (9th

55

> Cir. 2010) (citing <u>Vasquez v. Cnty. of Los
> Angeles</u>, 349 F.3d 634, 641 (9th Cir. 2003)
> (finding employee not similarly situated if he
> "did not engage in problematic conduct of
> comparable seriousness" to plaintiff's conduct)).

<u>Li</u>, 2017 WL 3015827, at *6 (emphasis in <u>Li</u>) (some citations omitted).

## C. **Racially Discriminatory Termination**

Plaintiffs are all Caucasians who allege they were terminated from their positions as timeshare sales executives based on their race.  Thus, the first and third elements of the prima facie case are satisfied.  Plaintiffs submitted evidence that: in the first quarter of 2014, Kelly was among the top ten sales executives at MVC-KOBC; [Kelly Decl. at ¶ 105;] when Reisinger worked at other MORI locations prior to transferring to MVC-KOBC, she had successful sales, received promotions and awards, and took on other duties, including training other sales executives and being a mentor to new sales executives; [Reisinger Decl. at ¶¶ 4-12, 18, 21-25;] Grant was periodically among the top one or two sales executives at MVC-KOBC; [Grant Depo. at 269;] and, at one point, Grant was "maybe $50" away from the required VPG to be eligible to apply for a higher sales position, [<u>id.</u> at 269].  Viewing the record in the light most favorable to Plaintiffs as the non-moving parties,[28] this Court finds that

---

[28] "We review a grant of summary judgment de novo and must determine, viewing the facts in the light most favorable to the
(continued...)

Plaintiffs were qualified for their positions as sales executives.

The official reason for each Plaintiff's termination was the receipt of three written warnings in the proceeding twelve-months.  <u>See</u> Kelly Depo., Exh. 15 (Disciplinary Action Form, dated 5/7/14), Exh. 16 (2014 Flight Plan at Page 3 of 26 (describing "performance management/progressive discipline sequence")); Reisinger Depo., Exh. 28 (Disciplinary Action Form, dated 4/25/14); Grant Depo., Exh. 30 (letter and Disciplinary Action Form, dated 4/28/14).  Plaintiffs each had at least one written warning for sub-standard VPG.  [Kelly Depo., Exh. 12 (Disciplinary Action Form, dated 9/5/13); Reisinger Depo., Exh. 26 (Disciplinary Action Form, dated 4/4/14); Grant Depo., Exh. 25 (Disciplinary Action Form, dated 4/28/14).]  For each Plaintiff, had he or she not received a written warning for sub-standard VPG, he or she would not have had three written warnings in the twelve months prior to the date of their termination.  Kelly states that, based on the sales data posted near the sales executives' break room, there were many periods when Hong Vuong had sub-standard sales.  According to Kelly, he did not receive written warnings when he should have been.

---

[28] (...continued)
nonmoving party, whether there are any genuine issues of material fact."  <u>Crowley v. Bannister</u>, 734 F.3d 967, 976 (9th Cir. 2013) (citations and quotation marks omitted).

[Kelly Decl. at ¶ 154.]  Viewing the record in the light most
favorable to Plaintiffs, this Court finds that Plaintiffs have
established that at least one non-Caucasian employee was treated
more favorably than they were and, had Plaintiffs received the
same treatment, they would not have been eligible for termination
under the 2014 Flight Plan.  Thus, for purposes of the instant
Motions, Plaintiffs have identified sufficient evidence to
establish their prima facie case.

MORI has "articulate[d] some legitimate,
nondiscriminatory reason for" the termination of each Plaintiff,
see Hawn, 615 F.3d at 1155, i.e. the receipt of three written
warnings within a twelve month period discussed supra.  Thus, the
burden shifts back to Plaintiffs to raise a triable issue of fact
as to pretext.  See id.

Plaintiffs have presented evidence that, on April 9,
2014, Mr. Her stated, "[i]t's a matter of time before we get rid
of all the haole people."  [Reisinger Kelly Decl. at ¶¶ 107-08;
Grant Kelly Decl. at ¶¶ 232-34.]  Within a month of this
statement, each Plaintiff received notice of his or her
suspension pending separation.  Although it was Mr. Grigaitis who
ultimately made all of the termination decisions, [Grigaitis
Kelly Decl. at ¶ 11,] Mr. Her was Plaintiffs' immediate
supervisor, and he signed Kelly's and Reisinger's notices of
suspension pending separation.  [Kelly Depo., Exh. 15; Reisinger

Depo., Exh. 28.]  Mr. Grigaitis signed Grant's notice of
suspension pending separation, [Grant Depo., Exh. 30,] but
Mr. Her signed other written warnings that were presented to
Grant after the "matter of time" statement.  [Id., Exh. 23
(Disciplinary Action Form, dated 4/19/14), Exh. 24 (Disciplinary
Action Form, dated 4/14/14).]  The evidence that Hong Vuong did
not receive written warnings for sub-standard VPG when he should
have also supports Plaintiffs' position that the purported reason
for their terminations was pretextual.

     In addition, as to Reisinger, she states that, after it
was given to her, the December 10, 2013 verbal warning was
altered with a hand-written note to state that it was a written
warning.  She did not see the hand-written note until her
deposition, although she found out about the change when she
received her April 12, 2014 written warning.  She recognized the
hand-writing on the December 10, 2013 warning as Mr. Her's.
[Reisinger Decl. at ¶¶ 111-12.]  The December 10, 2013 written
warning was used as one of the three warnings that her
termination was based upon.  [Reisinger Depo., Exh. 28.]  The
possible manipulation of the verbal warning so that it could be
used to as a basis for her termination supports Reisinger's
position regarding pretext.  As to Grant, Mr. Her issued Grant's
April 14, 2014 written warning for attendance, [Grant Depo.,
Exh. 24] even though Grant told Mr. Her that he had permission

from Ms. Shumack for one of the call-offs cited in the warning. [Grant CSOF, Decl. of Andrew Grant ("Grant Decl.") at ¶¶ 5-6.] The fact that Mr. Her apparently ignored Ms. Shumack's approval of one of Grant's call-offs so that Grant had enough call-offs to warrant a written warning supports Grant's position regarding pretext.

The evidence suggesting the manipulation of tour assignments to favor certain sales executives and to place Caucasian sales executives at a disadvantage also supports Plaintiffs' position. Plaintiffs have presented evidence that MVC-KOBC staff believed certain characteristics of a guest were reliable indicators of how easy or difficult it would be for the executive to sell the customer a timeshare. [Kelly Decl. at ¶ 26.] The front desk employees, all of whom are non-Caucasian, would use these characteristics to predict which customers were likely to buy a timeshare, and they would assign the favored sales executives to those tours. [Id. at ¶¶ 44-45.] Grant also testified that Mr. Her said Grant could not get more of the good tours because Grant's "'skin [wa]s the wrong color.'" [Grant Kelly Decl. at ¶¶ 344-45.] Plaintiffs also present the testimony of another Caucasian former MVC-KOBC sales executive that, when he asked why he was assigned so many bad tours, Ms. Chamizo – the front desk manager – responded: "'Sucks to be Haole.'" [Brevart Decl. at ¶¶ 6-7.] Plaintiffs do not allege they were denied

tours completely, and they do not allege the predictive factors the front desk employees relied upon in the assignment were always correct.  Further, some of the statements they rely upon are open to interpretation.  However, the evidence as a whole – viewed in the light most favorable to Plaintiffs – suggests that they were at a disadvantage in potential sales because of their race, and could allow a reasonable jury to find that MORI's reason for Plaintiffs' termination was a pretext for race discrimination.  See California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003) ("A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").  Thus, there are genuine issues of material fact that preclude summary judgment in favor of MORI on the issue of pretext.  The Kelly Motion, the Reisinger Motion, and the Grant Motion are denied, to the extent that MORI seeks summary judgment as to Plaintiffs' claims in Count I alleging they were terminated based upon their race, in violation of Title VII.

> **D.    Racially Hostile Work Environment**

The Court next turns to Kelly's and Grant's Title VII claims alleging that they were subjected to a racially hostile work environment.  The Court makes no findings or conclusions regarding the merits of Reisinger's Title VII hostile work environment claim because it has been dismissed based on her voluntarily withdrawal.  See supra Discussion Section I.

The Ninth Circuit has stated:

> To establish a prima facie case [for a Title VII hostile work environment claim, the plaintiff] must be able to show that, because of her race or sex, she was subjected to unwelcome conduct that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." <u>Fuller v. Idaho Dep't of Corr.</u>, 865 F.3d 1154, 1161 (9th Cir. 2017) (internal quotation marks omitted). The work environment must be both subjectively and objectively perceived as abusive. <u>Id.</u> We consider all circumstances, with a particular focus on issues such as the frequency and severity of the conduct, whether the conduct was physically threatening or humiliating, and the extent to which it unreasonably interfered with [the plaintiff]'s work performance. <u>Id.</u> She must also be able to show that the [defendant] itself is "liable for the harassment that caused the hostile environment to exist." <u>Freitag v. Ayers</u>, 468 F.3d 528, 539 (9th Cir. 2006).

<u>Campbell v. Hawaii Dep't of Educ.</u>, 892 F.3d 1005, 1016–17 (9th Cir. 2018) (some alterations in <u>Campbell</u>). "In assessing whether certain conduct is objectively hostile, the Court must examine the totality of circumstances and determine whether a reasonable person would perceive the workplace as hostile." <u>U.S. E.E.O.C. v. Glob. Horizons, Inc.</u>, 904 F. Supp. 2d 1074, 1085 (D. Hawai`i 2012) (citing <u>Craig v. M & O Agencies, Inc.</u>, 496 F.3d 1047, 1055 (9th Cir. 2007)).

> The necessary showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. <u>Ellison v. Brady</u>, 924 F.2d 872, 878 (9th Cir. 1991). . . . It is enough that the hostile conduct pollutes the victim's workplace, making it more difficult for the victim to do his or her job, to take pride in the work, and to want

62

to stay in the position.  See Vanhorn v. Hana
Grp., Inc., 979 F. Supp. 2d 1083, 1097 (D. Haw.
2013).

Silverstein v. Carter, No. 15-00097 SOM/KJM, 2016 WL 4256944, at

*20 (D. Hawai`i Aug. 11, 2016).

In addition to the evidence discussed *supra* regarding

the alleged racial discrimination in the tour assignments,

Plaintiffs present evidence that the term haole was used at

MVC-KOBC in a negative manner on a daily basis, including to

exclude Caucasians or to characterize Caucasians as stupid.

[Kelly Decl. at ¶¶ 38-39.]  The sales executives would also make

jokes about how haoles were rude and did not understand local

culture.  [Kelly Depo. at 152.]  Derogatory comments were also

frequently made about Indians and African Americans.  For

example, Be Vuong would make comments about African Americans

raping women, [Kelly Decl. at ¶ 36,] and when a new hire, who was

African American, said he went by "KK," Be Vuong told him: "'Oh

yeah, well I go by KKK' and did a Hitler salute."  [Reisinger

Decl. at ¶¶ 104-06.]  Although Plaintiffs are neither African

American nor Indian, the derogatory comments about Caucasians

must be considered in the context of the derogatory comments

about African Americans and Indians because they show a general

hostility toward certain races.  Further, Mr. Her, Plaintiffs'

supervisor, participated in the frequent racial comments and was

present when other sales executives would make such comments

63

during sales meetings.  See, e.g., Kelly Decl. at ¶¶ 34-36, 188, 190, 194.

Kelly and Grant subjectively found the racial comments offensive.  [Kelly Decl. at ¶ 196; Grant Kelly Decl. at ¶ 309 (describing the racial comments as "demeaning").]  As to the issue of whether the environment at MVC-KOBC was objectively abusive, it is true that Title VII is not a "general civility code."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Id. (internal quotation marks and citation omitted).  Viewing the evidence in the light most favorable to Plaintiffs, based on their testimony about the pervasiveness about the racially derogatory comments, considered in the context of the racially motivated tour manipulation, there is a genuine issue of material fact for trial as to whether the environment at MVC-KOBC was objectively abusive.

MORI, however, argues that, even if there was a racially hostile work environment, it was created by Plaintiffs' co-workers, and MORI is not liable based on the affirmative defense established in Faragher, 524 U.S. at 807-08, Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998), and their progeny.  "Where an employee is allegedly harassed by co-workers,

the employer may be liable if it knows or should know of the harassment but fails to take steps reasonably calculated to end the harassment." Dawson v. Entek Int'l, 630 F.3d 928, 937-38 (9th Cir. 2011) (citation and quotation marks omitted).  However,

> The Ellerth/Faragher defense provides that an employer may avoid liability if (1) it exercised reasonable care to prevent and correct promptly any discriminatory behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid them. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). . . .  [T]he Ellerth/Faragher defense is an affirmative defense such that Defendant, not Plaintiff, has the burden of establishing its application.  See Swinton v. Potomac Corp., 270 F.3d 794, 804 (9th Cir. 2001).

McNeill v. Kaiser Found. Hosps., Civil No. 11-00679 JMS/BMK, 2012 WL 3904310, at *4 (D. Hawai`i Sept. 6, 2012).  Even informal complaints to the employer can be considered as the plaintiff's attempt to take advantage of the employer's preventive or corrective programs.  Passantino v. Johnson & Johnson Consumer Prod., Inc., 212 F.3d 493, 506 (9th Cir. 2000).

As previously noted, MORI has a GFT process, including a hotline and the availability of appeals.  [MORI's Kelly CSOF at ¶ 9; Kelly CSOF at ¶ 9.]  Kelly does not recall ever using the hotline to report the offensive comments, [MORI's Kelly CSOF at ¶ 8; Kelly CSOF at ¶ 8,] and there is no evidence Kelly made informal complaints about the conduct that is the basis of her hostile work environment claim.  Thus, even viewing the record in

the light most favorable to her, Kelly failed to take advantage
of MORI's preventive/corrective processes.  In contrast, Grant
made complaints to both HR and to Mr. Grigaitis.  From 2009 to
2014, Grant raised several concerns about improper tour
assignments to Mr. Grigaitis, some of which were addressed, and
others not.  [MORI's Grant CSOF at ¶ 23; Grant CSOF at pg. 1.]
In addition, Grant made reports about, *inter alia*: the incident
with Mr. Denigris; the reprimand of an Asian front desk employee
for being nice to Grant; [MORI's Grant CSOF at ¶ 21; Grant CSOF
at pg. 1;] the fact that his incentive payment was delayed, while
another Asian sales executive's payment was not; and receiving
"'looks' . . . from certain associates" and the "'stink eye'"
from Mr. Her.  [MORI's Grant CSOF at ¶ 24; Grant CSOF at pg. 1.]
Finally, in April 2014 Grant utilized the GFT process to
challenge his written warnings.  [Grant Decl. at ¶ 16; Grant
Depo. at 213-14, 219-20, 222-23.]  Thus, Grant took advantage of
MORI's preventive/corrective processes.

        The fact that Kelly did not do so is not necessarily
fatal to her hostile work environment claim.  Plaintiffs have
presented the declaration of another Caucasian female who
formerly worked for MVC-KOBC as a timeshare sales executive.  She
experienced the "racial tension" there and the preferential
treatment of Be Vuong, Mr. Quach, and Mr. Wong.  [Kelly CSOF,
Decl. of Andrea Dunn ("Dunn Decl.") at ¶¶ 3-4, 6-7.]  She

confronted Be Vuong about calling her "haole," and she told him
she was going to HR, but he told her that, if she did, it would
not be the first time a complaint by a Caucasian employee was not
documented. She reported the incident to HR and the MORI GFT
hotline, but nothing happened. [Id. at ¶¶ 8-12.] Plaintiffs
have also presented Reisinger's testimony that, near the end of
her employment, she made a report to "Lesley Matsukawa, of the
Human Resources Department,[29] that [she] felt [she] was being
discriminated against because [she] was Caucasian and that [she]
felt like [she] was being picked on racially." [Reisinger Decl.
at ¶ 117.] This evidence is relevant to the issue of whether
Kelly's failure to use MORI's preventive/corrective processes was
unreasonable. Kelly has stated that the sales executives felt
they could not make complaints about Be Vuong's actions because
he was protected by Mr. Her; and such complaints could ultimately
cost them their jobs. [Kelly Decl. at ¶¶ 58-59.] She also
states she felt she "could not say something about what was going
on." [Id. at ¶ 200.] Viewing the evidence in the light most
favorable to Kelly, there is a genuine issue of material fact as
to whether her failure to use MORI's preventive/corrective
processes was unreasonable. The evidence regarding other
complaints to HR is also relevant to the issue of whether MORI

---

[29] This presumably refers to Lesley Matsuwaki, the MVC-KOBC
HR Manager at the time. [Matsuwaki Reisinger Decl. at ¶ 1.]

"exercised reasonable care to prevent and correct promptly any
. . . harassing behavior." See Faragher, 524 U.S. at 807.

In addition, the fact that Grant, Reisinger, and other
Caucasian sales executives made various types of reports alleging
discrimination against Caucasians raises a triable issue of fact
as to MORI's notice and whether the preventive/corrective
processes it had in place were reasonable. Thus, there are
genuine issues of material fact that preclude summary judgment as
to MORI's Faragher/Ellerth affirmative defense, and as to Kelly's
and Grant's Title VII hostile work environment claims as a whole.
The Kelly Motion and the Grant Motion are denied as to the
portion of Count I alleging Kelly's and Grant's Title VII claim
alleging a racially hostile work environment.

### E.   Kelly's Sex-Based Claims

Kelly has asserted that, during all of her monthly
reviews, Mr. Her commented about her attire and advised her to
smile more, be more girlie or feminine, and be more friendly.
[MORI's Kelly CSOF at ¶ 13; Kelly CSOF at ¶ 13; Kelly Decl. at
¶ 205.] When Kelly would make sales, Mr. Her would effectively
state that she must have followed his advice. Unidentified sales
executives would: make jokes about Mr. Her's comments to Kelly;
and tell Kelly she should dress more provocatively. An
unidentified person stated Kelly was flat chested. [MORI's Kelly
CSOF at ¶¶ 13-14; Kelly CSOF at ¶¶ 13-14.] Mr. Her apparently

made the comments about Kelly's sales during morning meetings, in front of their entire team. [Kelly Decl. at ¶ 208.] Kelly states: "I often felt Mr. Her would hold it against me as if I was purposely trying to challenge his authority because I tried to dress professionally." [Id. at ¶ 207.] However, she does not explain how Mr. Her "would hold it against" her, and she does not present any evidence that Mr. Her's advice that she wear dresses necessarily meant that she should dress unprofessionally or provocatively. It is merely Kelly's interpretation that, when Mr. Her said she must have worn a dress the day she made a sale, he was "insinuating that being more provocative improved [her] sales." [Id. at ¶ 209.]

### 1. **Termination**

Plaintiff is a woman who alleges she was terminated from her position based on her sex. Further, as discussed *supra*, viewing the record in the light most favorable to Kelly, she was qualified for her position. Thus, the first, second, and third factors of the McDonnell Douglas analysis are met. Kelly has identified one male (Hong Vuong) who was not issued written warnings for poor sales. Viewing the record in the light most favorable to Kelly, she has established that: there is at least one male employee who was treated more favorably than she was; and, if she had been treated the same as Hong Vuong, she would not have been eligible for termination under the 2014 Flight

Plan.  Thus, Kelly has identified sufficient evidence to establish her prima facie case of sex-based discrimination in her termination.

For the same reason set forth in the analysis of Plaintiffs' claims alleging race-based discrimination in their termination, MORI has identified a legitimate reason for Kelly's termination that is not based on her sex.  Thus, Kelly has the burden of raising a triable issue of fact as to pretext.

The sex-based comments summarized above, even when viewed in the light most favorable to Kelly, do not raise a genuine issue of fact as to pretext.  None of the comments related to her termination.  Plaintiffs have all taken the position that the preferential tour assignments impaired their ability to make sales, which put them at risk of receiving written warnings for sub-standard VPG.  Although there is enough evidence to raise a triable issue of fact as to whether the preferential tour assignments were racially motivated, there is not enough evidence to raise a triable issue of fact as to whether the preferential tour assignments were sexually motivated.  The evidence before the Court, even when viewed in the light most favorable to Kelly, suggests that the preferential assignments were primarily intended to impair the Caucasian sales executives, regardless of whether they were male or female.  There is no evidence to suggest that non-Caucasian females were

among the primary targets of the preferential assignment system. Further, Kelly has not presented any evidence that the sex-based comments made about her impaired her ability to make sales or otherwise contributed to the written warnings that were used to justify her termination. Kelly has therefore failed to raise a triable issue of fact as to pretext.

MORI is entitled to judgment as a matter of law as to Kelly's Title VII claim alleging sex-based discrimination in her termination. The Kelly Motion is granted, and summary judgment is granted in favor of MORI as to that portion of Count I.

### 2. <u>Sexually Hostile Work Environment</u>

> A plaintiff may establish a sex hostile work environment claim by showing that he was subjected to verbal or physical harassment that was sexual in nature, that the harassment was unwelcome and that the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. <u>See</u> <u>Gregory v. Widnall</u>, 153 F.3d 1071, 1074 (9th Cir. 1998). A plaintiff must establish that the conduct at issue was both objectively and subjectively offensive: he must show that a reasonable person would find the work environment to be "hostile or abusive," and that he in fact did perceive it to be so. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). . . .

<u>Dawson</u>, 630 F.3d at 937-38.

The comments that Kelly was subjected to, as summarized above, were based on her sex. They were also unwelcome and subjectively offensive to her. <u>See</u> Kelly Decl. at ¶ 205 (stating Kelly "had to hold herself back" and "put a false smile on" when

Mr. Her would make those comments), ¶ 208 (stating the comments

Mr. Her made in the morning meetings "were shocking to" Kelly),

¶ 210 (Kelly found all of the comments "deeply offensive").

However, even viewed cumulatively[30] and in the light most

favorable to Kelly, the comments were merely "simple teasing[

and] offhand comments" that did "not amount to discriminatory

changes in the terms and conditions of employment." See

Faragher, 524 U.S. at 788 (internal quotation marks and citation

omitted). No reasonable juror could find that the comments, even

"in the kind, number, frequency, and persistence described by

[Kelly], create a hostile environment." See Zetwick, 850 F.3d at

444;[31] compare Fuller v. Idaho Dep't of Corr., 865 F.3d 1154,

1163 (9th Cir. 2017) (holding that "repeated endorsements of [a

coworker who raped the plaintiff] were not 'simple teasing,

offhand comments, and isolated incidents,' or ordinary workplace

---

[30] "[I]t is not possible to determine whether the environment was 'hostile or abusive' without considering **the cumulative effect of the conduct at issue** to determine whether it was sufficiently 'severe or pervasive' to alter the conditions of the workplace." Zetwick v. Cty. of Yolo, 850 F.3d 436, 444 (9th Cir. 2017) (emphasis in Zetwick) (citation omitted).

[31] In Zetwick, the Ninth Circuit held that summary judgment was not appropriate because a reasonable juror could find in the plaintiff's favor, based on the plaintiff's testimony that the county sheriff, who was in charge of correctional officers, including plaintiff, "hugged her more than one hundred times over the period from 1999 to 2012, that he hugged female employees much more often than male employees and, indeed, from [the plaintiff]'s observations, he hugged female employees exclusively." 850 F.3d at 439, 443.

interactions" (quoting <u>Faragher</u>, 524 U.S. at 788, 118 S. Ct. 2275)), *cert. denied sub nom.* <u>Idaho Dep't of Correction v. Fuller</u>, 138 S. Ct. 1345 (2018).

Plaintiff has failed to raise a triable issue of material fact as to her Title VII claim alleging a sexually hostile work environment. The Kelly Motion is granted, and summary judgment is granted in favor of MORI as to that portion of Count I.

### F. Grant's Retaliation Claim

Under Title VII, it is unlawful for an employer to retaliate against an employee who has asserted his or her rights under Title VII. <u>See</u> 42 U.S.C. § 2000e-3(a). To make a prima facie retaliation claim under Title VII, a plaintiff must show that "(1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1093-94 (9th Cir. 2008) (citation omitted). The degree of proof necessary to oppose a motion for summary judgment by establishing a prima facie case of retaliation is "minimal." <u>See</u> <u>Cordovo v. State Farm Ins. Cos.</u>, 124 F.3d 1145, 1148 (9th Cir. 1997) (citations and quotation marks omitted).

> Protected activity includes the filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to

> "oppose[]" an employer's discriminatory practices.
> 42 U.S.C. § 2000e-3(a). "That an employer's
> actions were caused by an employee's engagement in
> protected activities may be inferred from
> 'proximity in time between the protected action
> and the allegedly retaliatory employment
> decision.'" Ray v. Henderson, 217 F.3d 1234, 1244
> (9th Cir. 2000) (quoting Yartzoff v. Thomas, 809
> F.2d 1371, 1371 (9th Cir. 1987)). In addition,
> the plaintiff must make some showing sufficient
> for a reasonable trier of fact to infer that the
> defendant was aware that the plaintiff had engaged
> in protected activity. See Cohen v. Fred Meyer,
> Inc., 686 F.2d 793, 796 (9th Cir. 1982).

Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197

(9th Cir. 2003) (alteration in Raad). As to the third element, a

plaintiff must show that the "unlawful retaliation would not have

occurred in the absence of the alleged wrongful action or actions

of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570

U.S. 338, 360 (2013). In other words, a plaintiff must show that

his protected activity was "a but-for cause" of the adverse

employment action. Id. at 362.

Once the plaintiff has made his prima facie case of

retaliation, the burden shifts to the defendant to establish a

nondiscriminatory reason for its decision under the McDonnell

Douglas burden-shifting analysis. See Villiarimo v. Aloha Island

Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).

Grant generally asserts that his "unequal treatment and

termination on May 2, 2014 were . . . in retaliation for

complaints about discrimination." [Grant Opp. at 3.] However,

Grant neither identifies what specific activities he engaged in

that constitute protected activity for purposes of a Title VII retaliation claim, nor does he make any argument as to how these purportedly protected activities were "a but-for cause" of the adverse employment actions.  See Nassar, 570 U.S. at 362.  At best, the Court takes Grant's last complaint to Mr. Grigaitis in January 2014 regarding the improper tour assignments as the closest purportedly "protected activity" prior to Grant's suspension pending termination on April 28, 2014.  This still leaves a time lapse of over three months between the protected activity and the adverse employment action, which fails to suggest that Grant's termination "follow[ed] on the heels of [his] protected activity."  See Villiarimo, 281 F.3d at 1065. With regard to timing, courts have not identified a "'bright line' rule providing that any particular period is always too long or always short enough to support an inference."  See Jindasa v. Brigham Young Univ.-Haw., CIVIL NO. 14-00441 SOM/KJM, 2016 WL 6645767, *14 (D. Hawai`i Nov. 9, 2016) (citing Coszalter v. City of Salem, 320 F.3d 968, 977-78 (9th Cir. 2003)).  Still, the United States Supreme Court cited with approval cases holding that a three-month lapse between the protected activity and the adverse employment does not support an inference of causation. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing Richmond v. Oneok, Inc., 120 F.3d 205, 209 (CA10 1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d

1168, 1174-1175 (CA7 1992) (4-month period insufficient)). Thus, the Court does not infer a causal connection between Grant's alleged protected activity and either his suspension pending termination or his ultimate termination. Further, Grant has not identified any direct evidence that his January 2014 report regarding improper tour assignments was "a but-for cause" of his termination.

Because Grant has not established his prima facie case, this Court need not address the <u>McDonnell Douglas</u> burden-shifting analysis. Accordingly, the Grant Motion is granted insofar as summary judgment is granted in favor of MORI as to the portion of Count I alleging Grant's Title VII retaliation claim.

## IV.  <u>Grant's Haw. Rev. Stat. § 378-2 Claims</u>

### A.  <u>Racially Discriminatory Termination</u>

It is unlawful to, "[b]ecause of race, sex including gender identity or expression, sexual orientation, age, religion, color, [or] ancestry, . . . to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment." § 378-2(a)(1)(A). In interpreting § 378-2, the Hawai`i Supreme Court has looked "to interpretations of analogous federal laws by the federal courts for guidance," and has, in some instances, adopted the same test for a § 378-2 claim as the test used by federal courts for the

similar Title VII claim.  _Schefke v. Reliable Collection Agency,
Ltd._, 96 Hawai`i 408, 425-26, 32 P.3d 52, 69-70 (2001) (adopting
test for retaliation claim) (citations omitted); _see also Jackson
v. Foodland Super Market, Ltd._, 958 F. Supp. 2d 1133, 1139
(D. Hawai`i 2013) ("A claim of discrimination under HRS
Chapter 378 is governed by the same test used by the federal
courts in Title VII cases." (citing _Schefke v. Reliable
Collection Agency, Ltd._, 96 Hawai`i 408, 32 P.3d 52, 69-70
(2001))).  However, the Hawai`i courts do not always find federal
case law persuasive, especially where the Hawai`i statute has
relevant differences from the corresponding federal statute.  _See
Shoppe v. Gucci Am., Inc._, 94 Hawai`i 368, 377, 14 P.3d 1049,
1059 (2000) (citing _Furukawa v. Honolulu Zoological Soc'y_, 85
Hawai`i 7, 13, 936 P.2d 643, 649 (1997)).

A plaintiff may establish his prima facie case for her
§ 378-2 discrimination claim "by producing either direct or
circumstantial evidence demonstrating that a discriminatory
reason more likely than not motivated the defendant."  _Jackson_,
958 F. Supp. 2d at 1139 (citing _McGinest v. GTE Serv. Corp_, 360
F.3d 1103, 1122 (9th Cir. 2004)).  In the alternative, a
plaintiff may proceed under the same _McDonnell Douglas_ burden-
shifting analysis used by federal courts in Title VII claims.
_Id._; _see also Furukawa_, 85 Hawai`i at 12-13, 936 P.2d at 648-649.

Grant contends there is direct evidence of race-based discrimination and the Court need not apply the McDonnell Douglas analysis.  This Court disagrees and concludes that the McDonnell Douglas framework is the appropriate analysis in this case.  For the same reasons set forth *supra* Discussion Section III.C. regarding Plaintiffs' Title VII claim alleging racially discriminatory termination: Grant has established a prima facie case for his § 378-2(a)(1)(A) claim alleging racially discriminatory termination; MORI has articulated a legitimate, nondiscriminatory reason for Grant's termination; and there are triable issues of material fact as to pretext.  The Grant Motion is therefore denied as to Grant's § 378-2 claim alleging racially discriminatory termination.

B.    **Hostile Work Environment**

When analyzing hostile work environment claims under § 378-2, Hawai`i courts consider factors that are similar to those considered in the analysis of a Title VII hostile work environment claim.  See Henao v. Wyndham Vacations Resorts, Inc., 927 F. Supp. 2d 978, 989 (D. Hawai`i 2013) (citing Nelson v. Univ. of Hawaii, 97 Hawai`i 376, 390, 38 P.3d 95, 109 (2001)).  However, the Hawai`i Supreme Court has stated that,

> in contrast to federal courts, this court's analysis of whether particular harassing conduct was "severe and pervasive" is separate and distinct from the remaining requirements of a plaintiff's claim: "it is the **harasser's conduct** which must be severe or pervasive, 'not its effect

> on the plaintiff or on the work environment.'"
> [Nelson, 97 Hawai`i at 390, 38 P.3d at 109]
> (quoting Hurley v. Atlantic City Police Dept., 174
> F.3d 95, 115 (3d Cir. 1999)).[32]  A finding that
> specific conduct was "severe or pervasive" does
> not require a finding that "the conduct had the
> purpose or effect of either: (a) unreasonably
> interfering with the claimant's work performance,
> or (b) creating an intimidating, hostile, or
> offensive work environment[.]"  Nelson at 390, 38
> P.3d at 109 (emphases omitted from original).

Arquero v. Hilton Hawaiian Vill. LLC, 104 Hawai`i 423, 431, 91

P.3d 505, 513 (2004) (emphasis in Arquero).  "[T]he 'severe or

pervasive' requirement reflects a general concern that an

employer not be held liable for trivial conduct."  Nelson, 97

Hawai`i at 390, 38 P.3d at 109 (citing Faragher, 524 U.S. at 788,

118 S. Ct. 2275).  Once a plaintiff proves that he is the victim

of a hostile work environment, the employer can nonetheless

"avoid liability by demonstrating that it took 'immediate and

appropriate corrective action' that was 'reasonably calculated to

prevent future harassment.'"  Arquero, 104 Hawai`i at 429, 91

P.3d at 511 (some citations omitted) (quoting Haw. Admin. R.

§ 12-46-109(d)) (citing McGinest v. GTE Serv. Corp., 360 F.3d

1103, 1103, 1120 (9th Cir. 2004)).

Based on the evidence discussed *supra* Discussion

Section III.D. regarding Kelly's and Grant's Title VII claims

alleging a racially hostile work environment, Grant has presented

---

[32] Hurley has been abrogated on other grounds.  See Nance v.
City of Newark, 501 F. App'x 123, 129 n.7 (3d Cir. 2012) (citing
Potente v. Cty. of Hudson, 900 A.2d 787, 794 (N.J. 2006)).

sufficient evidence to raise genuine issues of fact for trial as to: the elements of his § 378-2 claim alleging a racially hostile work environment; and MORI's defense that "it took immediate and appropriate corrective action that was reasonably calculated to prevent future harassment." See Arquero, 104 Hawai`i at 429, 91 P.3d at 511. This Court has considered the differences in the legal standards applicable to Title VII hostile work environment claims and similar claims under § 378-2, but this Court concludes the differences do not compel a different result in this case. The Grant Motion is therefore denied as to Grant's § 378-2 claim alleging a racially hostile work environment.[33]

## V.   **HWPA Claims**

HWPA provides, in pertinent part:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1)  The employee . . . reports or is about to report to the employer, or reports or is

---

[33] It is not clear from the Second Amended Complaint whether Grant's § 378-2 claims in Count II include a retaliation claim pursuant to § 378-2(a)(2), and neither party addressed the issue of what specific claims are alleged in Count II. Based upon its reading of the Second Amended Complaint as a whole, this Court does not interpret Count II as asserting a § 378-2(a)(2) retaliation claim as to Grant. However, to the extent Count II could be interpreted as alleging a § 378-2(a)(2) retaliation claim, this Court would grant summary judgment in favor of MORI as to Grant's § 378-2(a)(2) retaliation claim, for the same reasons set forth *supra* as to Grant's Title VII retaliation claim and *infra* as to his HWPA claim.

about to report to a public body, verbally or
in writing, a violation or a suspected
violation of:

       (A)  A law, rule, ordinance, or
       regulation, adopted pursuant to law of
       this State, a political subdivision of
       this State, or the United States[.]

Haw. Rev. Stat. § 378-62(1)(A).  This district court has
recognized that:

> To establish a prima facie claim under the
> HWPA, [the plaintiff] must prove that (1) he
> engaged in a protected activity, (2) he was
> subjected to an adverse employment action, and
> (3) the adverse employment action resulted because
> of his participation in the protected activity.
> See Cambron v. Starwood Vacation Ownership, Inc.,
> 945 F. Supp. 2d 1133, 1143 (D. Haw. 2013); Griffin
> v. JTSI, Inc., 654 F. Supp. 2d 1122, 1130-32 (D.
> Haw. 2008) (citing Crosby v. State Dep't of Budget
> & Fin., 76 Hawai`i 332, 876 P.2d 1300, 1310
> (1994)). . . .

Henao v. Hilton Grand Vacations Co., CIVIL NO. 16-00646 DKW-RLP,
2017 WL 4479253, at *7 (D. Hawai`i Oct. 6, 2017).

In analyzing whether the defendant took the challenged
action because of the employee's protected activity – i.e.
whether there is "a causal connection between the alleged
retaliation and the 'whistleblowing'" – the Hawai`i Supreme Court
has looked to HWPA's legislative history, which "indicates that
the legislature intended that the required burden of proof be
similar to that utilized in traditional labor management
relations discharge cases."  Crosby, 76 Hawai`i at 342, 876 P.2d
at 1310.  The supreme court noted:

81

Under the National Labor Relations Act, as amended, 29 U.S.C. §§ 151-168 (1988), an employee has the burden of showing that his or her protected conduct was a "substantial or motivating factor" in the decision to terminate the employee.

In reviewing an initial draft of the HWPA, the House Standing Committee reported:

> the bill imposes the burden of proof on the employee and also establishes a higher standard of proof than normally applied in civil cases. Under existing custom and practice in labor management relations discharge cases, the burden of proof is placed on the employer. Accordingly, your Committee amended the bill to remove subsection (d) of section -3, thereby maintaining the existing custom and practice of placing the burden of proof on the employer in discharge cases.

Hse. Stand. Comm. Rep. No. 25, in 1987 House Journal, at 1090. We note, however, that an aggrieved employee always retains the ultimate burden of proof in a retaliatory discharge case. Sonicraft, Inc. v. NLRB, 905 F.2d 146, 150 (7th Cir. 1990), *cert. denied*, 498 U.S. 1024, 111 S. Ct. 671, 112 L. Ed. 2d 664 (1991). The legislature must have been referring to the corresponding rule that "the burden of negating causation is on the employer." Id. Once the employee shows that the employer's disapproval of his [protected activity] played a role in the employer's action against him or her, "[t]he employer can defend affirmatively by showing that the termination would have occurred regardless of the protected activity." NLRB v. Howard Elec. Co., 873 F.2d 1287, 1290 (9th Cir. 1989) (citing NLRB v. Transportation Management Corp., 462 U.S. 393, 401-03, 103 S. Ct. 2469, 2474, 76 L. Ed. 2d 667 (1983)).[34] "In other words, the employer has an affirmative defense (no causation), as to

_____

[34] Transportation Management was abrogated on other grounds by Director, Office of Workers' Compensation Programs, Department of Labor v. Greenwich Collieries, 512 U.S. 267, 276-78 (1994).

> which of course he bears the burden of persuasion, but so far as the main case is concerned the burden of persuasion never shifts." <u>Sonicraft</u>, 905 F.2d at 150.

<u>Id.</u> (some alterations in <u>Crosby</u>) (footnote and some citations omitted).

### A. **Reisinger**

MORI argues it is entitled to summary judgment as to Reisinger's HWPA claim because: 1) Reisinger's claim is an improper attempt to raise an unexhausted Title VII claim; 2) even if Reisinger's HWPA claim is not considered to be a Title VII retaliation claim, it is still subject to an exhaustion requirement; and 3) there is insufficient evidence in the record for Reisinger's HWPA claim to survive summary judgment.

As to MORI's first argument, this Court notes that Title VII prohibits an employer from retaliating against any employee who "has opposed any practice made an unlawful employment practice by this subchapter, [*i.e.* Title VII,] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3. In contrast, HWPA is more broad, prohibiting retaliation against an employee who reports, or is about to report, a violation, or suspected violation, of any "law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States." § 378-62(1)(A). Thus, while

83

retaliation for a report to an employer regarding a suspected Title VII violation could be actionable as either a Title VII retaliation claim or a HWPA claim, HWPA also protects employees from retaliation for many other types of protected activity that would not be protected by Title VII.

MORI's second argument raises related concerns. This district court has previously noted:

> Requiring a WPA[35] plaintiff to go to the HCRC to exhaust administrative remedies prevents a plaintiff who has failed to exhaust a retaliation claim under [Haw. Rev. Stat. §] 378-2(2)[36] from escaping that failure by simply redesignating his retaliation claim as one under the WPA and filing it in court without ever going to the HCRC.
>
> The court nevertheless recognizes that requiring exhaustion for a WPA claim raises some troubling issues. First, no statute expressly requires a WPA claim to be exhausted. Section 368-11(a) of Hawaii Revised Statutes gives the HCRC jurisdiction over claims of discrimination asserted under part I of chapter 378, which includes sections 378-1 to 378-10. Section 368-11(c) requires a complaint of discrimination under section 378-2 to be filed with the HCRC within 180 days of the unlawful discriminatory practice or the last occurrence in a pattern of ongoing discrimination. The WPA is

---

[35] The district court in that case referred to the HWPA as the "WPA." <u>Lalau v. City & Cty. of Honolulu</u>, 938 F. Supp. 2d 1000, 1020 (D. Hawai`i 2013).

[36] In referring to the prohibition on retaliation as § 378-2(2), the district court was discussing a prior decision, <u>Linville v. Hawai`i</u>, 874 F. Supp. 1095 (D. Hawai`i 1994). <u>Lalau</u>, 938 F. Supp. 2d at 1020. Since January 1, 2012, the prohibition against retaliation has been codified at Haw. Rev. Stat. § 378-2(a)(2). 2011 Haw. Sess. Laws Act 206, § 2 at 676, § 5 at 678.

in section 378-62, which is part of part V of chapter 378. No statutory language gives the HCRC jurisdiction over claims brought under section 378-62 or any other part of part V. It is unclear what statutory language could be read to make section 368-11(c)'s exhaustion requirements applicable to the WPA.

There is, in addition, a practical problem with reading an exhaustion requirement into the WPA. The WPA protects all whistleblowers, not just whistleblowers asserting violations of employment discrimination laws. The HCRC's jurisdiction and expertise relate to employment discrimination, not to all laws that might be the subject of whistleblowing. For example, an employee fired for blowing the whistle on an employer's illegal dumping of hazardous waste would have a claim far outside the HCRC's normal areas of concern. The same could be said with respect to an employee who was suspended after reporting that an employer was concealing taxable income. It is hard to see the rationale for requiring exhaustion with the HCRC not only of claims relating to violations of part I of chapter 378, including section 378-2, but also of whistleblower claims unrelated to the forms of discrimination listed in part I.

The court's concern is not alleviated even if [the defendant] is assuming that the exhaustion requirement is limited to WPA claims that implicate a section 378-2 category. Admittedly, such WPA claims would mirror retaliation claims falling under section 378-2(2), which would have to be exhausted. However, limiting WPA exhaustion to claims relating to section 378-2 issues would require even more interpolation with respect to existing statutory language. The court would not only have to read into Hawaii Revised Statutes an exhaustion requirement for WPA claims, it would have to then create exceptions to that implied requirement. Every WPA claim would then have to be dissected to determine whether exhaustion was or was not required.

<u>Lalau</u>, 938 F. Supp. 2d at 1020-21.  The district court in <u>Lalau</u>
ultimately did not decide the issue of whether there is an
exhaustion requirement for a HWPA claim because the HWPA claim in
that case was untimely.  <u>Id.</u> at 1021.  This Court agrees with the
analysis and legal reasoning in <u>Lalau</u> and adopts them in the
instant case.

MORI's first argument essentially asks this Court to
rule that a HWPA claim based on facts that could also support a
Title VII claim is subject to the Title VII exhaustion
requirement.  This would require the same type of strained
reading of HWPA discussed in <u>Lalau</u>.  This Court predicts the
Hawai`i Supreme Court would hold[37] that HWPA claims are not
subject to the exhaustion requirement for either a Title VII
claim or a § 378-2 claim, even when the facts giving rise to the
HWPA claim could have supported a retaliation claim under either
Title VII or § 378-2(a)(2).  This Court therefore rejects MORI's
exhaustion arguments regarding Reisinger's claim.

Reisinger engaged in protected activity by making a
report to Ms. Matsuwaki in February or March 2014 about the
alleged racial discrimination in the tour assignments.  <u>See</u>

---

[37] "In the absence of a governing state decision, a federal
court attempts to predict how the highest state court would
decide the issue."  <u>Galima v. Ass'n of Apartment Owners of Palm
Court</u>, CIVIL 16-00023 LEK-KSC, 2017 WL 1240181, at *5 (D. Hawai`i
Mar. 30, 2017) (some citations omitted) (citing <u>Trishan Air, Inc.
v. Fed. Ins. Co.</u>, 635 F.3d 422, 427 (9th Cir. 2011)).

Reisinger Decl. at ¶¶ 56, 100.  Reisinger also reported to
Ms. Matsuwaki that she was being discriminated against and picked
on because she was Caucasian.  She made this report "[n]ear the
end of [her] employment with MORI."  [Id. at ¶ 117.]  In
addition, throughout her employment, Reisinger made numerous
complaints about Be Vuong's preferential treatment and that he
"was acting like a 'bully'."  [Id. at ¶ 116.]  It is unclear
whether these complaints about Be Vuong constituted reports of a
violation of federal, state, or local "law, rule, ordinance, or
regulation," see § 378-62(1)(A), or merely reports of violations
of MORI policy.  However, even without considering the complaints
about Be Vuong, Reisinger's complaints to Ms. Matsuwaki in 2014,
when viewed in the light most favorable to Reisinger, are
sufficient to satisfy the first element of Reisinger's prima
facie case for her HWPA claim.  Reisinger's termination satisfies
the second element.

　　　　To make a prima facie showing of a causal connection,
i.e. that the plaintiff's protected activity was "a substantial
or motivating factor" in the adverse employment action,

> "a plaintiff can introduce evidence regarding the
> 'proximity in time between the protected action
> and the allegedly retaliatory employment
> decision,' from which a 'jury logically could
> infer' [the connection]." Griffin [v. JTSI,
> Inc.], 654 F. Supp. 2d [1122,] 1132 [(D. Hawai`i
> 2008)] (quoting Coszalter v. City of Salem, 320
> F.3d 968, 977 (9th Cir. 2003)).  That is,
> "[although] an employee may always present direct
> evidence of motive, proximity in time is one type

of circumstantial evidence that is sufficient on
its own to meet the plaintiff's burden." <u>Id.</u>
(citation omitted).

<u>Taqupa v. VIPdesk, Inc.</u>, 125 F. Supp. 3d 1108, 1120 (D. Hawai`i

2015) (some alterations in <u>Taqupa</u>).  In light of the proximity of

Reisinger's complaints to Ms. Matsuwaki and her termination, a

reasonable jury could infer that she was terminated because of

her complaints.  For purposes of the Reisinger Motion, Reisinger

has established her prima facie case for her HWPA claim.

Further, in light of the evidence discussed *supra* regarding the

alleged racial discrimination in the tour assignments and the

allegedly hostile environment toward Caucasian sales executives

in general, there are genuine issues of material fact as to

MORI's affirmative defense that Reisinger's termination would

have occurred for legitimate reasons, regardless of her protected

activity.

MORI's Reisinger Motion is therefore denied as to the

portion of Count III alleging Reisinger's HWPA claim.

B.    **<u>Kelly</u>**

As to Kelly's HWPA claim, MORI raises the same two

exhaustion arguments it raised in the Reisinger Motion, and MORI

also argues there is insufficient evidence in the record for

Kelly's HWPA claim to survive summary judgment.  It is not

necessary for this Court to reach the exhaustion arguments as to

Kelly because she has failed to identify evidence establishing the required elements of her HWPA claim.

First, it is not clear from the Second Amended Complaint what protected activity Kelly based her HWPA claim on in the first instance. MORI emphasizes that Kelly has admitted she neither reported discrimination to HR nor utilized the GFT process to report discrimination. [Mem. in Supp. of Kelly Motion at 33-34 (citing Kelly Depo. at 29, 85, 87, 98, 122-24, 158).] Kelly has admitted

> she raised certain concerns with her supervisors,
> Xee Her and Melinda Chastain, within six months of
> her re-hire in March 2012. [Kelly] talked to
> Mr. Her about B. Vuong getting tours out of the
> proper rotation, and getting away with things like
> disrespecting management, buying lunch for front
> desk employees, and having special computer access
> to information on guests who were touring.
> [Kelly] told Mr. Her that B. Vuong buying lunch
> for the front desk was inappropriate and was part
> of the reason he got special treatment.

[MORI's Kelly CSOF at ¶ 7; Kelly CSOF at ¶ 7.] MORI argues: "These reports, at most, describe possible violations of company polices, not violations of a federal, state or local 'law, rule, ordinance, or regulation,'" and therefore the reports do not constitute protected activity for purposes of a HWPA claim. [Mem. in Supp. of Kelly Motion at 34.] Kelly did not respond to this argument, nor to any of MORI's arguments about her HWPA claim. Thus, Kelly has not identified any evidence which would support a finding that her complaints about Be Vuong were reports

89

of a possible violation of a local, state, or federal "law, rule, ordinance, or regulation."

This Court therefore finds that, even viewing the evidence in the light most favorable to Kelly, there are no genuine issues of material fact, and Kelly's complaints in 2012 about Be Vuong do not constitute protected activity for purposes of a HWPA claim. Further, even viewing the evidence in the light most favorable to Kelly, she has not identified evidence of other actions that may constitute protected activity for purposes of her HWPA claim. This Court therefore concludes that Kelly has failed to establish the first element of her prima facie case for her HWPA claim. Because Kelly has not established the first element, this Court need not address either the remaining elements of her prima facie case or MORI's affirmative defense.

The Kelly Motion is granted insofar as summary judgment is granted in favor of MORI as to Kelly's HWPA claim in Count III.

C.  **Grant**

In the Grant Motion, MORI argues it is entitled to summary judgment as to Grant's HWPA claim because Grant cannot establish that he engaged in protected activity and, even if can establish protected activity, he cannot establish a causal connection. Grant used MORI's GFT process in 2012 to report the incident when Mr. Denigris allegedly assaulted him and in 2014 to

contest his written warnings, which he alleges were discriminatory. [Grant Depo. at 81-83, 213-14, 219-20, 222-23.] These uses of the GFT process constitute protected activity under HWPA. Grant's termination satisfies the second element of his prima facie case.

However, the 2012 report is too far removed from his termination to infer a causal connection through temporal proximity. Further, even when the record is viewed in the light most favorable to Grant, there is no evidence to suggest that the 2012 report was a factor in any decision that was part of the process that resulted in Grant's termination.

Grant contacted the GFT hotline on April 24, 2014. [Grant Depo. at 213.] This is sufficiently close to his May 2, 2014 termination that it could support an inference of a causal connection. However, MORI has presented evidence that Grant's termination would have occurred regardless of Grant's alleged protected activity because he received three written warnings within a twelve-month period. None of the written warnings could have been motivated by a desire to retaliate against Grant for initiating the GFT process because all of the warnings were issued before he called the GFT hotline. Further, as stated previously with regard to Grant's Title VII retaliation claim, Grant has not identified any evidence which suggests that a causal connection exists between his initiation of the GFT

process and the ultimate decision to terminate him after his suspension pending investigation for termination. This Court therefore finds that, even construing the evidence in the light most favorable to Grant, there are no genuine issues of material fact, and Grant's HWPA claim fails as a matter of law.

The Grant Motion is granted insofar as summary judgment is granted in favor of MORI as to Grant's HWPA claim in Count III.

## CONCLUSION

On the basis of the foregoing, MORI's Motion for Summary Judgment as to All of Plaintiff Sandra Denise Kelly's Claims, filed April 20, 2018; MORI's Motion for Summary Judgment as to All of Plaintiff Robin Reisinger's Claims, also filed April 20, 2018; and MORI's Motion for Summary Judgment as to All of Plaintiff Andrew Grant's Claims, filed May 11, 2018, are HEREBY GRANTED IN PART AND DENIED IN PART.

The Kelly Motion is GRANTED as to: 1) the portions of Count I alleging Kelly's Title VII sex-based claims; 2) all of Kelly's claims in Count II; and 3) Kelly's HWPA claim in Count III. The Kelly Motion is DENIED as to the portions of Count I alleging Kelly's Title VII race-based claims.

The Reisinger Motion is GRANTED as to Reisinger's claims in Count II, and it is DENIED as to Reisinger's claims in Counts I and III. The denial of the Reisinger Motion as to her

hostile work environment claim in Count I is based on mootness because Reisinger voluntarily dismissed that claim. Thus, Reisinger's only Count I claim remaining for trial is her claim alleging racially discriminatory termination.

The Grant Motion is GRANTED as to the portion of Count I alleging Grant's Title VII retaliation claim and Grant's HWPA claim in Count III. The Grant Motion is DENIED as to Grant's race-based claims in Count I and all of Grant's claims in Count II. This Court emphasizes that it does not construe Grant's claims in Count II as including a retaliation claim under Haw. Rev. Stat. § 378-2(a)(2).

If any party files a motion for reconsideration of this Order, the motion for reconsideration will not affect the trial date or any deadline in this case, unless any party obtains a continuance from this Court.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, November 21, 2018.



    /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**ANDREW GRANT, ET AL. VS. MARRIOTT OWNERSHIP RESORTS, INC., ET AL;
CIVIL 16-00451 LEK-RLP; ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**